Tomo Shibata
2306 Capitol Ave. Apt. 2
Sacramento, CA 95816
Telephone: (916)620-0921
Fax: (916)668-7065
Email: revival@hush.com
*Plaintiff*



**FILED**

JUN 0 9 2017

CLERK, U.S. DISTRICT COURT
EASTERN DISTRICT OF CALIFORNIA
BY _____
DEPUTY CLERK

## UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF CALIFORNIA

Tomo Shibata,

      Plaintiff,

  v.

G4S Secure Solutions (USA) Inc. et al.,

      Defendants.

No.     **2:1 7 - CV - 1 2 0 8 TLN AC PS**

**NOTICE OF INITIAL *EX PARTE* MOTION TO EXTEND THE TIME TO FILE PLAINTIFF'S COMPLAINT PERSUANT TO F.R.C.P. §6(b)(1)(A) AND L.R. 144(c)**

**PLEASE TAKE NOTICE** that upon Plaintiff Tomo Shibata's Affidavit dated June 9, 2017, Plaintiff Tomo Shibata's Memorandum of Law in Support of this Initial *Ex Parte* Motion to Extend the Time to File Plaintiff's Complaint dated June 9, 2017, and all submissions related to the facts and circumstances discussed therein, Plaintiff will move this Court, Robert T. Matsui Federal Courthouse, 501 I Street, Room 4-200, Sacramento, CA, 95814 for an order to extend the time to file Plaintiff's Complaint till September 8, 2017 pursuant to the Federal Rules of Civil Procedure 6(b)(1)(A) and U.S. the District Court for the Eastern District of California Local Rules 144(c), in order to reasonably accommodate Plaintiff Tomo Shibata's disabilities, difficulties and interferences resulting

from her ongoing victimization of organized torture and organized surveillance

harassment committed by some of the Defendants named in this action and her prior

parental child incestuous abuse victimization, as per Judicial Conference Policy.


Dated: Sacramento, California


June 9th, 2017


By: _____

Tomo Shibata, Plaintiff

Tomo Shibata
2306 Capitol Ave. Apt. 2
Sacramento, CA 95816
Telephone: (916)620-0921
Fax: (916)668-7065
Email: revival@hush.com
*Plaintiff*

## UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| | No. |
| Tomo Shibata, | |
| Plaintiff, | **PLAINTIFF'S AFFIDAVIT IN SUPPORT OF** |
| | **PLAINTIFF'S INITIAL EXPARTE MOTION** |
| v. | **TO EXTEND THE TIME TO FILE** |
| G4S Secure Solutions (USA) Inc. et al., | **PLAINTIFF'S COMPLAINT PERSUANT TO** |
| Defendants. | **F.R.C.P. §6(b)(1)(A) AND L.R. 144(c)** |

Plaintiff Tomo Shibata, being duly sworn says:

Plaintiff's Initial Ex Parte Motion to Extend Time to File Plaintiff's Complaint that my affidavit herein supports is the first, initial motion as to the matter for which the extension is sought.

I cannot reasonably receive any of a stipulation to extend the time to file my complaint from any of the Defendants because any of the Defendants have not been served with the complaint or summons, yet.

**The Necessary Grounds for the Extension**:

## I.  Reasonably Accommodating Plaintiff's Permanent Disability Caused by Child Incestuous Abuse Victimization

Plaintiff Tomo Shibata is a survivor of child incestuous abuse committed by her own father. Exhibit 1: the Affidavit of Hiroya Shibata (Plaintiff requests the Court to make this affidavit accessible to the public). Please see PLAINTIFF'S MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFF'S INITIAL *EX PARTE* MOTION TO EXTEND THE TIME TO FILE PLAINTIFF'S COMPLAINT PERSUANT TO F.R.C.P. §6(b)(1)(A) AND L.R. 144(c) for the detail interdisciplinary legal argument.

## II.  Ongoing Torture Victimization

TOMO SHIBATA, THE INVISIBLE MAIMING TORTURE ENTERPRISE OF ORGANIZED STALKING ASSAULTS (2012) details my testimony as to how my organized torture started and has developed. Even at this moment I write this Affidavit, I have been tortured with and debilitated by "electronic weapons," defined as a "devise or weapon from which an electrical current, impulse, wave or beam may be directed, which current, impulse, wave or beam is designed to incapacitate temporarily, injure or kill" in Massachusetts State's Act Relative to the Possession of Electronic Weapons. As to the further detail of electronic weapons, please see the attached Exhibit 2, Rania Khalek, *6 Creepy New Weapons the Police and Military Use To Subdue Unarmed People*, ALTERNET, Jan. 5, 2015.

I have been tortured not only with electronic weapons, but also with other clandestine means that inflict injuries invisible to the naked human eye, such as non-lethal poisoning on a daily basis. Such electronic weapons are deployed in conjunction with radars that can see through walls in order to accurately aim at my head and other bodily parts behind walls for the

purpose of torture and incapacitation. Please see Exhibit 3, Michael Casey, *Police radars that can see through walls worry privacy advocates*, CBS NEWS, Jan. 20, 2015. Please see Exhibit 4, Tomo Shibata, *Legislative Proposal: Organized Torture Act*, my analytic report on organized torture, including a legislative bill proposal to the California State Legislature.

Organized torturers use organized stalking in order to keep the victim under surveillance and control. Please see Exhibit 5, the affidavit of Ted Gunderson, a former Chief Inspector General from the FBI Headquarters, who witnessed organized surveillance harassment and organized torture that come into being through structural corruption within law enforcement, some of whom are named Defendants in this action of Plaintiff. Exhibit 6, Rahul Manchanda, *The Surreptitious Reincarnation of COINTELPRO with the COPS Gang-Stalking Program,* MODERN DIPLOMACY, Aug. 22, 2016.

## III. Defendant G4S' Ongoing Interference with Plaintiff's Act of Commencing a Lawsuit against Defendant Cornell

Defendant G4S has the recent history of security-contracting with Defendant Cornell University, with whom Plaintiff has an employment dispute.[1] Exhibit 7. Further, G4S is a prime contractor of the Department of Homeland Security's Fusion Center, which works closely with local criminal law enforcement and other local first responders across the United States by having branches across the U.S. (including a branch near Ithaca, NY, and a branch in Sacramento, CA) and in around 125 countries with 618,000 employees, specialized in the organized surveillance of a person while grossly intruding upon such a person's civil liberties.

---

[1] See PLAINTIFF'S MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFF'S INITIAL *EX PARTE* MOTION TO EXTEND THE TIME TO FILE PLAINTIFF'S COMPLAINT PERSUANT TO F.R.C.P. §6(b)(1)(A) AND L.R. 144(c).

Exhibit 8. G4S has been using the constant surveillance harassment of Plaintiff, who poses the threat of a lawsuit against the University, as a secret means to contract with Defendant Cornell University, thereby expanding security sales. Because of the secret nature of the contract, no student activist organization would oppose to such a security contract.

As a part of such a security contracting with Defendant Cornell, Defendant G4S has been most plausibly prompting attorneys, whom I seek representation, to give me wrongful legal information in order to discourage me from Defendant Cornell and/or not to represent me. For example, Plaintiff reached out to Attorney Evonne Opoku from a well established non-profit organization vindicating the rights of people with disabilities, Disability Rights New York, and talked over the phone concerning Plaintiff's disability discrimination complaint dismissed by the Tompkins County Human Rights Commission. After reading Plaintiff's email sent on 1/9/2015, which refers to the previous phone conversation on the dismissed discrimination complaint, Attorney Opoku stressed, in her 1/12/2015 email to Plaintiff, Plaintiff's options available to complain against Cornell were all already time-barred. Exhibit 9. Attorney Giovanna D'Orazio, a private attorney at the time named in the Super Lawyer or Rising Star list in the area relevant to my claim, stressed, in a manner strikingly similar to that of Attorney Opoku, that Plaintiff's claim was already time-barred without probing into the possibility of equitable tolling in her email sent to Plaintiff on 1/15/2015. Exhibit 10. These attorneys' categorically discouraging treatment of Plaintiff rendered Plaintiff helpless about finding attorneys to represent Plaintiff.

Defendant G4S has been most plausibly prompting attorneys to implant a pejorative preconception about me in the minds of attorneys who would otherwise represent me. As a result, for example, every single attorney on the Northern California Civil Rights Super Lawyer List refused to represent me in 2016. See Exhibit 11: The Annotated Lists of Attorneys Plaintiff

AFFIDAVIT TO EXTEND TIME TO FILE COMPLAINT

Requested Representation, and Exhibit 12: Rejection Letters Plaintiff Received from Attorneys. Therefore, I have no choice but to proceed *pro se* in this constitutional civil rights action against numerous Defendants represented by their attorneys with significantly superior experiences, skills and knowledge, by studying relevant laws on my own, which has been requiring the overwhelming amount of time to prepare for the lawsuit.

Tomo Shibata, Plaintiff

Sworn and subscribed to before me on this 9th day of June, 2017

Notary Public

**CALIFORNIA JURAT WITH AFFIANT STATEMENT**          **GOVERNMENT CODE § 8202**

☑ See Attached Document (Notary to cross out lines 1–6 below)
☐ See Statement Below (Lines 1–6 to be completed only by document signer[s], *not* Notary)

1. _____

2. _____

3. _____

4. _____

5. _____

6. _____

*Signature of Document Signer No. 1*          *Signature of Document Signer No. 2 (if any)*

---

A notary public or other officer completing this certificate verifies only the identity of the individual who signed the document to which this certificate is attached, and not the truthfulness, accuracy, or validity of that document.

---

State of California
County of Sacramento

Subscribed and sworn to (or affirmed) before me

on this 9th day of June, 20 17,
          *Date*          *Month*          *Year*

by

(1) Tomo Shibata

(and (2)_____ ),
          *Name(s) of Signer(s)*

proved to me on the basis of satisfactory evidence to be the person(s) who appeared before me.

Signature _____

*Signature of Notary Public*

CHRISTOPHER L. GERBITZ
Commission # 2142820
Notary Public - California
Sacramento County
My Comm. Expires Feb 15, 2020

*Seal*
*Place Notary Seal Above*

━━━━━━━━━━━━━━━━━━ **OPTIONAL** ━━━━━━━━━━━━━━━━━━

*Though this section is optional, completing this information can deter alteration of the document or fraudulent reattachment of this form to an unintended document.*

**Description of Attached Document**

Title or Type of Document: AFFIDAVIT TO EXTEND TIME TO FILE COMPLAINT Document Date: 6/09/2017

Number of Pages: 5 Signer(s) Other Than Named Above: _____

©2014 National Notary Association • www.NationalNotary.org • 1-800-US NOTARY (1-800-876-6827)   Item #5910

EXHIBIT 1: AFFIDAVIT OF HIROYA SHIBATA

City of Tokyo )   ss:

Embassy of the United States of America )

## AFFIDAVIT

Before the undersigned personally appeared Hiroya SHIBATA who, being duly sworn, deposes and says:

Tomo Shibata was born to my ex-wife and me in 1974. When Tomo was eleven years old, I asked my ex-wife about any change in my growing daughter's body. My ex-wife said, "I do not know." I thought she was not interested in Tomo's growth. Then, I simply hoped to find out how much Tomo' s breast developed and touched her breast. Tomo screamed, "Ugh,what are you doing!" So I removed my hand. At the time, I did not think that Tomo would suffer from my act.

When Tomo was sixteen years old, she learnt a word, "sexual abuse." She then recognized my act of touching her breast at the age eleven as sexual abuse. She suddenly asked me to apologize to her. I apologized to her.

When she turned seventeen years old, Tomo left to the United States and later became a student at Cornell University. When she came back to Japan during summer and winter breaks, she asked me to leave the house. So I rented a room somewhere else while she came back.

In 2004, Tomo filed a civil lawsuit against me at Kyoto District Court. I testified that I regretted that I had touched her breast. I also testified that I was only trying to find out her growth and did not have any sexual interest.

The district court judgment says that my act of touching Tomo's breast lacked consideration for Tomo's feelings and self-esteem and cannot be justified. However, the judgment says, my act did not have any sexual interest and does not go beyond the limit of what is socially accepted. Tomo appealed to Osaka Appellant Court and finally to the Supreme Court. These courts dismissed her appeals.

In Japanese society, a father's act of touching his growing daughter's breast happens frequently. Thus, I was not found guilty. However, I would be found guilty in the United States. I realize that my thoughtless act of touching Tomo's breast when she was eleven affected her later life very much. I regret my act deeply.

And further deponent saith not.

_Hiroya Shibata_
Signature

Subscribed and sworn to before me on **JUL -2** 2013 .

Consul of the United States of America at Tokyo, Japan

holding an indefinite commission

Helena Passos
Consular Associate

EXHIBIT 2



SEARCH

  ◄

**HUMAN RIGHTS**

# 6 Creepy New Weapons the Police and Military Use To Subdue Unarmed People

*From chemical agents to deafening sonic blasters, these weapons are at the cutting edge of crowd control.*

By *Rania Khalek* / **AlterNet**     *January 5, 2015*

1.4K                                                    9 COMMENTS

The U.S. is at the forefront of an international arms development effort that includes a remarkable assortment of technologies, which look and sound like they belong in a Hollywood science fiction thriller. From microwave energy blasters and blinding laser beams, to chemical agents and deafening sonic blasters, these weapons are at the cutting edge of crowd control. Recently, we've seen many of them deployed on the streets of Ferguson, Missouri and New York City to disperse those protesting police brutality.

The Pentagon's approved term for these weapons is "non-lethal" or "less-lethal" and they are intended for use against the unarmed. Designed to "control crowds, clear streets, subdue and restrain individuals and secure borders," they are the 21st century's version of the police baton, pepper spray and tear gas. As journalist Ando Arike puts it, "The result is what appears to be the first arms race in which the opponent is the general population."

Today's rapid advancements in media and telecommunications technologies allow people to record and publicize images and video of undue force more than ever before. Authorities are well aware of how images of violence play out publicly. In 1997, a joint report from the Pentagon and the Justice Department warned:

> A further consideration that affects how the military and law enforcement apply force is the greater presence of members of the media or other civilians who are observing, if not recording, the situation. Even the lawful application of force can be misrepresented

to or misunderstood by the public. More than ever, the police and the military must be highly discreet when applying force.

Meanwhile, tens of millions of dollars have been invested in the research and development of more "media-friendly" weapons for everyday policing and crowd control. This has lead to a trade-in of old school weapons for more exotic and controversial technologies. The following are six of the most outrageous "non-lethal" weapons that will define the future of crowd control.

### 1. The Invisible Pain Ray: The 'Holy Grail of Crowd Control'

*Source: Pasadena Star News*

It sounds like a weapon out of *Star Wars*. The Active Denial System, or ADS, works like an open-air microwave oven, projecting a focused beam of electromagnetic radiation to heat the skin of its targets to 130 degrees. This creates an intolerable burning sensation forcing those in its path to instinctively flee (a response the Air Force dubs the "goodbye effect").

The Pentagon's Joint Non-Lethal Weapons Program (JNLWP) says, "This capability will add to the ability to stop, deter and turn back an advancing adversary, providing an alternative to lethal force." Although ADS is described as non-lethal, a 2008 report by physicist and less-lethal weapons expert Dr. Jürgen Altmann suggests otherwise:

"... the ADS provides the technical possibility to produce burns of second and third degree. Because the beam of diameter 2 m and above is wider than human size, such burns would occur over considerable parts of the body, up to 50% of its surface. Second- and third-degree burns covering more than 20% of the body surface are potentially life-threatening – due to toxic tissue-decay products and increased sensitivity to infection – and require intensive care in a specialized unit. Without a technical device that reliably prevents re-triggering on the same target subject, the ADS has a potential to produce permanent injury or death. "

The weapon was initially tested in Afghanistan, but later recalled due to a combination of technical difficulties and political concerns, including the fear that ADS would be used as a torture tool making it "not politically tenable," according to a Defense Science Board report. The tens of millions of dollars spent to develop the ADS did not necessarily go to waste, however.

While the weapon may be too controversial for use on the battlefield, it appears that nothing is too sadistic for use on US prisoners, so the ADS has since been modified into a smaller version by Raytheon, for use in law

enforcement. Last year, the renamed Assault Intervention System (AIS) was installed at the Pitchess Detention Center's North County Correction Facility at the behest of the Los Angeles County Sheriff's Department (LASD). Former LASD Commander, Charles "Sid" Heal had been lobbying for the pain ray for years, calling it the "Holy Grail of Crowd Control," due to "its ability to make people scatter, almost instantly."

The device is operated by a jail officer with a joystick, and is intended to break up prison riots, inmate brawls and prevent assaults on officers. Sheriff Lee Baca added that it would allow officers to "quickly intervene" without having to physically enter the area to incapacitate prisoners.

The ACLU claims that use of such a device on American prisoners is "tantamount to torture." The organization even sent a letter to the sheriff in charge, demanding he never use the energy weapon against inmates. "The idea that a military weapon designed to cause intolerable pain should be used against county jail inmates is staggeringly wrongheaded," said Margaret Winter, associate director of the ACLU National Prison Project. "Unnecessarily inflicting severe pain and taking such unnecessary risks with people's lives is a clear violation of the Eighth Amendment and due process clause of the U.S. Constitution."

The pain ray's use in the Pitchess Detention Center is a pilot program. If successful, the weapon could find its way into other prisons around the country. The National Institute of Justice has also expressed interest in a hand-held, rifle-sized, short-range weapon "that could be effective at tens of feet for law enforcement officials."

Trump Prophet Speaks Out

**Man who predicted Trump victory makes next shocking prediction**
moneywise411.com

## 2. The Laser Blinding 'Dazzler'

*Source: Air Force Fact Sheet*
The Personal Halting and Stimulation Response rifle, or PHaSR, is a massive laser shooter. PHaSR technology is being co-funded by the National Institute of Justice (NIJ), Joint Non-Lethal Weapons Program (JNLWP), and the Office of the Secretary of Defense, and is being developed by the Air Force Research Laboratory. While JNLWP is interested in the technology for military applications, NIJ is focusing on its law enforcement use.

So what is the purpose of this light-shooting toy? Well, it won't kill you, but it will temporarily blind you — or as the NIJ prefers to say, it will "dazzle" you into disorientation — by shooting you with two low-power diode-pumped lasers.

Protocol IV, the Blinding Laser Protocol of the United Nations Convention on Conventional Weapons, states that, "The use of laser weapons that are specifically designed, as their sole combat function or as one of their combat functions, to cause permanent blindness to unenhanced vision is prohibited."

After the US agreed to the Blinding Laser Protocol in 1995 under President Clinton, the Pentagon was forced to cancel several blinding laser weapon programs that were in the works. But the PHaSR rifle can skirt this regulation because the blinding effect is apparently temporary due to its low-intensity laser.

According to a U.S. Air Force fact sheet, "The laser light from PHaSR temporarily impairs aggressors by dazzling them with one wavelength. The second wavelength causes a repel effect that discourages advancing aggressors." The JNLWP website says that "a significant amount of research and experimentation is still required to gain a full understanding of the safety, military effectiveness, and limitations of these future capabilities."

### 3. The Taser on Steroids

*Source: Taser website*
The Albuquerque Police Department now has Taser shotguns in its arsenal. Most of us are familiar with hand-held Tasers and understand that they only work if the police are standing pretty close to you (about 20 feet).

But Taser has developed the Taser X12, a 12-gauge shotgun that instead of firing lethal bullet rounds, is designed to fire Taser projectile rounds. Known as Extended Range Electronic Projectiles (XREP), the XREP cartridge, as defined by the Taser website, is a "self-contained, wireless projectile that delivers the same neuro-muscular incapacitation bio-effect [a fancy way of saying electric shock] as the handheld Taser, but up to 100 feet."

Taser International has taken the XREP to the next level, teaming up with the Australian electronic gun company Metal Storm to enhance the 12-gauge Multi-Shot Accessory Under-Barrel Launcher (MAUL).

The two companies will combine Metal Storm's MAUL stacked projectile technology to "provide semi-automatic fire as fast as the operator can squeeze the trigger," which boasts a full weapon reload of up to five rounds in less than

two seconds. Picture five rounds of Taser XREP cartridges flying out in less than two seconds up to 30 yards away -- that is the plan.

In September 2010 Raw Story reported that the rate of Taser-related deaths were on the rise. The story cited an Amnesty International report from 2008 that found "351 Taser-related deaths in the US between June 2001 and August 2008, a rate of just slightly above four deaths per month." About 90 percent of the victims were unarmed and did not appear to pose any serious threat, according to an article in the *Boston Review*. The Amnesty report points out that Tasers are "inherently open to abuse as they are easy to carry and easy to use and they can inflict severe pain at the push of a button without leaving substantial marks." In Amnesty's *US 2010 report*, the Taser-related death toll had increased to 390. If the MAUL-Taser combined shooter find its way into police departments around the country, it may not bode well for the rate of Taser-related deaths.

Another project of Taser International described by Ando Arike is the Shockwave Area-Denial System, "which blankets a large area with electrified darts, and a wireless Taser projectile with a 100-meter range, helpful for picking off 'ringleaders' in unruly crowds." In 2007, Taser's French distributor announced plans for a stun-gun-equipped flying saucer that shoots stun darts at "criminal suspects or rioting crowds"; however, it has yet to be unveiled. Clearly there is no limit to Taser International's capacity for creativity.

### 4. Calmative Agents for Riot Control

The Sunshine Project, a transparency and accountability organization, defines calmatives as "chemical or biological agents with sedative, sleep-inducing or similar psychoactive effects." Although the 1997 Chemical Weapons Convention prohibits the use of riot control agents in warfare, JNWLP and NIJ have long considered calmatives for both military and law enforcement applications, such as dispersing a crowd, controlling a riot or calming a noncompliant offender.

The most well-known and widely used riot-control agents are tear gas (CS) and chloroacetophenone (CN), also known as mace. A few ways that more advanced non-lethal calmatives might be administered, depending on the law enforcement environment, would include "a topical or transdermal skin

application, an aerosol spray, an intramuscular dart, or a rubber bullet filled with an inhalable agent," according to NIJ research.

In the March 2010 issue of *Harper's* magazine, Ando Arike gives an extensive overview of riot control technology in his article "The Soft Kill: New Frontiers in Pain Compliance." He wrote:

> Pentagon interest in "advanced riot-control agents" has long been an open secret, but just how close we are to seeing these agents in action was revealed in 2002, when the Sunshine Project, an arms-control group based in Austin, Texas, posted on the Internet a trove of Pentagon documents uncovered through the Freedom of Information Act. Among these was a fifty-page study titled "The Advantages and Limitations of Calmatives for Use as a Non-Lethal Technique," conducted by Penn State's Applied Research Laboratory, home of the JNLWD-sponsored Institute for Non-Lethal Defense Technologies.
>
> Penn State's College of Medicine researchers agreed, contrary to accepted principles of medical ethics, that "the development and use of non-lethal calmative techniques is both achievable and desirable," and identified a large number of promising drug candidates, including benzodiazepines like Valium, serotonin-reuptake inhibitors like Prozac, and opiate derivatives like morphine, fentanyl, and carfentanyl, the last commonly used by veterinarians to sedate large animals. The only problems they saw were in developing effective delivery vehicles and regulating dosages, but these problems could be solved readily, they recommended, through strategic partnerships with the pharmaceutical industry.

Trump Prophet Speaks Out

Man who predicted Trump victory makes next shocking prediction
moneywise411.com

> Little more was heard about the Pentagon's "advanced riot-control agent" program until July 2008, when the Army announced that production was scheduled for its XM1063 "non-lethal personal suppression projectile," an artillery shell that bursts in midair over its target, scattering 152 canisters over a 100,000-square-foot area, each dispersing a chemical agent as it

parachutes down. There are many indications that a calmative, such as fentanyl, is the intended payload—a literal opiate of the masses.

## 5. Screaming Microwaves That Pierce the Skull

*Source: Wired*

Researchers are in the process of developing the Mob Excess Deterrent Using Silent Audio or MEDUSA (that's right, from Greek mythology), which uses "a beam of microwaves to induce uncomfortable auditory sensations in the skull." The device "exploits the microwave audio effect, in which short microwave pulses rapidly heat tissue, causing a shockwave inside the skull that can be detected by the ears," explains David Hambling in the New Scientist. MEDUSA's audio effect is loud enough to cause discomfort or even incapacitation. It may also cause a little brain damage from the high-intensity shockwave created by the microwave pulse.

MEDUSA's intended purpose is deterring crowds from entering a protected perimeter, like a nuclear site, and temporarily incapacitating unruly individuals. So far the weapon remains in development and is funded by the Navy.

## 6. Ear-Splitting Siren

*Source: Associated Press*

The Long Range Acoustic Device, or LRAD, developed by American Technology Corporation, "focuses and broadcasts sound over ranges of up to hundreds of yards," according to David Axe in Wired's Danger Room. LRAD has been around for years, but Americans first took notice when police used it in Pittsburgh to ward off protesters at the 2009 G-20 summit. David Hambling says it is generally used in two ways: "as a megaphone to order protesters to disperse; or, if they disobey, as an "ear-splitting siren" to drive them away." While LRAD may not be deadly, it can cause permanent hearing damage.

Similar sonic blasters have proven deadly. One is the Thunder Generator, an Israeli-developed shock wave cannon that farmers commonly use to scare away crop destroying birds. According to a *Defense News* report last year, Israel's Ministry of Defense licensed ArmyTec to market the Thunder Generator in military and security versions.

In a brief overview, Hambling explains that it works using "gas from a cylinder of domestic liquid petroleum," which is mixed with air. When detonated it produces "a series of high-intensity blasts," at a range of 50 meters." While the makers insist it doesn't cause permanent damage, they warn that people within 10 meters could suffer lasting injuries or possibly death.

**The Impact**

The application of pain to control to coerce people into submission helps achieve the desired aims of perception management, while sheltering the public from the brutality of such devices.

Perhaps these less-lethal tactics for crowd control do result in fewer injuries. But they also severely weaken our capacity to enact political change. Authorities have ever more creative ways to manage dissent, at a time when the need for change by popular demand is vital to the future of our society and the planet.

*Rania Khalek is an independent journalist living in the Washington D.C. area.*

SHARE ON FACEBOOK                  SHARE ON TWITTER

REPORT TYPOS AND CORRECTIONS TO: CORRECTIONS@ALTERNET.ORG

**9 COMMENTS**

**Sign Up!** | *Get AlterNet's Daily Newsletter in Your Inbox*

EMAIL:                    SUBSCRIBE    + sign up for additional lists

# LATEST VIDEOS

0:34                        0:40

EXHIBIT 3

# New police radars can 'see' inside homes

**Brad Heath** , USA TODAY    Published 6:26 p.m. ET Jan. 19, 2015 | Updated 1:27 p.m. ET Jan. 20, 2015

*At least 50 U.S. law enforcement agencies quietly deployed radars that let them effectively see inside homes, with little notice to the courts or the public.*



*(Photo: L3 Communications)*

WASHINGTON — At least 50 U.S. law enforcement agencies have secretly equipped their officers with radar devices that allow them to effectively peer through the walls of houses to see whether anyone is inside, a practice raising new concerns about the extent of government surveillance.

Those agencies, including the FBI and the U.S. Marshals Service, began deploying the radar systems more than two years ago with little notice to the courts and no public disclosure of when or how they would be used. The technology raises legal and privacy issues because the U.S. Supreme Court has said officers generally cannot use high-tech sensors to tell them about the inside of a person's house without first obtaining a search warrant.

The radars work like finely tuned motion detectors, using radio waves to zero in on movements as slight as human breathing from a distance of more than 50 feet. They can detect whether anyone is inside of a house, where they are and whether they are moving.

Current and former federal officials say the information is critical for keeping officers safe if they need to storm buildings or rescue hostages. But privacy advocates and judges have nonetheless expressed concern about the circumstances in which law enforcement agencies may be using the radars — and the fact that they have so far done so without public scrutiny.

"The idea that the government can send signals through the wall of your house to figure out what's inside is problematic," said Christopher Soghoian, the American Civil Liberties Union's principal technologist. "Technologies that allow the police to look inside of a home are among the intrusive tools that police have."

Agents' use of the radars was largely unknown until December, when a federal appeals court in Denver said officers had used one (http://www.ca10.uscourts.gov/opinions/13/13-3329.pdf) before they entered a house to arrest a man wanted for violating his parole. The judges expressed alarm that agents had used the new technology without a search warrant, warning that "the government's warrantless use of such a powerful tool to search inside homes poses grave Fourth Amendment questions."

By then, however, the technology was hardly new. Federal contract records show the Marshals Service began buying the radars in 2012, and has so far spent at least $180,000 on them.

Justice Department spokesman Patrick Rodenbush said officials are reviewing the court's decision. He said the Marshals Service "routinely pursues and arrests violent offenders based on pre-established probable cause in arrest warrants" for serious crimes.

The device the Marshals Service and others are using, known as the Range-R, looks like a sophisticated stud-finder. Its display shows whether it has detected movement on the other side of a wall and, if so, how far away it is — but it does not show a picture of what's happening inside. The Range-R's maker, L-3 Communications, estimates it has sold about 200 devices to 50 law enforcement agencies at a cost of about $6,000 each.



Other radar devices have far more advanced capabilities (https://www.youtube.com/watch?v=bt3ecnqdUCo)   (http://savefrom.net/? url=https%3A%2F%2Fwww.youtube.url=...   where people are located inside a building, according to marketing materials from their manufacturers. One is capable of being mounted on a drone (https://www.documentcloud.org/documents/1505138-00-wallsensorreport-508.html#document/p20/a198024). And the Justice Department has funded research to develop systems that can map the interiors of buildings and locate the people within them.

The radars were first designed for use in Iraq and Afghanistan. They represent the latest example of battlefield technology finding its way home to civilian policing and bringing complex legal questions with it.

Those concerns are especially thorny when it comes to technology that lets the police "see" inside a home. The Supreme Court ruled in 2001 (http://www.law.cornell.edu/supct/html/99-8508.ZS.html) that the Constitution generally bars police from scanning the outside of a house with a thermal camera unless they have a warrant, and specifically noted that the rule would apply to radar-based systems that were then being developed.

In 2013, the court limited police's ability (http://www.law.cornell.edu/supremecourt/text/11-564) to have a drug dog sniff the outside of homes. The core of the Fourth Amendment, Justice Antonin Scalia wrote, is "the right of a man to retreat into his own home and there be free from unreasonable governmental intrusion."

Still, the radars appear to have drawn little scrutiny from state or federal courts. The federal appeals court's decision published last month was apparently the first by an appellate court to reference the technology or its implications.

That case began when a fugitive-hunting task force headed by the U.S. Marshals Service tracked a man named Steven Denson, wanted for violating his parole, to a house in Wichita. Before they forced the door open, Deputy U.S. Marshal Josh Moff testified (https://www.documentcloud.org/documents/1505139-suppression-hearing-transcript.html#document/p63/a198022), he used a Range-R to detect that someone was inside.

Moff's report (https://www.documentcloud.org/documents/1505111-d-kan-13-cr-10111-dckt-000013-001-filed-2013-08-05.html#document/p2/a198096) made no mention of the radar; it said only that officers "developed reasonable suspicion that Denson was in the residence."

Agents arrested Denson for the parole violation and charged him with illegally possessing two firearms they found inside. The agents had a warrant for Denson's arrest but did not have a search warrant. Denson's lawyer sought to have the guns charge thrown out, in part because the search began with the warrantless use of the radar device.

Three judges on the federal 10th Circuit Court of Appeals upheld (http://www.ca10.uscourts.gov/opinions/13/13-3329.pdf) the search, and Denson's conviction, on other grounds. Still, the judges wrote, they had "little doubt that the radar device deployed here will soon generate many questions for this court."

But privacy advocates said they see more immediate questions, including how judges could be surprised by technology that has been in agents' hands for at least two years. "The problem isn't that the police have this. The issue isn't the technology; the issue is always about how you use it and what the safeguards are," said Hanni Fakhoury, a lawyer for the Electronic Frontier Foundation.

The Marshals Service has faced criticism for concealing other surveillance tools. Last year, the ACLU obtained (https://www.aclu.org/sites/default/files/assets/aclu_florida_stingray_police_emails.pdf)an e-mail from a Sarasota, Fla., police sergeant asking officers from another department not to reveal that they had received information from a cellphone-monitoring tool known as a stingray. "In the past, and at the request of the U.S. Marshals, the investigative means utilized to locate the suspect have not been revealed," he wrote, suggesting that officers instead say they had received help from "a confidential source."

William Sorukas, a former supervisor of the Marshals Service's domestic investigations arm, said deputies are not instructed to conceal the agency's high-tech tools, but they also know not to advertise them. "If you disclose a technology or a method or a source, you're telling the bad guys along with everyone else," he said.

*Follow investigative reporter Brad Heath on Twitter at @bradheath (http://twitter.com/bradheath)*

Read or Share this story: http://usat.ly/1J4iPWr

EXHIBIT 4

# The Bill Proposal: The Organized Torture Act

Tomo Shibata, PhD

## I. A Report to the California State Legislature on Organized Torture

If you are a victim of or a witness to violence used as a means of subjugation for which no evidence is left other than your testimony, the author of such violence does not have to kill you in order to perfect the violent crime. Indeed, your sudden death or disappearance will naturally raise law enforcement's suspicion. Criminal organizations can provide the service of perfecting the said violent crime by making you perceived as delusional/paranoid.

The President's Commission on Law Enforcement and Administration of Justice's *The Task Force Report: Organized Crime* (1967) reports the following classic characterization of organized crime:

> Organized crime ['s]... actions are not impulsive but rather the result of intricate conspiracies, carried on over many years... What organized crime wants is money and power... Organized criminal groups participate in any illegal activity that offers maximum profit at minimum risk of law enforcement interference. They offer goods and services that millions of Americans desire even though declared illegal by their legislatures... Organized crime uses torture and murder to destroy the particular prosecution at hand.[1]

The White House's *Strategy to Combat Transnational Organized Crime* (2011) reports the recent developments of organized crime: "Criminal networks are not only expanding their operations, but also diversifying their activities... using increasingly sophisticated tactics."[2]

### 1. Organized Stalking as a Means to Control a Torture Victim

In lieu of abducting you (and your sudden disappearance thereof), transnational criminal organizations coordinate systematic stalking by a multitude of intricately conspiratorial individuals in order to seize maximum control of your life to perpetually effect and perfect clandestine torture. Former Chief Inspector at F.B.I. Headquarters (and former Senior Special Agent-In-Charge of the Los Angeles

---

[1] The President's Commission on Law Enforcement and Administration of Justice, *The Task Force Report: Organized Crime* (Washington, D.C.: U.S. Government Printing Office, 1967), 1.
[2] Barack Obama, The National Security Council, The White House, *Strategy to Combat Transnational Organized Crime: Addressing Converging Threats to National Security* (2011), v, 13 *available at* http://www.whitehouse.gov/sites/default/files/Strategy_to_Combat_Transnational_Organized_Crime_July _2011.pdf (last visited Nov. 24, 2012).

Field Office of the F.B.I.) Ted L. Gunderson deposes, in his sworn affidavit (dated 2011), the following:

> Based on my investigative work, which include intelligence from sources such as active and former members of Intelligence Services (including the F.B.I., the C.I.A. the N.S.A. and military Intelligence), information from informants active in criminal enterprises, and, victim testimonies, I have come to the conclusion that thousands of victims have been targeted by… criminal enterprise that is active 24 hours a day… Individual targeted by this program have been subjected to illegal and unconstitutional phone taps,… illegal audio "bugging", surreptitious entry into home, office, and vehicle, visual surveillance in the home conducted by illegal placement of miniature remote, wireless cameras…, illegal internet spyware, illegal GPS tracking…, regular fixed and mobile surveillance, …mail theft and tampering, financial and employment sabotage, slander campaigns and community ostracizing…, poisoning, assaults and murder, illegal set-ups on drug charges and other felony charges.[3]… [T]he aforementioned surveillance and harassment activities [are carried out] in conjunction with organized crime, the cult movement… and even misguided civic organizations and neighborhood groups.[4]

Central (West) Coast News, KION 46 (a CBS affiliate), broadcasted a case of organized gang stalking on January 29, 2011.[5] This news report included an interview with Santa Cruz Police Lieutenant Larry Richard, who stated the following:

> The Police are becoming more aware of gang stalking because of cyber bullying. Gang stalking is nothing new, but new technology is making it more common. Gang stalkers themselves have elevated themselves to technology so this is something that's been going on before Facebook or Twitter. They just now have gone into those areas.

According to a survey report on stalking issued by the Department of Justice in 2009, 6.5 percent of stalking victims (totaling 3.4 million in the U.S. during a 12-month period) responded that the number of their stalkers is *unknown*.[6] 13.1 percent responded that the number of their stalkers is three or more,[7] of which 41.2 percent of these victims reported that their perpetrators cooperated to stalk the victims.[8] Former FBI Chief Inspector Gunderson states:

> In addition to higher ranking members of… intelligent services,… wealthy, powerful members of criminal syndicates, multimillionaires and the corporate elite… can get a targeted individual harassed for the rest of that individual's life (individual cases of gang stalking lasting for over a decade are common). The higher status members of the gang stalking conspiracy initiate the

---

[3] Ted Gunderson, *Affidavit* (Los Angeles, CA: April 26, 2011), 2-4.

[4] Ibid., 3.

[5] Candice Nguyen, "Gang Stalking, 'Bullying on Steroids,'" *Central Coast News*, Jan 29, 2011, accessed February, 12, 2011, http://www.kionrightnow.come/Global/story.asp?S-13931348.

[6] Bureau of Justice Statistics, U.S. Department of Justice, *Stalking Victimization in the United States* (2009), 5, available at www.ovw.usdoj.gov/docs/stalking-victimization.pdf (last visited November 25, 2012).

[7] Ibid, 12, appendix table 3.

[8] The Department of Justice's reply to FOIA request No. 10-00169 dated March 22, 2010.

2

gang stalking and coordinate logistics and funding. Lower echelon government rouge operatives,... petty criminals and street thugs perform actual grunt work of daily monitoring and harassment of individuals targeted by the program.[9]

Indeed, according to the DOJ's stalking survey in 2009, 11% of stalking victims said they had been stalked for five years or more.[10]

According to the aforementioned DOJ stalking report in 2009, 18.8 percent of the stalking victims who reported their stalking to the police responded that the police took no action.[11] 11 percent of these victims perceive that the police did not take action because there was not enough evidence.[12] Without visible evidence and without knowing the existence of the social phenomenon of organized stalking, the police assume that the target is unreasonable and psychologically unreliable. 13.2 percent of stalking victims perceive that the police did not take action because the police didn't believe the victim.[13] Almost 23 percent of stalking victims responded that their situations got worse after reporting their stalking to the police, and 48.9 percent of stalking victims responded that the situation stayed the same.[14]

The techniques of organized invisible torture, effected with organized stalking (in lieu of abduction) to keep the victim under surveillance control, are strategically and calculatedly engineered to make your experience resemble either the diagnostic description of the persecutory subtype of delusional disorder or paranoid schizophrenia, as stipulated in the most authoritative manual of psychiatry written by the American Psychiatric Association, *Diagnostic and Statistical Manual of Mental Disorders 4ᵗʰ ed.*[15] Human abuse is tolerable as long as human abuse can hide its internal mechanism by conflating and confusing two critically and qualitatively different phenomena that have exactly the same appearance—the delusional case and the real case of invisible organized torture victimization. That is to say, delusional reports end up making a real occurrence of invisible organized torture less credible. Invisible organized torture strategically exploits this grand legal loophole created by the profound abuse of the mental illness diagnoses.

Stalking is defined in federal and state criminal laws—as well as in the aforementioned Department of Justice statistics—as "a course of conduct directed at a specific person that would cause a reasonable person to feel fear." According to Orit Kamir, this unwarranted focus on a victim's "reasonableness" suggests legislative uncertainty regarding the substantial social harm of stalking, inviting judicial scrutiny of both victims and the reliability of their emotional responses.[16] If the victim

---

[9] Gunderson, *Affidavit*, 4.

[10] Bureau of Justice Statistics, *Stalking Victimization in the United States*, 2.

[11] Bureau of Justice Statistics, *Stalking Victimization in the United States*, 14.

[12] Ibid.

[13] Ibid.

[14] Ibid., 15.

[15] American Psychiatric Association, *The Diagnostic and Statistical Manual of Mental Disorders*, 4th ed. (Washington, DC: American Psychiatric Association, 2000), 323-328.

[16] Orit Kamir, *Every Breath You Take: Stalking Narratives and the Law* (The University of Michigan Press, 2001), 212.

3

complains about invisible collective violence in a manner that resembles the diagnostic description of either persecutory delusional disorder or paranoid schizophrenia, law enforcement personnel are prone to prejudge the victim to be unreasonable and psychologically unreliable. This reasonableness requirement thus ironically encourages stalking assailants to perfect their crime by undermining the perceived psychological reasonableness of the victim. In order to undermine the credibility of the victim, stalking assailants keep their deeds as covert and invisible as possible, and solicit many others to gang up on one target in order to hide and cover up the proof of violence. That is to say, the statutory reasonableness requirement ironically instigates the desire to render stalking assaults organized, covert and invisible.

## 2. Organized Torture Effected with Electronic Weaponry

The term 'organized crime' connotes planned, non-impulsive, methodical, systematic, self-perpetuating and clandestine criminal activities involving violence and based on intricate conspiracy.[17] Leaders are isolated from other members who physically commit the actual crimes.[18] Such organized crime 'successfully' evades detection and prosecution while corrupting and influencing the public and private sectors over the long term.[19] The perpetually repeated, invisibly maiming torture of one individual by a multitude of conspiring individuals that is often coordinated by crime syndicates are hereby referred to as organized invisible torture.

State of New Jersey Commission of Investigation's *The Changing Face of Organized Crime in New Jersey: A Status Report* (2004) attributes the unsurpassed resilience, stability and strength of the Genovese Mafia family (in comparison to other Mafia families[20]) to its *penchant for secrecy* and the sophistication of its operations.[21] As a result, in the largest-ever Mafia arrest by the federal and state agents in January 2011, wherein numerous highest ranking members of other major Mafia families (especially Gambino and Colombo) were arrested, only two lowest ranking soldiers of the Genovese family were arrested.[22] By adapting to law enforcement's investigative techniques, today's surviving

---

[17] President's Commission, *Organized Crime*, 1; U.S. Department of Justice, *Overview of the Law Enforcement Strategy to Combat International Organized Crime* (2008), 2, *available at* http://www.justice.gov/ag/speeches/2008/ioc-strategy-public-overview.pdf.

[18] President's Commission, *Organized Crime*, 7.

[19] Howard Abadinsky, *Organized Crime* (Boston, M.A.: Allyn and Bacon, Inc., 1981), 5, 16; White House, *Combat Transnational Organized Crime*, iii.

[20] An organized crime family comprises a boss, a *consigliere* (counselor), *caporegima*s (lieutenants) and soldiers who are members grouped under lieutenants. President's Commission, *Organized Crime*, 9.

[21] State of New Jersey Commission of Investigation, *The Changing Face of ORGANIZED CRIME IN NEW JERSEY: A Status Report* (Trenton, NJ: 2004), 106, accessed online December 9, 2011, http://www.state.nj.us/sci/reportsoc.shtm.

[22] Jerry Markon, "Largest-ever Mafia sweep makes nearly 120 arrests," *The Washington Post,* January 20, 2011. On the FBI's chart of the arrested members of each crime family, see "The Mafia family tree: FBI flowchart reveals 127 'mobsters' arrested in biggest ever blitz on New York's crime empires," *Daily Mail,*

and thriving mafia family has reverted to its roots and tried to become as invisible as possible.[23] The most successful criminal organizations, such as the Genovese family, have thus developed their torture techniques *clandestine and invisible enough* to elude law enforcement's detection, thereby inducing the investigating police officer to summarily dismiss the torture victim's complaint as delusional.

Freedom from Covert Harassment and Surveillance, a non-profit organization established under § 501(c) of the U.S. Internal Revenue Code consists of approximately 10,000 self-identified victims of organized invisible torture and organized stalking (as of 2016).[24] The ex-president of this organization, Derrick Robinson has personally interacted with over 1,000 victims between 2005 and 2010.[25] According to Robinson and Eleanor White, a former Navy engineer, who has interacted with at least 2000 victims between 1996 and 2010,[26] the aforementioned invisible organized torture include the combination of the following: repeated non-lethal poisoning, toxic gassing of the victim's residence and aggravated battery committed with electronic weapons, alternatively called electromagnetic, psychotronic or directed-energy weapons. The Act Relative to the Possession of Electronic Weapons enacted in Massachusetts in 2004 defines such weapons as "a portable devise or weapon from which an electrical current, impulse, wave or beam may be directed, which current, impulse, wave or beam is designed to incapacitate temporarily, injure or kill."[27]

For example, microwave cannons are modified microwave ovens (whose lids are removed) that emit microwaves toward a directed area that could be a part of human body, such as a brain. The microwaves heat up the target's body part (such as the brain) by vibrating water molecules of the irradiated cells, thereby cooking these cells or plausibly maiming them, depending on the chosen level of radiation. Microwave canons are sold online for $20 each.[28] Some of these weapons sold online are as small as a handgun, and the projectile of some of them, such as Projectile Firing Module, "can maim or kill a person" according to the aforementioned online catalogue of electronic weapons.[29] The pictures of some of these electromagnetic weapons, including a laser gun, are displayed with cogent explanations of the scientific function and mechanism of each weapon on the website of a security

---

January 20, 2011, accessed December, 13, 2011, http://www.dailymail.co.uk/news/article-1348951/127-mobsters-arrested-biggest-blitz-New-Yorks-crime-empires.html.

[23]Sean Gardiner, Pervaiz Shallwani, "Mafia Is Down—but Not Out," *The Wall Street Journal*, February 18, 2014,                accessed                July                16,                2014, http://online.wsj.com/news/articles/SB10001424052702304626804579363363092833756.

[24] A statement made by President Darlene Miles during the said NPO's teleconference call on February 21, 2016.

[25] Derrick Robinson, phone interview by and email message to author, July 6, 2010.

[26] Eleanor White, email message to author, May 24, 2010.

[27] MASS. GEN. LAWS ch. 140, § 131J (2004).

[28] For example, see the following electric-gun catalogue of an online store called Information Unlimited, which    is    physically    located    in    New    Hampshire:    accessed    December    15,    2015, www.amazing1.com/electrokinetic-guns.html. An array of different electric guns are displayed in the catalogue.

[29] accessed December 15, 2015, www.amazing1.com/electrokinetic-guns.html.

company called Advanced Electronic Security Co. in Los Angeles, CA.[30] The president of this company has served approximately 3,000 clients who have been subjected to electronic weaponry torture.[31]

Such sophisticated weapons maim internal organs and yet leave no external marks visible to the naked eye, thus strategically allowing the police and the military to apply force in a highly discreet manner, thereby preventing the media from scandalously misrepresenting such force applied.[32] The torturer fires the weapon at the victim across the wall by using a radar technology that can detect the exact real-time body location of the victim through the wall.[33] Therefore, the victim cannot visually witness the torturer physically firing the electronic weapon at the victim because. The development of these beam weapons now marks emerging global weaponry competition among nation-states, especially Russia, the U.S. and Israel, rendering global nuclear weapon competition obsolete.[34]

On December 30, 2008, the 18th Judicial District Court of Kansas in Sedgwick County issued an order of protection, banning Defendant Jeremiah Redford from hiring the third party, a syndicate, to further stalk and assault, with electronic weapons, Plaintiff James Walbert, who was the defendant's former business associate.[35] The plaintiff testified at the court that the defendant threatened the plaintiff with "jolts of radiation" after a disagreement over a business deal in 2004.[36] After receiving the threat, the plaintiff complained that he had been continuously tortured with remotely deployed weapons on a daily basis, implanted with a RFID chip in his right upper back[37] and stalked by a multitude of conspiratorial individuals in an organized fashion.[38]

On May 19th, 2015, the City of Richmond, CA, adopted a resolution that "serves as a safeguard for targeted individuals who claim to be under assault from electronic weaponry that should

[30] See the following website of this company for more information: accessed December 15, 2015, http://www.bugsweeps.com/info/electronic_harassment.html.

[31] Cited from the author's phone conversation with the president of Advanced Electronic Security Co., Roger Tolces, in October, 2015.

[32] John J. Pennella and Peter L. Nacci, U.S. Department of Justice and Department of Defense, *Department of Justice and Department of Defense Joint Technology Program: Second Anniversary Report* (1997), 5, accessed November 27, 2012, https://www.ncjrs.gov/pdffiles/164268.pdf.

[33] Brad Heath, "New police radars can 'see' inside of homes," *USA Today*, January 20, 2015, accessed December 15, 2015, www.usatoday.com/story/news/2015. The reporter states "my fear is when criminals get a hold of these tools."

[34] "Electromagnetic Weapons: Frying tonight," *The Economist*, October 15, 2011, accessed November 27, 2012, http://www.economist.com/node/21532245;
Komsomolskaya Pravda, "Russians have psychotronic weapon to zombie people," *Pravda*, August 14, 2007, accessed November 24, 2012, http://english.pravda.ru/science/tech/14-08-2007/95965-psychotronic_weapon-0.

[35] Walbert v. Redford, No. 08DM8647 (18th Judiciary D. Ct. Kan. Dec. 30, 2008).

[36] David Hambling, "Court to Defendant: Stop Blasting That Man's Mind!" *Wired*, July 1, 2009, accessed December 15, 2015, http://www.wired.com/2009/07/court-to-defendant-stop-blasting-that-mans-mind/

[37] Private Investigator William J. Taylor's investigation report (dated November 21, 2008) attached to the plaintiff's complaint in Walbert v. Redford.

[38] The plaintiff's complaint and Former Member of Missouri State House of Representative Jim Guest's letter of support (dated October, 10, 2007) attached to the plaintiff's complaint in Walbert v. Redford.

6

be outlawed by the Space Preservation Act."[39] The Space Preservation Act was introduced by U.S. Congressperson Dennis Kucinich (D-Ohio) to ban satellite-based electronic weaponry used to assault civilians by remote transmission. *San Jose Mercury News* reports:

> Few societal threats escape the watchful eye of the Richmond City Council, so it was no surprise Tuesday night that it voted its opposition to airborne weapons systems that have purportedly targeted residents with mind-control technology... After a dozen professed victims told of pain suffered from... particle beams and electromagnetic radiation, the council voted 5-2 in favor of Councilwoman Jovanka Beckles's resolution "in support of the Space Preservation Act... to permanently ban spaced-based weapons."[40]

### 3. Why the Police Treat an Organized Torture Victim as a Public Threat: The Wrongful Incrimination of Psychological Disability under the Name of Welfare

Richmond City Councilwoman Jovanka Beckles, who introduced the aforementioned resolution to ban space-based electronic weaponry torture, states:

> It has been brought to my attention that many survivors have reached out to their city officials peacefully, through numerous avenues of redress and accountability about these types of horrifying abuses, only to experience dismissal, being stonewalled, mocked and ignored, or a level of all out discrimination resulting in these individuals being wrongly labeled as unstable, criminals, or troublemakers.[41]

250 self-identified victims of organized invisible torture across the county took a survey conducted by Freedom from Covert Harassment and Surveillance between 2013 and 2015. 20% of these 250 victims have been detained in a psychiatric unit against their wills by the police, especially when the victims filed the organized invisible torture complains to the police. Moreover, at the time the victims were detained by the police, the victims were not dangerous to self or others, which are the statutory requirements set forth in Section 5150(a) of the Welfare and Institutions Code (and equivalent statutes in other states) for the police to detain a (perceived or actual) mentally ill person.[42]

Criminal law enforcement habitually treats a person with a psychological disability (either perceived or actual) as a public threat to be monitored extra-judicially through community policing (if not through psychiatric detention), yet rarely recognizes her/him as a victim of subjugation violence

---

[39] Richmond City, CA, Res. 51-15 (2015). The following news article describes this legislation in detail:

[40] Tom Barnidge, "No more mind-control weapons targeting Richmond residents," *San Jose Mercury*, May 20, 2015, accessed January 4, 2016, www.mercurynews.com/news/ci_28154573/barnidge:-no-more-mindcontrol-weapons-targeting-richmond-residents.

[41] Letter from Jovanka Beckles, City Council Member of Richmond City, CA, to the survivors of organized invisible torture (April 24, 2015) (on file with the Richmond City Council Office).

[42] Cited from the author's phone interview with the former president of NPO Freedom from Covert Harassment and Surveillance, Derrick Robinson, December 29, 2015.

motivated by psychological disability discrimination. If you complain about invisible organized torture to the police, the police will mark you as a person with psychiatric warning in Spillman's integrated public safety software (or equivalent)—software that compiles your incident, arrest and warrant records (if any), and is readily available to investigating officers.[43] Such cutting-edge software maximizes efficiency in administering public safety by instantly transmitting integrated, centralized and purportedly "accurate" data (such as the aforementioned psychiatric warning) to public safety personnel in order for them to make an "accurate" decision (such as dismissing a "delusional" complaint filed by a person with such a warning and/or stalking and harassing the person in order to "keep her/him in line") in real time.

Crime syndicates must become increasingly sophisticated in order to maintain acceptable levels of success by responding to the given opportunities for crimes and to the given techniques of crime prevention and law enforcement.[44] Community policing is law enforcement's current discriminatory technique of crime prevention (i.e., psychological disability profiling) that keeps people with untreated psychological disabilities under informal active probation. Intentionally false police reports based on what former FBI Chief Inspector Gunderson calls "illegal set-ups on drug charges and other felony charges"[45] are covertly filed against the victim of organized torture. Because the police perceive the organized invisible torture victim as a delusional/paranoid criminal who refuses to take medications, the police subject the torture victim to overzealous community policing in order to prevent "the mentally ill criminal" from committing more crimes. Such community policing structurally deprives the organized torture victim of her/his constitutional rights to be informed of the nature and cause of (even intentionally false) criminal accusations filed against her/him and to be confronted with—and cross-examine—the sophisticatedly fabricated (in innumerable cases) evidence and the witnesses against her/him. Concomitantly, crime syndicates can orchestrate, with impunity, the filing of intentionally false criminal allegations against the organized torture victim. By informing the police of the torture victim's real-time location, syndicates, functioning as community-policing agents, enable the police to stalk the organized torture victim ostentatiously (with sirens and other methods) and thereby infiltrate into the police by using the torture victim as bait.

## 4. Organized Torture as Organized Hate Crime Based on Psychological Disability: Re-victimizing Child Abuse Survivors

The said enterprise of perfecting a crime is expedient if you already have a history of psychological treatment—including post-traumatic stress disorder, which is nonetheless qualitatively and critically distinct from persecutory delusional disorder or paranoid schizophrenia. The author of this

---

[43] See www.spillman.com. Last visited on January 4, 2016.

[44] Mary MacIntosh, *The Organisation of Crime* (London: Macmillan, 1975).

[45] Gunderson, *Affidavit*, 4.

8

report has personally interacted with over 100 victims of organized invisible torture (effected with organized stalking) and discovered that the majority of the victims were sexually and/or physically abused as children (especially by their parents). Clinical Psychiatry Professor Judith Herman states that, most ominously, those who are exploited as children are perpetually exploited as adults in various ways.[46] For example, the survivors of childhood incestuous abuse are targeted for sexual and physical violence at least *twice* as frequently as women who had not been subjected to the same category of gross human rights violation.[47] The constant state of being exposed to an extreme danger of abuse at home deprives a child victim of developing the otherwise normally acquired ability to intuitively detect the implicit signs of the other's hidden intention for committing assault, and to instinctively and immediately leave such a dangerous situation.[48] If the abused child develops this otherwise naturally formed self-protective instinct, the child will have to register, into her consciousness, the existence of a heinous crime committed by the person on whom the child entirely depends for her continuous living and growth. The unconscious and continuous suppression of the development of this self-protective instinct during the formative years, especially if abuse was committed for a long period of time, results in an extreme difficulty in developing this self-protective instinct otherwise naturally formed during childhood if raised by non-abusive parents.[49]

According to the leading experimental and cognitive psychologists in the field of delusional disorder, a difficulty in envisaging others' intentions and motivations appertains to the etiology of delusional disorder.[50] Child abuse survivors' social disability, i.e., difficulty in envisaging others' intentions and motivations to harm these survivors renders these survivors significantly more susceptible to a wide range of violence and exploitation, while such disability/difficulty is judged as an indication of delusional disorder, as per the etiology of delusional disorder set forth in experiment and cognitive psychologies. It is ironic that the leading researchers in the field of delusional disorder have not been able to realize this inner mechanism of child abuse survivors' re-victimization, by which this social disability most foreseeably causes marginalization, scapegoat persecution (collective violence) and disenfranchisement in general. Conversely, the magnitude and frequency of persecution complaints brought by child abuse survivors are interpreted by experimentalist and cognitive psychologists, who do not have this social disability, as sheer implausibility (from the perspective of those who have such a social ability). The said "contribution" by experimental and cognitive psychology to the development of the etiology of delusional disorder as a psychiatric concept has promoted a misdiagnosis of the real re-victimization of child abuse survivors, who lack the self-protective ability to predict others' intentions

---

[46] Judith Herman, *Father-Daughter Incest* (Cambridge, Mass.: Harvard University Press, 2000), 29-34.

[47] Diana Russell, *The Secret Trauma: Incest in the Lives of Girls and Women* (New York: Basic Books, 1986), 172-173.

[48] Herman, *Father-Daughter Incest*, 187.

[49] Russell, *The Secret Trauma*, 174.

[50] For example, Chris Frith, The Cognitive Neuropsychology of Schizophrenia (New York: Psychology Press, 1992), cited from Shmuel Fenning, Laura Fochtmann and Evelyn Bromet, "Delusional and shared psychotic disorder" in Benjamin Sadock, Virginia Sadock and Harold Kaplan, *Kaplan & Sadock's Comprehensive Textbook of Psychiatry* (Philadelphia: Lippincott Williams & Wilkins, 2005), 1532.

9

and motivations to harm these survivors, as persecutory delusions, thereby breeding impunity surrounding the re-victimization of child abuse survivors in the form of organized torture.

Powerfully interacting with the cognitive and experimental psychologies' above complicity in promoting impunity surrounding the child abuse survivors' re-victimization, the invisible nature of organized torture techniques makes it even more expedient to induce investigating officers to interpret the history of the post-traumatic stress disorder of these survivors as circumstantial evidence for their delusional disorder or paranoid schizophrenia. The re-victimization of child abuse survivors is judicially permitted (though unwittingly) due to the above mechanism of the disenfranchisement of child abuse survivors, conflating the profound scar of child abuse with an indication of delusion/paranoia.

The DSM states that hearing deficiency and low socioeconomic status may predispose an individual to the development of a paranoid type of delusional disorder, and that major depressive episodes probably occur in individuals with delusional disorder more frequently than in the general population.[51] According to the U.S. Department of Justice's survey report titled *Stalking Victimization in the United States*, "as with crime more generally, a pattern of decreasing risk for stalking victimization existed for persons residing in households with higher incomes."[52] That is to say, the DSM does not instruct how to perspicaciously discern the profound ways in which underworld violence, to which those with low socioeconomic status and psychological disabilities are significantly more likely to be exposed than socio-economically privileged psychiatrists, constitutes major depressive episodes. Organized torture thus succeeds at the level of the functional operation of law where the psychiatrist is considered by law enforcement to be a pre-judge to the judge by manipulatively abusing psychiatrists' notions of psychological disability. The psychiatrists ought to learn how to learn from their socio-economically disadvantaged clients, whose experiences and backgrounds critically differ from those of the privileged psychiatrists, instead of objectifying the clients with systematic preconceptions. Further, each police officer shall be educated so as to no longer hold an assumption that the victim has to be rich and important to be subjected to a conspiracy crime of this magnitude.

According to Nietzsche, "knowledge is not to know, but to schematize for a pragmatic necessity."[53] A pragmatic necessity in this context marks the doctors' act of gaining the satisfactory perception that they have come to fully diagnose/understand the narrative of the "patient." The concept of "delusional disorder" unwittingly authorizes underground persecution by providing a self-deceivingly satisfactory avenue for psychiatrists to *expediently* "diagnose" the material reality of invisible oppression, which is easily and conveniently decipherable for the privileged psychiatrists as delusional. It is the genealogy of delusional disorder as a psychiatric construct that has reflected and promoted the disenfranchisement of people of a low socio-economic status and those with the

---

[51] American Psychiatric Association, *The Diagnostic and Statistical Manual of Mental Disorders*, 326.

[52] Bureau of Justice Statistics, *Stalking Victimization in the United States*, 3.

[53] Fredrick Nietzsche, trans. Walter Kaufmann, *The Will to Power* (New York: Random House, 1968), § 515.

10

aforementioned social disability (the inability to envisage others' intentions and motivations)[54] due to surviving parental child abuse.

The systematic objectification of organized torture victims, which comes into being in the psyche of psychiatrists while making a clinical assessment, thereby discourages psychiatrists from complying with the following fundamental principles of clinical judgment stipulated in the standard textbook of psychiatry used in the U.S. medical schools, *Kaplan & Sadock's Comprehensive Textbook of Psychiatry*:

> Often, the extremeness and inappropriateness of the patient's behavior rather than the simple truth or falsity of the belief indicate its delusional nature. Consequently, when evaluating individuals with possible delusional disorder, the most sensible approach is to gather as much data as possible from many sources and then use clinical judgment in determining whether a threshold indicating psychopathological disturbance has been passed.[55]

Given that organized torture victims are almost invariably misdiagnosed, psychiatrists often decide not to fulfill their stipulated duty to "gather as much data as possible from many sources," including sources concerning the material existence of the clandestine organized violence about which the client complains.

Psychiatrists further choose not to fulfill the aforementioned clinical duty to make a critical assessment of "the extremeness and inappropriateness of the patient's behavior rather than the simple truth or falsity of her belief." That is to say, psychiatrists should assess whether there is reasonable *proportionality* between the client's behavior and the client's beliefs. For example, if the client believes that her food at home is being non-lethally poisoned by organized stalking assailants who break into her residence while she is away, then the client's act of placing a lock on her fridge is proportional to her beliefs (i.e., her behavior based on her belief is not inappropriate or extreme). However, if the client decides not to eat or drink at all for the rest of her life, then the client's behavior and her beliefs are not proportional (i.e., her behavior based on her belief is inappropriate and extreme).

According to Freud's etiology of delusional disorder, paranoia is a protective response to a profound threat to self-esteem or to the self while a subject is intensely attempting to retain the appearance of normalcy through the defensive mechanism of projection. In the psychic phenomenon of paranoia, it is the subject's own ego that becomes the subject's scapegoat in order to maintain the appearance of the subject's normalcy.[56] Before making the diagnosis of delusional disorder, a psychiatrist shall be required to identify the actual threat to his or her client's self-esteem and normalcy, for which the client's ego is unconsciously made a scapegoat. Such a conscious identification of what is

---

[54] Fenning et al., "Delusional and shared psychotic disorder," 1532.

[55] Ibid.

[56] Sigmund Freud, "On the Mechanism of Paranoia" in *The Standard Edition of the Complete Psychological Works of Sigmund Freud*, trans. James Strachey, vol. 7, *1911-1913* (London: The Hogarth Press, 1957), 59-79.

11

perceived to be a threat most plausibly enables the client to recover from delusional disorder (if the client is indeed delusional).

A psychiatrist should be aware of the substantial and unjustifiable risk that will result from her or his diagnostic negligence: a misdiagnosis of delusional disorder or paranoid schizophrenia clearly violates the client's established constitutional right to the equal protection of law and facilitates indefinitely repeated torture resulting in the permanent impairment of their clients. The risk of such a negligent misdiagnosis is of such a nature and degree that a psychiatrist's failure to perceive this risk, considering the nature and purpose of her or his judicial function as a prejudge to the judge and the circumstances known to her or him, involves a gross deviation from the standard of care, conscience and duty.[57] Qualified immunity generally applies to a government-employed psychiatrist's decisions relating to diagnosis (outside of the context of a hearing, when s/he acts as a court-appointed psychiatrist).[58] A misdiagnosis resulting from medical negligence as described above should not be protected by qualified immunity since a psychiatrist has plainly failed to perform, in good faith, his or her clinical duty to conduct the said relevant research and to examine belief-behavior proportionality before making a clinical judgment. A psychiatrist who misdiagnoses a scapegoat victim should be held liable, not only in civil law, but also in criminal law, for negligently obstructing the administration of justice, namely a law enforcement agencies' investigation that may otherwise have led to the discovery of evidence of organized crime that had been hidden on purpose.

The organized crime "client," who pays for and derives benefit from this crime perfection service, often commits the original instance of violent crime (to be perfected by the criminal organization) because the client perceives the victim as socio-psychologically disabled (such as the aforementioned self-protection disability, often due to child abuse victimization), less likely to be believed by law enforcement and less equal in human worth. In other words, given the current bias and prejudice of the law enforcement system against those with psychological disabilities, organized torturer conspirators intentionally select those with perceived socio-psychological vulnerability in order to seek impunity. Such an intentional selection of victims with psychological disabilities, as well as the intentional fabrication of psychological disabilities of specific kinds (paranoid schizophrenia and delusional disorder), qualifies clandestine organized torture as a form of hate crime.

Especially if the victim files a complaint against the perpetrator of the original instance of violent crime, the perpetrator may elect to pay a criminal organization to torture the victim in order to punish the victim for challenging psychological disability discrimination practiced, in the act of hate violence of the original instance, by the perpetrator. Article 1 of the 1984 UN Convention against Torture defines the term "torture" as:

---

[57] This statement reflects the Model Penal Code's definition of criminal "negligence" as one of culpable mental states (*mens rea*). Model Penal Code § 2.02 (2)(d) (1962).

[58] Christopher Slobogin, Arti Rai, Ralph Reisner, *Law and the Mental Health System: Civil and Criminal Aspects,* 5th ed. (St. Paul, MN: Thomson/West, 2009), 244-243.

12

any act by which severe pain or suffering, whether physical or mental, is intentionally inflicted on a person for such purpose as... punishing him for an act he... has committed or is suspected of having committed, or intimidating or coercing him, or for any reason based on discrimination of any kind.

First and foremost, organized torture serves the purpose of extra-judicially punishing a person with a perceived or actual psychological disability (often due to surviving child abuse) for attempting to disturb the wrongfully assumed (by the torturer) hierarchy of human worth (between the torturer and the torture victim with a psychological disability) in order to reinstate such hierarchy. The organized torture clause to be added to the Penal Code shall state that the Legislature intends to display society's condemnation of the said purpose of organized torture. Secondly, invisible organized torture serves the purpose of perfecting the violent crime of the original instance by inducing criminal law enforcement personnel to dismiss complaints filed by the said victim.

Given the prevalence of the re-victimization of child abuse survivors in the form of organized torture, there ought to be an express provision that increases the penalty (both the fine and the prison terms) of the organized torturers if their victim has the history of child abuse victimization. The torturers do not have to have any explicit knowledge that their victim survived child abuse, though such knowledge, if proven, shall further increase the amount of fine.

Further, the organized torture clause to be added to the Penal Code shall expressly state that, if the organized torture victim has a perceived or actual psychological disability, then such organized torture constitutes an organized hate crime and is subjected to a greater penalty both in prison term and fine. The torturers should also receive in-prison education on psychological disability discrimination.

By summarily dismissing complaints about invisibly maiming perpetual organized torture, criminal law enforcement continues to commit unjustifiable complicity in the organized torture. There shall be a provision that allows the Internal Affairs of the local criminal law enforcement agency to receive a verified complaint concerning a law enforcement officer's act of dismissing organized torture complaint or/and the officer's act of detaining the complainant in a psychiatric unit. The Internal Affairs shall investigate such an officer concerning the officer's possible connection with the criminal organization that centrally coordinates the said torture.

The current law does not render a peace officer liable for summarily dismissing the organized torture complaint that, prima facie, resembles persecutory delusion or paranoia as the result of the exercise of discretion vested in him/her by judging that the complaint is delusional or paranoid. Currently Section 820.2 of the Government Code states:

Except as otherwise provided by statute, a public employee is not liable for an injury resulting from his act or omission where the act or omission was the result of the exercise of the discretion vested in him, where or not such discretion be abused.

Given the prevalence of the police's abuse of a person with psychological disability and the survivor of child abuse (who most often has self-protection disability and other socio-psychological disability), the following section shall be added to the Government Code as Section 820.23 of the code:

13

> Notwithstanding other provisions of the law, a peace officer is liable for an injury, suffered by a person with a perceived or actual psychological disability and a person who survived child abuse, resulting from a peace officer's act or omission. Proving the peace officer's knowledge of the injured person's child abuse history or psychological disability is not required to establish the peace officer's liability for abusing the discretion vested in her/him.

The above amendment of the Government Code will prevent the police from failing to protect the aforementioned classes of people (psychologically disabled persons and the survivors of child abuse, though these two classes substantially overlap), who are at substantially high risk of being abused in a way that is not easily recognized by law enforcement. Any form of violence and exploitation (other than organized invisible torture), that criminal organizations may ingeniously contrive in the future to abuse these two classes of people with impunity in order to sate criminal organizations' lust for subjugation (to be discussed below), will be more effectively prevented by such an amendment.

The organized torture provision to be added to the Penal Code shall expressly state that the physical injuries caused by organized torture are often invisible and seem naturally caused, and the complaint of such torture resembles the diagnostic description of persecutory delusional disorder or paranoid schizophrenia, *prima facie*. Moreover, the legislative intent section of the added provision on organized torture shall state that the Legislature finds and declares that organized torture is a crime against humanity.

### 5. The *Mens Rea* of Organized Torture: A Lust for Domination

Organized torturers assume that every human is not equal in human worth. Organized torturers gain a manic[59] sense of self-worth by intentionally inflicting physical and mental pain on, with impunity, a person whom the torturers perceive as psychologically disabled (especially due to surviving child abuse) and "thus" less worthy.[60] According to the first survey report on stalking conducted by the U.S. Department of Justice in 1998 titled *Stalking in America*, much stalking is motivated by stalkers' desire to control their victims. The survey results dispel the myth that most stalkers are psychotic or delusional. Only 7 percent of the victims said they were stalked because their stalkers were mentally ill

---

[59]The concept of mania herein comports with Freud's analysis of maniawhereby mania is about triumphing over a loss of ideal (such as the equality of human worth) that is hidden from the manic ego. Sigmund Freud, "Mourning and Melancholia" in *The Standard Edition of the Complete Psychological Works of Sigmund Freud*,vol. 14, *1914-1916*, 254.

[60] David Lawson, *Cause Stalking* (North Palm Beach, FL: Scrambling News, 2008), 22. Lawson is a private investigator licensed in New York State and Florida State, and what he reports in this book is based on his act of infiltrating into organized stalking enterprises in order to serve his clients who were victims of organized stalking violence in the course of twenty years.

or abusing drugs or alcohol.[61]Kamir states that ordinary men and women commit stalking and that anti-stalking statutes should begin by stating that stalking is a crime of dominance and control.[62] It is this mental state (*mens rea*[63]) of a lust for subjugation—while committing a violent criminal action—that ought to be categorized as the guiltiest mental state (first-degree *mens rea*) in determining judicial punishment.

The media has been portraying a person with a psychological disability as nothing but an exotic monster and a scapegoat, on to which society can safely project its internal conflicts. The media deploys such social objectification and derision of a person with a psychological disability in order to manufacture the audience's addiction to the media consumption. This way, the media has been most effectively promoting the public's paranoid prejudice against a person with a psychological disability, thereby massively instigating hate violence against such a person. Organized torture marks a contemporary form of witch hunting.

According to Sigmund Freud's etiology of delusional disorder, paranoia is a protective response to a profound threat to self-esteem or to the self, while intensely attempting to retain the appearance of normalcy through the defensive mechanism of projection.[64] In the current social phenomenon of the public's paranoia about mental illness, those who gain a manic sense of self-worth through subjugation violence attempt to retain the appearance of normalcy and legality (despite having the mental state of violent criminals) through the defensive mechanism of scapegoating the psychologically disabled.

## 6. Organized Torture Places Torturers Above the Law While Enabling Torturers to Accumulate Social Capital

According to the U.S. Department of Justice's *Overview of the Law Enforcement Strategy to Combat International Organized Crime*:

> International organized crime in its highest form is far removed from the streets. These groups are highly sophisticated, highly educated, and employ some of the world's best accountants, lawyers, bankers and lobbyists.[65]

---

[61] National Institute of Justice, U.S. Department of Justice, *Stalking in America: Finding From the National Violence Against Women Survey* (April, 1998), 8.

[62] Orit Kamir, *Every Breath You Take: Stalking Narratives and the Law* (The University of Michigan Press, 2001), 211.

[63] [Law Latin "guilty mind"] The state of mind that the prosecution, to secure a conviction, must prove that a defendant had when committing a crime. Cited from Bryan A. Garner and Henry C. Black, *Black's Law Dictionary*, 8th ed. (St. Paul, MN: West Group, 1999), s.v. "*mens rea*."

[64]Sigmund Freud, "On the Mechanism of Paranoia" in *The Standard Edition of the Complete Psychological Works of Sigmund Freud*, trans. James Strachey, vol. 7, *1911-1913* (London: The Hogarth Press, 1957), 59-79. See also Fenning et al., "Delusional and shared psychotic disorder," 1532.

[65] Department of Justice, *Combat International Organized Crime*, 10.

15

The question is how the most successful international criminal organizations manage to recruit these highly educated, world's best professionals across various sectors who do not need to resort to organized crime to obtain high revenues. It is plausible that the said world's best professionals make use of the service of organized invisible torture, which most sophisticated international criminal organizations offer, in order to proactively tamper with a witness to whatever crime these professionals or their family members committed, or, in some cases, to tamper with a prosecuting witness, i.e., a victim. Indeed, the most desirable "client" who pays for, makes full use of and derives benefit from this crime perfection service is a professional who will form a mutually advantageous alliance to strategically expand diverse and sophisticated enterprises of criminal syndicates. For example, lawyers can advise syndicates how to exploit legal loopholes. Bankers can advise syndicates how to launder money.[66] Psychiatrists can advise syndicates how to torture the crime-perfection-enterprise target in order to have her/him diagnosed as paranoid. Media executives can thwart the critical media coverage of criminal enterprises that continue to elude criminal law enforcement's consciousness.

The preexisting desire for subjugation held by certain public officials—especially certain police officers who chose their profession in order to fulfill their desire for "power" (herein defined as the desire to control absolutely, subjugate and destroy "the other" with impunity)—prompts them to commit "power"-oriented crimes to be perfected by the syndicate. According to the White House's aforementioned report:

> Today's criminal networks are... forging alliances with corrupt elements of national governments and using the power and influence of those elements to further their criminal activities.[67]

This crime perfection service that places its client "above the law and the constitution" is more compelling for certain public officials with a desire for subjugation than sheer monetary bribery. According to the aforementioned affidavit of former FBI Chief Inspector Gunderson:

> a sophisticated network of rogue operatives has secretly infiltrated... key governmental positions. This rogue element seeks personal power and wealth and considers themselves above the law and the Constitution. ...The victims are targeted for a variety of reasons including government and corporate whistleblowers, parties to financial and employment disputes, parties to marital disputes (usually divorced women), and even jilted paramours.[68]

So please note that Gunderson attests that organized invisible torture effected with organized stalking marks not only the crime-perfection service, but also the service of stalking by proxy (i.e., stalking on behalf of an ex-husband, constituting a form of domestic violence) and the service of discrediting and "punishing" whistleblowers. In exchange for receiving such criminal services of "compelling interest"

---

[66] White House, *Combat Transnational Organized Crime*, 8, 5; Department of Justice, *Combat International Organized Crime*, 10.

[67] White House, *Combat Transnational Organized Crime*, v.

[68] Gunderson, *Affidavit*, 3.

that place rouge public officials above the law and the constitution (so these officials can commit the said domestic violence with impunity, for example), these officials use their public power and influence to further and perfect the said crime-perfection and other services in their official capacities. In other words, such sophisticated services (i.e., continuing criminal enterprises) based on the use and abuse of psychological disability enables the most thriving transnational criminal organizations to develop symbiotic relations with rouge public officials and to infiltrate into various sectors of government.[69] The aforementioned U.S. Department of Justice's report on organized crime states: "The most powerful international organized crime groups benefit from the symbiotic relationship that their leaders have developed with corrupt public officials and business tycoons."[70] One of the most effective ways for criminal organizations to undo law enforcement's infiltration into criminal organizations is to render the criminal organizations' infiltration into criminal law enforcement *more thorough and sophisticated* than criminal law enforcement's infiltration into the criminal organizations. Such infiltration is central to the success of criminal organizations' overall operations.[71]

The self-perpetuating quality of organized torture bases itself upon such indefinite and continuous mutual exchange of secret services among torture conspirators. The White House's aforementioned report on transnational organized crime states, "Today's criminal networks are fluid, striking new alliances with other networks around the world and engaging in a wide range of illicit activities."[72] Organized invisible torture as a cutting-edge technology of transnational organized crime perpetually generates social credentials among conspirators such as crime syndicates, professionals and public officials, among others. It is this exponential and post-modern accumulation of the widest-ranging social capital[73] across diverse social sectors and professional disciplines—realized through the coordination of organized torture—that enables crime syndicates to rapidly expand their operations and loose fluid networks around the world, to diversify their activities, and to render their operations more sophisticated than ever before.

Organized invisible torture operation sophisticatedly manipulates immanent social fabric as a means of infiltration deployed in the course of organized (to this date, "perfect") hate crime based on psychological disability discrimination. By infiltrating into every sector of society with which the target (victim) interacts, thereby increasingly accumulating wide-ranging social capital, crime syndicates succeed in discursively augmenting the invisible sphere of manipulative influence.

---

[69] White House, *Combat Transnational Organized Crime*, iii. Characteristics possessed by transnational organized criminals and identified by the National Security Council at the White House include an attempt to gain influence in government through corrupt as well as legitimate means.
[70] Department of Justice, *Combat International Organized Crime*, 10.
[71] President's Commission, *Organized Crime*, 117.
[72] White House, *Combat Transnational Organized Crime*, 3.
[73] Pierre Bourdieu defines "social capital" in *The Forms of Capital* (1986) as the following: "Social capital is the aggregate of the actual or potential resources which are linked to possession of a durable network of more or less institutionalized relationships of mutual acquaintance and recognition ."

Of all the traditional La Cosa Nostra families, the Genovese group, which has one of its branches in Los Angeles, has the most contact with non-traditional criminal organizations [74] proliferating in California today. The unsurpassed amount of social capital enjoyed by the Genovese crime family today has been plausibly acquired and accumulated through coordinating organized invisible torture locally with non-traditional criminal organizations. California Attorney General's report on transnational organize crime (2014) states that 305 transnational criminal organizations are operating in California.[75]

The Racketeer Influenced and Corrupt Organizations Act (RICO), 18 U.S.C. Chapter 96, § 1962 (a), punishes the act of investing *financial* capital, accumulated by previous racketeering activities of a criminal organization, in any enterprise, but it does not address *social* capital—the intricate, discursive, hidden and manipulative conspiracy network and symbiosis between local, state and federal criminal law enforcement and crime syndicates principally based on mutually advantageous exchanges of crime-perfection services. Organized torture effected with organized stalking thus guarantee the accumulation of social capital to be invested in future diverse organized criminal enterprises, which RICO, as well as the California Control of Profits of Organized Crime Act, do not foresee or proscribe.

Once the system (machinery) of organized torture is set in place by constantly stalking and battering at least one vulnerable and marginalized person (especially with a child abuse survivor with the socio-psychological disability to protect her/himself from violence) in every municipality across the country and around the globe, transnational criminal organizations are equipped to track down and torture, as a punishment, victims fleeing international sex slavery (i.e., human trafficking), whom these organizations attempt to keep under constant surveillance and global control. Further, the most resourceful Mafia crime family today most plausibly participates the above organized stalking and invisible torture techniques in order to induce its lower-ranking members to constantly and perpetually partake in prospective punishment for breaking the oath of Omerta[76] (i.e., fleeing the organizations and intentionally divulging their internal information, especially to criminal law enforcement). Indeed, according to the above State Commission of Investigation report, the Genovese Mafia family has remained relatively free of turncoats.[77] Invisible organized torture thus functions as the secret, proactive countermeasure that enables the most powerful crime family equipped with ingenious adaptability to undermine the federal Witness Security Program.

Councilperson Jovanka Beckles of the City of Richmond, CA, who sponsored the aforementioned resolution (adopted in 2015) that declares to serve as a safeguard for the victims of organized torture effected with electronic weaponry (especially satellite-based), states:

---

[74] New Jersey Commission, *The Changing Face of ORGANIZED CRIME*, 106.

[75] Kamala D. Harris, California Attorney General, *Gangs Beyond Borders: California and the Fight Against Transnational Organized Crime* (March, 2014), 9, accessed January 5, 2016, https://oag.ca.gov/sites/all/files/agweb/pdfs/toc/report_2014.pdf.

[76] A code of silence about criminal activity, practiced by the Mafia.Cited from the *Concise Oxford English Dictionary*, 10th ed., s.v. "omerta."

[77] New Jersey Commission, *Changing Face of ORGANIZED CRIME*, 107.

I would like to encourage other officials at the local, state and national levels to explore methods to extend… means to make these abuses visible and recognized as crimes by local, county/parish, state and federal legislators and law enforcement alike.[78]

### 7. Investigating Organized Tortures by Keeping the Torturer Organization under Continuous Surveillance

There are portable electronic engineering devices available, both calibrated and non-calibrated, to detect the approximate directions and locations from which electronic weapons are fired at the torture victim. Law enforcement satellites have the technology to scan the area around the victim (in her/his residence, for example) with infrared radar in order to detect the trajectory of heat beam that hits the victim and that emanates from an electronic weapon fired by the organized torturer. Such space-based infrared radar can also detect the body heat of the torturer who fires the electronic weapon at the victim. Once identifying the approximate location where the torturers frequently fire electronic weapons at the victim (by using either method mentioned above), the following surveillance methods can be used to find out more information about the organized torturers' intricate conspiracies and activities.

Now please note that, most ironically, an array of methods of organized surveillance that have been customarily deployed both by organized torturers and law enforcement against the organized torture victim mark the most effective methods of investigating organized crime by law enforcement.[79] Such organized surveillance techniques are phone taps; the surreptitious interception of text messages, airmails and emails; placing audio "bugs" in places torturers communicate with each other to plan and coordinate invisible torture; placing remote wireless cameras in front of the entrance area of a building where the torturers gather routinely for the coordination of the organized torture plan; hacking torturers' computers; GPS tracking (often through torturers' mobile phones as well as GPS placed in the torturers' cars), regular fixed and mobile surveillance[80] (including the drone and satellite surveillance of organized torturer's movements). Section 629.52 of the California Penal Code shall be amended to include, expressly, organized invisible torture and organized stalking as one of the qualified crimes, whereby law enforcement is allowed to conduct the above surveillance methods, in addition to the surveillance method already stipulated in the said section, for the organized torture investigation.

The critical exception to the reverse-engineering of the organized surveillance currently done to the organized torture victim is that law enforcement shall never harass the torturers (while conducting the surveillance) since such harassment will inevitably function as a warning to the organized torturers.

---

[78] Beckles' letter (2015).

[79] "The great majority of law enforcement officials believe that the evidence necessary to bring criminal sanctions to bear consistently on the higher echelons of organized crime will not be obtained without the aid of electronic surveillance techniques." President's Commission, *Organized Crime*, 17.

[80] Gunderson, Affidavit, 3, 4.

Organized invisible torture and organized stalking play a critical role in most extensively *misdirecting* law enforcement's investigative attention and resource from the organized torture criminals to the victim of organized torture. The operation of organized invisible torture therefore subverts the two most effective techniques to investigate organized crime developed by law enforcement in the U.S. history (more specifically, Task Force on Organized Crime of the President's Commission on Law Enforcement and Administration of Justice), namely:

    1) The Federal Witness Security Program (as discussed above);

    2) The electronic surveillance of criminal organizations (wiretapping and bugging).

Law enforcement is encouraged not to arrest any of the organized torturers until law enforcement identifies each and every member of the torture-crime organization, each member's rank and role (i.e., specific crimes to charge the member of) in the organized torture conspiracy, and the gamut of the criminal organization's activities through the above mentioned surveillance methods. If law enforcement arrests each member of a criminal organization, who physically commit the actual torture crimes, each time law enforcement finds such a member, law enforcement will not be able to find the very leader of the criminal organization, who is isolated from other members who physically commit the actual torture crimes.[81] Such continuous surveillance of the network of organized torture activities, without showing any sign of law enforcement's warning, thus plays a critical role in identifying:

    1)  the very leader of the criminal organization, who centrally coordinates organized torture;

    2)  the entirety of the organized torture activities, which includes torture activities the criminal organization commits against all other victims, who reside within the same territory of the said criminal organization;

    3)  the other criminal organization (hereby named Crime Family B), which the primary criminal organization (hereby named Crime Family A) requests to continue stalking and torturing the victim, when the victim moves to the territory of Crime Family B. Tracking down the trace of money transfers allows the law enforcement to identify the network of torture-crime organizations (such as Crime Families A and B) as well as the financer of the organized invisible torture project of the particular victim (such as the client of the crime-perfection service, the stalking-by-proxy service or the whistleblower discrediting service, or the management of a certain criminal organization itself, such as Crime Family A).

California Attorney General Kamala Harris recommends that the state legislature remove the current requirement for state prosecutors to prove a defendant's subjective intent in financial transaction "structuring," i.e., breaking up financial transactions into amounts smaller than $10,000 in a single day, which is the limit federal law sets for financial institutions' mandatory report to financial regulators.[82] The author of this report on organized invisible torture supports such an amendment that will increase

---

[81] President's Commission, *Organized Crime*, 7.

[82] California Attorney General, *Gangs Beyond Borders*, 79.

the risk of state criminal liability for unmonitored transactions and money laundering to facilitate invisible torture enterprise by transferring a smaller amount of money periodically.[83]

Furthermore, by keeping organized torturers under long term surveillance, law enforcement is likely to discover the gamut of other horrendous criminal activities committed by the same criminal organization that commits organized invisible torture in question. Former FBI Chief Inspector Gunderson attests:

> These [organized invisible torture] operations require extensive financing with no return on the investment. This program's operations are financed by illegal black operations, i.e., narcotics, prostitution, child kidnapping..., human trafficking, gambling and other rackets.[84]

Thus, the said continuous surveillance of the criminal organization that effects organized torture plausibly brings about the detection and apprehension of the entire fluid networks of criminal organizations, as well as the entire scope of their diverse enterprises, across the state, the country and even the globe, since all of these organizations are virtually connected and enabled by information systems technologies,[85] as well as, to a substantial extent, by the organized torture conspiracy. In this light, the investigation of organized torture crime shall be conducted by the pre-existing unit in each law enforcement agency that is already specialized in investigating organized crime.

The largest obstacle to investigating and apprehending torturer-crime organizations marks certain criminal law enforcement and intelligence officers' (who have symbiotic relations with criminal organizations) acts of:

1) clandestinely informing the criminal organizations of law enforcement's forthcoming investigation into these criminal organizations, and

2) sophisticatedly misleading law enforcement into stalking the victim of organized torture, instead of keeping the torture-crime organization under investigative surveillance.

A law enforcement officer, who has prompted other law enforcement officers to keep the organized invisible torture complainant under law enforcement's perpetual surveillance harassment (thus has misdirected law enforcement's investigative attention and resources), should be investigated for organized torture conspiracy. The clause to be added to Section 206 of the penal code that expressly prohibits organized invisible torture shall include a provision for indicting such a law enforcement officer's conspiracy crime of torture.

---

[83] In addition to avoid the mandatory report to financial regulators, plausibly, Crime Family A chooses the periodic payment (i.e., "small installments") as opposed to a lump-sum payment for the following reason: The torture victim may, once again, move to another new locality (which is under the territory of another criminal organization, hereby named Crime Family C) immediately after Crime Family A pays the "handling"(stalking and torture) fee to Crime Family B.

[84] Gunderson, *Affidavit*, 2, 3.

[85] White House, *Combat Transnational Organized Crime*, 3.

Please note that, as argued in above (I.6 of this report), law enforcement cannot realistically expect any member of the criminal organization to provide information concerning the criminal organization's operations or members (including the leader) in exchange for the grant of immunity. It is because every member of the criminal organization that coordinates organized invisible torture will be subjected to organized invisible torture and organized stalking himself, if he becomes a turncoat.

The above surveillance provision shall be limited to violent organized crime only, otherwise, such surveillance constitutes a serious breach of constitutional right to privacy as guaranteed by Section 1, Article 1 of the state constitution. A provision as to how to investigate the abuse of organized surveillance by law enforcement has to be developed by the Internal Affairs of each law enforcement agency and any other agency that oversees law enforcement abuse.

## 8. Amend the Penal Code to Severely Penalize the Leaders of Criminal Organizations

California Attorney General Kamala Harris recommends in her aforementioned report on organized crime:

> California has no statutory authority that specifically targets or punishes supervisors, managers or financers… of transnational criminal organizations. …Congress enacted… the Criminal Enterprise Act (21 U.S.C. Section 848), …[according to which] a director of an illegal criminal organization may be sentenced to prison for not less than twenty years to life without the possibility of parole… To more effectively combat transnational criminal organizations and their criminal gang associates, the California Legislature should… amend current law to include a Criminal Enterprise Act… By doing so, law enforcement can more effectively target the "shot-callers" of these criminal organizations and destabilize their operations.[86]

Because the federal Criminal Enterprise Act targets only the enterprise of drug-trafficking but not the enterprise of organized invisible torture, or any other organized violence (such as murder for hire), the California version of the Criminal Enterprise Act should include organized invisible torture as well as any other self-perpetuating violent organized crime as the qualified crimes subject to the act's penalty provisions.

---

[86] California Attorney General, *Gangs Beyond Borders*, 73.

## II. The Proposed Bill Text

### The Organized Torture Act

Vote: majority. Appropriation: no. Fiscal committee: yes. State-mandated local program: no.

**THE PEOPLE OF THE STATE OF CALIFORNIA DO ENACT AS FOLOWS:**

**SECTION 1**. Chapter 12, Section 186.4, 186.41, 186.42, 186.43, 186.44, 186.45 and 186.46 of the Penal Code are added to read:

**CHAPTER 12. Organized Torture** [186.4 – 186.46]

**186.4**

This act may be cited as the "Organized Torture Act."

**186.41** For the purpose of this chapter, the following definitions apply:

(a) "Organized stalking" means the systematic surveillance and harassment of a specific person, by a multitude of individuals, and often centrally coordinated by a criminal organization or conspired criminal organizations.

(b) A "criminal organization" means an organization, under isolated leadership, that commits planned, non-impulsive, methodical, systematic, self-perpetuating and clandestine criminal activities. Such activities involve violence and manipulation based on intricate conspiracy, carried on over many years, seeking money and power. A criminal organization participates in any illegal activity that offers maximum profit at minimum risk of law enforcement interference. The leaders are isolated from other members who physically commit the actual crimes. A criminal organization seeks to evade law enforcement's detection and prosecution while corrupting and influencing the public and private sectors over the long term. A "criminal organization" has the same meaning as the term used in Chapter 96 of Title 18 of the United States Code, cited as "Racketeer Influenced and Corrupt Organizations Act," and Chapter 9 of the California Penal Code, cited as "California Control of Profits of Organized Crime Act."

23

(c) "Harassment" means a knowing and willful course of conduct directed at a specific person that seriously alarms, annoys, torments, or terrorizes the person, and that serves no constitutional purpose.

(d) "Course of conduct" means two or more acts occurring over a period of time, evincing a continuity of purpose. Constitutionally protected activity is not included within the meaning of "course of conduct."

(e) "Organized torture" means a knowing and willful course of conduct directed at a specific person that inflicts extreme or cruel pain or suffering by non-impulsively, calculatedly and clandestinely inflicting grave bodily injury. Such injury is mostly invisible and/or often seems prima facie naturally occurred, and inflicted in such sophisticated and diverse methods as to render the victim's torture complaint resemble delusional or paranoid. A criminal organization often centrally coordinates such torture for such purposes as discrediting the victim, who filed a civil or criminal complaint against a member or an associate of the criminal organization; discrediting a crime witness; discrediting a whistleblower; punishing the victim for the act s/he committed; coercing the victim; gaining sadistic pleasure; and/or for any reason based on discrimination of any kind. In lieu of abducting the victim, which results in the sudden disappearance of the victim and naturally raises law enforcement's suspicion, organized stalking is used to keep the victim under the control of the criminal organizations.

(f)  "Person" means an individual and not an entity.

(g) An "electronic weapon" means a portable devise or weapon from which an electrical current, impulse, wave or beam may be directed and whose current, impulse, wave or beam is designed to incapacitate temporarily, injure or kill.


**186.42 The Legislature's Statement of Findings and Purpose**

The legislature finds and declares that today's criminal organizations are forging alliances with corrupt elements of law enforcement, and using the power and influence of those elements to further their activities of manipulation and violence. Organized crime in its highest form is far removed from the streets. These groups are highly sophisticated, highly educated, and employ some of the world's best lawyers, bankers, psychiatrists and lobbyists. The most powerful criminal organizations benefit from the symbiotic relationship that their leaders have developed with corrupt law enforcement officials and business tycoons. These symbiotic conspirators centrally coordinate organized torture in order to place themselves above the law and the constitution. Organized invisible torture as a cutting-edge technology of transnational organized crime perpetually generates social credentials among these conspirators. The said accumulation of the widest-ranging social capital across diverse social sectors and professional fields enables crime syndicates to rapidly expand their operations and loose fluid networks around the world. The social capital accumulation realized through the coordination of organized torture further enables crime syndicates to diversify their activities and to render their operations more sophisticated

24

and covert than ever before. By infiltrating into every sector of society with which the organized torture victim interacts, crime syndicates succeed in augmenting the invisible sphere of manipulative influence. Once the system of organized torture is set in place by constantly stalking and battering at least one disenfranchised person in every municipality across the state and around the globe, transnational criminal organizations are equipped to track down and torture any person anywhere.

In order to perfect organized torture by prompting the police to dismiss the victim's torture complaint as delusion/paranoia, the methods of torture are strategically designed to make the victim's complaint resemble prima facie the diagnostic description of delusional disorder or paranoid schizophrenia. Prior to the enactment of this Act, the police have had summarily dismissed the victims' complaints assuming that the victims are delusional/paranoid, and wrongfully detained the victims in psychiatric institutions for observation, as per Section 5150 of Welfare and Institutions Code. Organized torture is a crime against humanity.

The largest obstacle to investigating and apprehending torturer-crime organizations marks certain criminal law enforcement officers' (who have symbiotic relations with criminal organizations) acts of 1) clandestinely informing the criminal organizations of law enforcement's forthcoming investigation into these criminal organizations, and 2) sophisticatedly misleading law enforcement into stalking the victim of organized torture, who seem delusional/paranoid, instead of keeping the torture-crime organization under investigative surveillance.

Organized torturer conspirators often intentionally select the survivors of child abuse and those with psychological disabilities for organized torture because the torturers assume that a person with a psychological disability (such as disability to protect oneself from violence often caused by child abuse victimization) is less likely to be believed by law enforcement and less equal in human worth. Organized torture serves the purpose of extra-judicially punishing a person with a psychological disability for attempting to disturb the wrongfully assumed (by the torturer) hierarchy of human worth (between those with and those without psychological disabilities) in order to reinstate such hierarchy. The Legislature intends to display society's condemnation of the said discriminatory purpose of organized torture.

The Legislature finds and declares that organized torture is the crime of domination and control. The torturers gain manic sense of power, self confidence and sadistic pleasure by controlling and destroying the victim whom the torturers perceive as less in human worth. It is this mental state (*mens rea*) of a lust for subjugation—while committing a violent criminal action—that the Legislature hereby categorizes as the guiltiest mental state (first-degree *mens rea*) in determining judicial punishment.

Acts that would constitute "organized torture" shall be used by a prosecuting agency to seek the remedies provided by this chapter, even if any act of organized torture occurred before the effective

date of this chapter. The Legislature's purpose herein is to prevent any and all future forms of organized violence, motivated by a desire for power and subjugation, which law enforcement will not be able to immediately detect. Otherwise, high-echelon criminal organizations will perpetually secure impunity surrounding the acts of sophisticatedly contriving and committing new, diverse, ingenious and more covert forms of subjugation violence by responding to the given opportunities for crime and to the given techniques of law enforcement and crime prevention.

**186.43  Prohibited activities; organized stalking**

Any person is guilty of the crime of organized stalking as defined in 186.41(a), if s/he 1) commits a conspiracy, as defined in Section 182, to commit; and 2) commits, or attempts to commit, underlying offenses as described in both subdivision (a) and (b):

(a) Willfully keeps another person under organized and systematic surveillance, whose widely diverse, sophisticated and covert methods include, but not limited to:

   (1) Offenses relating to the subcutaneous implanting of RFID in that person's body, including that person's tooth filling, crown or bridge, or through that person's vaccination syringe, in order to track that person, as proscribed by Section 52.7 of the Civil Code.

   (2) Offenses relating to the unauthorized access to that person's computers, computer systems, and computer data, as specified in Section 502 of the Penal Code.

   (3) Offenses relating to the interception of that person's telecommunication, as specified in Section 631 of the Penal Code.

   (4) Offenses relating to the act of eavesdropping on that person, as specified in Section 632.

   (5) Offenses relating to the use of an electronic tracking device to determine the location or movement of that person, as specified in Section 637.7.

   (6) Offenses relating to a pen register or a trap and trace device, as specified in Section 638.51.

   (7) Trespassing on that person's residence for such purposes as defined in 186.43(a) (8), (9) and (10) and 186.43(b)(2) and (3).

   (8) Placing eavesdropping devices in that person's residence, and any other places such as that person's vehicle, where information concerning that person is expected to be obtained.

   (9) Placing a video recording device inside that person's residence or vehicle, or at a location that captures that person's residence, such as that person's entrance door or garage door. Installing, remotely or otherwise, a video-recording software in the mobile phone, the computer or any other electronic device of that person or that person's cohabitant.

   (10) Searching through that person's belongings to gain further information.

26

(11) The interception of that person's airmails, often achieved with the conspiracy committed by mail delivery personnel.

(12) Soliciting others to commit organized surveillance against that person.

(13) This subsection is not applicable to a law enforcement officer who conducts the above organized surveillance with a valid warrant issued by the court. However, law enforcement officer who conducts the above indictable acts of organized surveillance without a valid warrant issued by the court shall be prosecuted.

(b) Based on the information about a specific person acquired by committing the acts proscribed in 186.43(a), willfully, systematically and repeatedly follows, harasses and sabotages (financially, employment-wise, and otherwise) that person in covert, sophisticated and diverse methods including, but not limited to, the following:

(1) If committed by a peace officer, a firefighter, an emergency medical technician, a school bus driver, a public transportation driver, a delivery driver or a private security guard, such harassment includes, but not limited to, the act of repeatedly showing up in front of that person in the police, ambulance, firefighter, school, security guard and/or public transportation vehicles, and the repeated use of the emergency sirens and/or alarming lights of some of these vehicles, which are equipped with sirens and alarming lights within the proximity of that person;

(2) Offenses relating to the unauthorized tampering of that person's computers and computer data, including erasing that person's emails and work-related data; stealing email password, composing a harassing email under that person's email address and sending the harassment email to that person's client or employee to have that person fired.

(3) Making a false allegation of a crime that is hard to prove, such as a sexual offense, against that person as defined in Section 118 of the Penal Code, for such purposes as rendering that person fired by her/his employer, gaining more information on that person by prompting the police into investigating that person, and by receiving such information from a police officer who conspires with a criminal organization, instigating that person's community to hate, stalk, ostracize and harass that person, and falsely and maliciously indicting that person for any crime, as defined in 182(a)(2).

(4) Producing wrongful and defamatory records of that person, including a false hospital record evincing that that person received drug-addiction treatment.

(5) Delaying, stealing or misdirecting that person's mails, after intercepting the mail, in order to sabotage that person's employment, exercise of civil rights and so forth. Such an act includes delaying the delivery of a mail concerning a job interview notice or a court hearing notice until the day of the job interview date or the court hearing date.

(6) Housing sabotage, by a means such as soliciting that person's landlord to harass and illegally eject that person.

27

(7)  Defamation, including internet disinformation and smear campaigns, as defined in Section 44, 45(a) and 46 of the Civil Code.

(8)  Soliciting, directly or indirectly, attorneys not to represent that person for a violation of that person's civil or other rights; or to give wrongful legal information to that person in order to discourage that person from protecting her/his rights.

(9)  Unconstitutional set-ups on drug charges and other felony charges, such as remotely installing child pornography in that person's computer.

(10)  Mixing an invisible substance not harmful enough to immediately damage that person's physical health, in the food or beverage that person is expected to consume.

(11)  Invisibly gassing, which does not severely harm the gassed person's physical health, by such a means as covertly placing invisible toxin that releases airborne toxin in that person's residence or by spraying that person's residence through an opened window or spraying that person's body directly.

(12)  Soliciting, directly or indirectly, psychiatrists to give that person the wrongful diagnosis of delusional disorder or paranoid schizophrenia.

(13)  Vandalizing that person's vehicle.

(14)  Offenses relating to a direct or implied threat with the intent to place that person in fear for his or her safety, or the safety of his or her immediate family.

(15)  Soliciting others to commit organized stalking harassment against that person.

## 186.44 Prohibited activities; organized torture

(a)  Any person is guilty of the crime of organized torture as defined in 186.41(e), if s/he 1) commits conspiracy, as defined in Section 182, to commit; and 2) commits, or attempts to commit any of the underlying diverse, sophisticated and invisible acts, which include, but not limited to:

(1)  Battery committed with an electronic weapon, which damages the internal organ of another person or inflicts severe pain on that person, whereof injuries are invisible to the naked eye. Such battery is committed often across a wall with the aid of radar or another device to see through a wall so that the torturer is invisible to the naked eye of that person.

(2)  Invisible poisoning, including polluting the water supply of that person's residence and placing invisible poison in the food or beverage that the torturers expect that person to consume.

(3)  Clandestine (often invisible), poisonous gassing of that person, in such ways as placing invisible airborne toxin in that person's residence, smearing invisible toxin (biochemical or otherwise) on the surface of an object, with which that person's skin has direct or indirect contact, or spraying that person directly (for purposes such as making that person lose

28

consciousness in order to prevent that person from witnessing those who are invading that person's residence).

(b) Any person is guilty of the crime of soliciting organize torture as defined in 186.41(e), if s/he commits any of the underlying diverse and sophisticated acts including, but not limited to:

    (1) Soliciting, directly or indirectly, a physician to wrongfully diagnose that another person has no physical injury when that person sustained a physical injury invisible to the naked eye, due to organized torture; or to erase any medical evidence as to a physical injury that person sustained due to organized torture.

    (2) Soliciting, directly or indirectly, psychiatrists to give an organized torture victim or an organized stalking victim the wrongful diagnosis of delusional disorder or paranoid schizophrenia.

    (3) Soliciting, directly or indirectly, a police officer to dismiss the complaint of organized torture or organized stalking, or to detain the complainant in a psychiatric institution for observation.

    (4) Soliciting others to commit organized torture.

(c) A peace officer is guilty of facilitating organized torture if s/he knowingly obstructs the administration of justice by

    (1) misleading his or her police agency to keep the complainant of organized torture under police harassment surveillance, instead of keeping the criminal organization that commits organized torture, under police surveillance; or

    (2) misleading his or her police agency to believe that an organized torture complainant is delusional or paranoid, and thus to dismiss the complaint and/or to detain the complainant in a psychiatric institution even when the complainant is not in danger to self or others and when the complainant can take care of her/his food, housing and clothing.

## 186.45  Criminal penalties

### (a) Penalties for organized stalking;

#### (1) Imprisonment.

    (A) Whoever violates any provision of Section 186.43(a) shall be imprisoned for two, three or four years.

    (B) Whoever violates any provision of Section 186.43(b) shall be imprisoned for not less than four years and not more than ten years.

    (C) Two years shall be added to the imprisonment term if the victim is a child abuse survivor or a person with a psychological disability. Proving the defendant's perception

that the victim is a child abuse survivor or a person with a psychological disability is not necessary.

(D) If the prosecutor proves that the defendant perceived that the victim was a person with a psychological disability or a child abuse survivor before or while committing organized stalking, three years shall be added to the imprisonment term.

(2) **Fine**

(A) A peace officer who conducts the above indictable act of organized surveillance as defined in Section 186.43(a) without a valid warrant issued by the court shall be sentenced to a fine not less than $5,000.

(B) Whoever conducts the indictable act of organized surveillance as defined in Section 186.43(a), other than a peace officer, shall be fined not less than $2,000.

(3) **Penalties for leading organized stalking**

(A) A criminal law enforcement officer who leads, principally administers or organizes organized stalking as defined in Section 186.43 shall not hold a position of a criminal law enforcement officer for the rest of his or her life, and shall be fined not less than $50, 000 and not more than $400,000.

(B) Any person, who leads, principally administers or organizes organized stalking as defined in Section 186.43, shall be sentenced to not more than 20 years and fined not less than $10,000 and not more than $200,000.

(C) A half of the fine shall be distributed to the state and another half shall be distributed to the victim.

(b) **Penalties for organized torture;**

(1) **Imprisonment and fines.**

(A) Any person who knowingly engages in organized torture shall be sentenced to a term of imprisonment which may not be less than 20 years and which may be up to life imprisonment, to a fine not to exceed the $4,000,000 if the defendant is an individual or $10,000,000 if the defendant is other than an individual.

(B) Additional five years of the imprisonment term and not more than $500,000 of the fine shall be added if the victim is a child abuse survivor or a person with a psychological disability. Proving the defendant's perception that the victim is a child abuse survivor or a person with a psychological disability is not necessary.

(C) If the prosecutor proves that the defendant perceived that the victim is a person with a psychological disability or a child abuse survivor before or while committing organized

30

stalking, additional ten years of the imprisonment term and $1,000,000 of the fine shall be added.


**(2) Life imprisonment for leading organized torture**

Any person who engages in organized torture shall be sentenced life imprisonment, without a possibility of parole, to a fine in accordance with subsection (a) of this section, and to the forfeiture of her or his entire asset, in accordance with subsection (c) of this section, if—

(A) such a person is the principal administrator, organizer, or leader of the enterprise or is one of such principal administrators, organizers, or leaders;

(B) such a person is a law enforcement officer who either knowingly facilitates a criminal organization in organized torture or who principally administers, organizes or leads organized torture; or

(C) such a person pays or otherwise solicits a criminal organization or law enforcement to have another person subjected to organized torture.


**(3) The forfeiture of the entire property for leading organized torture**

(A) Any person who leads organized torture as proscribed in (A), (B) or (C) of Subsection 186.44(b)(2) shall forfeit, to the State of California, his or her entire real property (including things growing on, affixed to, and found in land) and entire personal property, whether tangible or intangible, including rights, privileges, interests, alimonies, claims and securities (such as any and all proceeds of, interests in and claims against any of his or her criminal profiteering activity as defined in Section 186.2 and organized torture as defined in 186.43 of the Penal Code) in accordance with the forfeiture proceeding provisions set forth in Section 186.4, 186.5, 186.6 and 186.7.


**(B) The distribution of the fine**

A half of the fine shall be distributed to the state and another half shall be distributed to the victim.


**(c) Penalty determination guideline for organized stalking and organized torture**

The temporal duration, the intensity and the motivation of organized torture or organized stalking shall be considered in determining the guilt of the defendant. The combination of the degree of each defendant's guilt and the amount of his or her existing asset and income shall be proportional to the amount of fine collected from the defendant. Those with greater assets and income shall be fined a higher amount for the same degree of guilt as those with less assets and

income. No income and asset consideration shall be made in determining the imprisonment term.

**186.46 The facilitation of organized torture by a psychiatrist and a medical doctor;**

(a) A psychiatrist or a medical doctor, who knowingly facilitates organized torture or organized stalking by giving a wrongful psychiatric diagnosis, such as delusional disorder or paranoid schizophrenia, to the victim of organized torture or organized stalking, whereof the evidence is not readily available; or by tampering with medical evidence concerning physical injury sustained by an organized torture victim shall;

   (1) have her/his license permanently revoked,

   (2) pay a fine not less than $10,000 and not more than $40,000. A half of the fine shall belong to the state while another half shall be given to the victim of the wrongful diagnosis, and

   (3) be imprisoned for two or three years.

   (4) If the victim of the wrongful psychiatric diagnosis is a child abuse survivor or a person with a psychological disability, who has a legitimate diagnosis other than the wrongful diagnosis, the fine shall be not less than $15,000 and not more than $60,000, for each wrongful diagnosis, and the prison sentence shall be three years.

(b) Miscellaneous provisions on the facilitation of organized torture by a psychiatrist and a medical doctor;

   (1) Hyper-vigilance caused by such victimizations as organized torture, organized stalking, or any past abuse victimization, including child abuse survival, shall not be diagnosed as delusional disorder, but as Abuse Victimization Difficulties.

   (2) The record of psychiatrists and medical doctors, who made a wrongful diagnosis in order to facilitate organized torture, shall be available to the public.

   (3) A government-employed and court-appointed psychiatrist and medical doctor are also subjected to the provisions set forth in 186.46 and shall not be granted any immunity, either qualified or absolute.

**Section 2.** Section 629(a)(7) and (8) and Section 629.52(d) of the Penal Code are added, and Section 629.52(a)(8) of the Penal Code is amended, to read:

**629.52(a)**

(7) Any violation of Section 186.43.

(8) Any violation of Section 186.44.

(d) There is a probable cause to believe that a peace officer commits complicity with a criminal organization by misleading the police into spending the police resources on committing organized stalking, as defined in Section 186.43, against a person with a psychological disability, in order;

(1) to prevent the police from investigating a criminal organization, and/or;

(2) to give information on that person, which the police have gathered, to the criminal organization, in order to enhance the criminal organization's ability to keep that person under the criminal organization's control to effect and perfect organized torture.

## Section 3. Section 646.9 (a) of the Penal Code is amended to read:

**646.9(a)**

The Legislature finds and declares that stalking is a crime of domination and control, but not caused by mental illness, as long as psychiatry has not classified a desire for domination and control as a type of mental illness. Any person who willfully and repeatedly follows, and;

(1) willfully harasses another person, or,

(2) makes a threat with the intent to place that person in fear for his or her safety, or the safety of his or her immediate family

is guilty of the crime of stalking, punishable by imprisonment in a county jail for not more than one year, or by a fine of not more than one thousand dollars ($1,000), or by both that fine and imprisonment, or by imprisonment in the state prison.

## Section 4. Section 799 of the Penal Code is amended to read:

Section 799 Prosecution for an offense punishable by death or by imprisonment in the state prison for life or for life without the possibility of parole, for the embezzlement of public money, or organized torture may be commenced at any time.

## Section 5. Section 13519.4 (d)(6) and 13519.4(k) of the Penal Code are added to read:

**13519.4 (d)(6)**

A fraction of law enforcement officers commit organized stalking against persons with perceived or actual psychological disabilities, especially when such disabilities are not treated by mental health professionals, or use unjustified physical violence against persons with psychological disabilities, due to such officers' prejudice against persons with psychological disabilities.

**13519.4 (k)**

(1) The commission shall establish a rule concerning recruiting persons with psychological disabilities and child abuse survivors to the local police by providing reasonable accommodations as a means to eliminate psychological disability profiling practiced among a fraction of law enforcement.

(2) The commission shall establish a rule concerning how to prevent local law enforcement from employing those with a desire for domination and control since law enforcement officers with such a desire tend to abuse, lethally or non-lethally, the discriminated classes of people including persons with psychological disabilities and the survivors of child abuse.

(3) The commission shall establish a rule that realizes the substantial representation of persons with psychological disabilities and the survivors of child abuse in a unit that directly recruits, promotes and relegates law enforcement officers in each local law enforcement agency.

(4) The commission shall develop and disseminate guidelines and training for all peace officers in California as described in subdivision (a) of Section 13510, on eliminating psychological disability discrimination.

**Section 4.**  Section 820.23 of the Government Code is added to read:

**820.23**

Notwithstanding any other provision of the law, a peace officer is civilly and criminally liable for an injury suffered by a person with a perceived or actual psychological disability or by a person who survived child abuse and caused by a peace officer's act or omission where the act or omission was the result of the exercise of the discretion vested in the officer. Proving the peace officer's knowledge of the injured person's child abuse history or psychological disability is not required to establish the peace officer's liability for abusing her or his discretion. The peace officer shall not be entitled to be indemnified under any circumstance.

**Section 5.**  Section 820.41 of the Government Code is added to read:

**820.41** Notwithstanding any other provision of the law, a peace officer is civilly and criminally liable for his act or omission in the execution or enforcement of any law, if a person who is injured by the peace officer's such act or omission is a person with a psychological disability or a child abuse survivor. Proving the peace officer's knowledge of the injured person's child abuse history or psychological disability is not required to establish the peace officer's liability herein. The peace officer shall not be entitled to be indemnified under any circumstance.

**Section 6.**  Section 5150 (k) of the Welfare and Institutions Code is added to read:

(1) A peace officer, who summarily dismisses an organized torture complaint simply because the complaint resembles, prima facie, the diagnostic description of delusional or paranoid schizophrenia, shall be fined $20,000, per dismissal.

(2) A peace officer, who detains the organized torture complainant in a psychiatric institution simply because the organized torture complaint appears, prima facie, delusional or paranoid, even though the complainant is not in danger to oneself or others and can take care of her or his food, clothing and housing, shall be fined an additional $20,000 per detention.

(3) The officer shall never be indemnified under any circumstance under this sub-section.

(4) A half of the collected fine shall be distributed to the state while another half to the victim.

35

EXHIBIT 5

# TED L. GUNDERSON & ASSOCIATES

6230-A Wilshire Blvd., Suite 6
Los Angeles, California 90048
Phone: (337) 344-8876

I, Ted L. Gunderson, hereby swear under the pains and penalties of jury that the following statements are true and correct:

1.     My name is Ted L. Gunderson. I am the owner and operator of Ted L. Gunderson & Associates, an international security and consulting firm based out of Santa Monica, California. I am currently a licensed private investigator in the state of California. I have performed private investigation and security work for numerous individuals, companies, and governments worldwide since founding my firm in 1979. I have worked for, amongst others, F. Lee Bailey, Esq., The California Narcotics Authority by appointment of Governor Jerry Brown, The 1984 Los Angeles Olympic Committee, and The 1979 Pan American Games in San Juan, Puerto Rico by appointment of then U.S. Attorney General Griffin Bell.

2.     Previous to my work as a private investigator I spent nearly three decades in the F.B.I. Between 1951 and 1960 I was an F.B.I. Special Agent. In 1960 I was promoted as a supervisor at F.B.I. Headquarters in Washington, D.C., where I was in charge of Organized Crime and Racketeering investigations covering 26 F.B.I. Field Offices nationwide. Following the assassination of President John F. Kennedy, I was re-assigned to Special Inquiry White House Matters at F.B.I. Headquarters. In 1965 I was promoted again to Assistant Special Agent-In-Charge of Internal Security and Anti-Terrorism of the F.B.I. New Haven, Connecticut Field Office. In 1970 I was promoted to Assistant Special Agent-In-Charge of the F.B.I. Philadelphia, Pennsylvania Field Office. On July 12, 1972 I successfully negotiated with two terrorist hijackers of National Airlines Flight 496 for the release of 119 passengers at Philadelphia International Airport. In 1973 I was promoted to Chief Inspector at F.B.I. Headquarters. I also served

as Special Agent-In-Charge of the F.B.I. Memphis and Dallas Field Offices. I retired from the F.B.I. as Senior Special Agent-In-Charge of the Los Angeles Field Office of the F.B.I. with over 700 employees and a budget of over 22 million dollars in 1979.

3.   I have read the Complaint in the current action of Mr. Keith Labella against F.B.I. and D.O.J. It is my professional opinion, based on information, knowledge and belief that the information sought by Mr. Labella in this F.O.I.A. suit regarding "gang stalking", "gang stalking groups" and "gang stalking methods" reasonably describes an ongoing, active, covert nationwide program that is in effect today, and, based on my investigations and experience, has been operational since at least the early 1980's. Since the 1980's gang stalking has increased in scope, intensity and sophistication by adapting to new communications and surveillance technology. These programs are using the codenames Echelon Program, Carnivore System, and Tempest Systems. The Echelon Program is administered by the N.S.A. out of Fort Meade, Maryland, and monitors all email and phone calls in the world. Carnivore System is administered by the N.S.A. out of Fort Meade, Maryland, and can download any computer system without being traced or otherwise known to the owner. Tempest Systems can decipher what is on any computer screen up to a quarter of a mile away. These programs are negatively impacting thousands of Americans and severely abusing their civil rights on a daily basis.

4.   Based on my investigative work, which includes intelligence from sources such as active and former members of the Intelligence Services (including the F.B.I., the C.I.A., the N.S.A. and Military Intelligence), information from informants active in criminal enterprises, and, victim testimonies, I have come to the conclusion that thousands of victims have been targeted by an illegal government rogue criminal enterprise that is active 24 hours a day within the U.S. This conspiracy is far too active to be controlled or operated by private enterprise whose goals are achieving financial gain. These operations require extensive financing with no return on the investment. This program's operations are financed by illegal black operations, i.e., narcotics, prostitution, child

2

kidnapping (children sell at covert auctions for up to $50,000 per child), human trafficking, gambling and other rackets.

5.   I have documentation and know that throughout the U.S., operating 24 hours-a-day and 7 days-a-week, there is a Central Command, located within the U.S., with multiple satellite offices, whose administrators can instantly initiate surveillance, phone taps and harassment against any individual in the country. They have the technology, financing and manpower to dispense illegal surveillance and harassment against anyone at any time, day or night. I have files on numerous cases of active, programmatic, illegal government harassment currently being conducted against thousands of Americans. This makes the F.B.I.'s former COINTELPRO program, which I worked on, including in a supervisory capacity, look like a Sunday school program by comparison.

6.   I firmly believe that most individuals working in the F.B.I., other intelligence agencies, and the government overall are honest, law-abiding public servants. However, a sophisticated network of rogue operatives has secretly infiltrated the F.B.I., other intelligence agencies including the C.I.A., and other key government positions. This rogue element seeks personal power and wealth and considers themselves above the law and the Constitution. They are carrying out the aforementioned surveillance and harassment activities in conjunction with organized crime, the cult movement in America including Satanic cults, other commercial and political interests, and even misguided civic organizations and neighborhood groups. This illegal surveillance and harassment program is being called gang stalking and organized stalking by the victims targeted by it. The victims are targeted for a variety of reasons including government and corporate whistleblowers, parties to financial and employment disputes, parties to marital disputes (usually divorced women), and even jilted paramours. Journalists covering controversial issues, and, even attorneys and private investigators representing unpopular clients or interests, have been targeted by this program.

7.   Individuals targeted by this program have been subjected to illegal and unconstitutional phone taps, illegal re-routing of business and

3

private phone calls for purposes of harassment, illegal audio "bugging", surreptitious entry into home, office, and vehicle, visual surveillance in the home conducted by illegal placement of miniature remote, wireless cameras (often accessible via internet), illegal internet spyware, illegal GPS tracking (often through their own mobile phones), regular fixed and mobile surveillance, mail misdirection, mail theft and tampering, financial and employment sabotage, slander campaigns and community ostracizing, internet disinformation and smear campaigns, poisoning, assaults and murder, illegal set-ups on drug charges and other felony charges, amongst many other civil rights abuses.

8. In addition to high-ranking members of the F.B.I., other intelligence services, and the government overall, wealthy, powerful members of criminal syndicates, multi-millionaires and the corporate elite are using the government gang stalking program to harass enemies. They can get a targeted individual harassed for the rest of that individual's life (individual cases of gang stalking lasting for over a decade are common). The higher status members of the gang stalking conspiracy initiate the gang stalking and coordinate logistics and funding. Lower echelon government rogue operatives, lower ranking members of the military (in violation of Posse Comitatus), petty criminals and street thugs perform the actual grunt work of daily monitoring and harassment of individuals targeted by the program.

9. Based on my professional experience, extensive intelligence information and belief, it is my professional opinion that the F.B.I. is involved in and has investigative files on the subject of gang stalking, related gang stalking methods, and gang stalking groups in the F.B.I.'s vast intelligence files, that are responsive to Mr. Labella's F.O.I.A. Complaint. Furthermore, I have personally referred numerous victims of gang stalking to the appropriate agents at the F.B.I. for investigation of their cases. I have also furnished the F.B.I. with documentation of an active, international child kidnapping ring probably operated by rogue C.I.A. agents. The F.B.I. has ignored my requests to investigate even though it is their responsibility to investigate kidnappings. I have a contact in Germany who advises me that the C.I.A. has set up secret operations on U.S. military bases for the kidnapping, sale and

4

trafficking of children worldwide. The F.B.I. may be using a unique codename and nomenclature for the gang stalking phenomenon in its records. However, this is a semantic difference, and, in no way changes my professional opinion that the F.B.I. has investigative files on the nationwide phenomenon of gang stalking described in reasonable and specific detail in Mr. Labella's F.O.I.A. Complaint. These F.B.I. files contain information responsive to Mr. Labella's F.O.I.A. Complaint regarding the subject of gang stalking. The F.B.I. and other intelligence agencies are administering and covering up the rogue, covert, government criminal enterprise of gang stalking. The gang stalking phenomenon appears in the records of both the F.B.I. and the N.S.A. in their records pertaining to the Echelon Program, Carnivore System, and Tempest Systems. In addition, the gang stalking phenomenon appears in the records of both the F.B.I. and the N.S.A. in their records pertaining to information collected by Narus systems. Narus is a wholly owned subsidiary of defense contractor Boeing that produces sophisticated, mass surveillance computer systems currently being used by both the F.B.I. and the N.S.A.

Dated this 26 day of April 2011.

Los Angeles, California

_Ted L. Gunderson_
Ted L. Gunderson

_____
NOTARY

5

# CALIFORNIA ALL-PURPOSE ACKNOWLEDGMENT

State of California

County of _Los Angeles_

On _4-25-2011_ before me, _Robert R.S. Propp_
　　　　Date　　　　　　　　　　　　Here Insert Name and Title of the Officer

personally appeared _Ted L Gundelson_
　　　　　　　　　　　　　　　Name(s) of Signer(s)

---

ROBERT R.S. PROPP
COMM. 1795936
NOTARY PUBLIC CALIFORNIA
LOS ANGELES COUNTY
My Comm. Expires April 20, 2012

Place Notary Seal Above

who proved to me on the basis of satisfactory evidence to be the person(s) whose name(s) is/are subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their authorized capacity(ies), and that by his/her/their signature(s) on the instrument the person(s), or the entity upon behalf of which the person(s) acted, executed the instrument.

I certify under PENALTY OF PERJURY under the laws of the State of California that the foregoing paragraph is true and correct.

WITNESS my hand and official seal.

Signature _____
　　　　　　　Signature of Notary Public

---

*OPTIONAL*

Though the information below is not required by law, it may prove valuable to persons relying on the document and could prevent fraudulent removal and reattachment of this form to another document.

**Description of Attached Document**

Title or Type of Document: _Sizelicion of Ted L Gundelson & Associates_

Document Date: _4-26-2011_　　　　Number of Pages: _5_

Signer(s) Other Than Named Above: _____

**Capacity(ies) Claimed by Signer(s)**

Signer's Name: _Ted L Gundelson_
- ☑ Individual
- ☐ Corporate Officer — Title(s): _____
- ☐ Partner — ☐ Limited ☐ General
- ☐ Attorney in Fact
- ☐ Trustee
- ☐ Guardian or Conservator
- ☐ Other: _____

RIGHT THUMBPRINT
OF SIGNER
Top of thumb here

Signer Is Representing: _____

Signer's Name: _____
- ☐ Individual
- ☐ Corporate Officer — Title(s): _____
- ☐ Partner — ☐ Limited ☐ General
- ☐ Attorney in Fact
- ☐ Trustee
- ☐ Guardian or Conservator
- ☐ Other: _____

RIGHT THUMBPRINT
OF SIGNER
Top of thumb here

Signer Is Representing: _____

©2007 National Notary Association • 9350 De Soto Ave., P.O. Box 2402 • Chatsworth, CA 91313-2402 • www.NationalNotary.org   Item #5907   Reorder: Call Toll-Free 1-800-876-6827

EXHIBIT 6

# The Surreptitious Reincarnation of COINTELPRO with the COPS Gang-Stalking Program

 BY   RAHUL D. MANCHANDA, ESQ. (/INDEX.PHP?OPTION=COM_K2&VIEW=ITEMLIST&TASK=USER&ID=510:RAHULDMANCHANDAESQ)   ·   AUG 22, 2016

Facebook     Twitter     LinkedIn     Flipboard     Digg



In 1975 Senator Frank Church convened a joint senatorial/congressional inquiry into the egregious human rights and civil liberties violations of the Central Intelligence Agency ("CIA"), National Security Agency ("NSA"), as well as the Federal Bureau of Investigation ("FBI") against people both foreign and domestic. Such blatant transgressions included the "neutralization" and "elimination" of political dissidents, "enemies of the state," real or imagined threats to National Security, and anyone else on the proverbial shit list of the Military Industrial Complex ("MIC").

The Church Committee was the United States Senate Select Committee to Study Governmental Operations with Respect to Intelligence Activities, a U.S. Senate committee chaired by Senator Frank Church (D ID) in 1975. A precursor to the U.S. Senate Select Committee on Intelligence, the committee investigated intelligence gathering for illegality by the aforementioned agencies after certain activities had been revealed by the Watergate affair.

Some famous examples which have since emerged include: (1) the FBI sending letters to Martin Luther King Jr encouraging him to kill himself or else they would tell the world about his sexual proclivities; (2) the planned or successful assassinations of foreign leaders such as Fidel Castro, Patrice Lumumba, and countless other South American, Middle Eastern or Asian leaders; (3) the wholesale undermining of entire foreign economies if they democratically elected someone at odds with the elite power structure deep state of the United States such as what occurred against Salvatore Allende of Guatemala; (4) the possible assassination of John F Kennedy; (5) revelations of Christopher Pyle in January 1970 of the U.S. Army's spying on the civilian population; (6) the December 22, 1974 New York Times article by Seymour Hersh detailing operations engaged in by the CIA over the years that had been dubbed the "family jewels," involving covert action programs involving assassination attempts against foreign leaders and covert attempts to subvert foreign governments were reported for the first time; (7) efforts by intelligence agencies to collect information on the political activities of US citizens; and (8) countless other examples, both overseas and domestically.

The end result of the Church Committee Hearings was the outright banning on CIA assassinations as well as the FBI/DOJ COINTELPRO gang-stalking programs. In 1975 and 1976, the Church Committee published fourteen reports on various U.S. intelligence agencies' formation, operations, and the alleged abuses of law and of power that they had committed, with recommendations for reform, some of which were later put in place.

Among the other matters investigated were attempts to assassinate other foreign leaders such as Rafael Trujillo of the Dominican Republic, the Diem brothers of Vietnam, Gen. René Schneider of Chile, and Director of CIA Allen Dulles's plan (approved by President Dwight Eisenhower) to use the Sicilian Mafia to kill Fidel Castro of Cuba.

Under recommendations and pressure by this committee, President Gerald Ford issued Executive Order 11905 (ultimately replaced in 1981 by President Reagan's Executive Order 12333) to ban U.S. sanctioned assassinations of foreign leaders.

Together, the Church Committee's reports have been said to constitute the most extensive review of intelligence activities ever made available to the public. Much of the contents were classified, but over 50,000 pages were declassified under the President John F. Kennedy Assassination Records Collection Act of 1992.

The Church Committee learned that beginning in the 1950s, the CIA and FBI intercepted, opened, and photographed more than 215,000 pieces of mail by the time the program was shut down. The Church report found that the CIA was zealous about keeping the US Postal Service from learning that mail was being opened by government agents. CIA agents moved mail to a private room to open the mail or in some cases opened envelopes at night after stuffing them in briefcases or coat pockets to deceive postal officials.

On May 9, 1975, the Church Committee called CIA director William Colby. That same day Ford's top advisers (Henry Kissinger, Donald Rumsfeld, Philip W. Buchen, and John Marsh) drafted a recommendation that Colby be authorized to brief only rather than testify, and that he would be told to discuss only the general subject, with details of specific covert actions to be avoided except for realistic hypotheticals. But the Church Committee had full authority to call a hearing and require Colby's testimony. Ford and his top advisers met with Colby to prepare him for the hearing.

The Ford administration, particularly Rumsfeld, was "concerned" about the effort by members of the Church Committee in the Senate and the Pike Committee in the House to curtail the power of U.S. intelligence agencies. It seemed that Rumsfeld et al was comfortable giving the power to arbitrarily destroy anyone as "enemies of the state" by anyone working in the IC and MIC.

COINTELPRO (COunter INTELligence PROgram) was a series of covert and illegal projects conducted by the FBI aimed at surveilling, infiltrating, discrediting, and disrupting domestic "political dissidents."

FBI records show that COINTELPRO resources targeted groups and individuals that the FBI deemed subversive, including anti Vietnam War organizers, activists of the Civil Rights Movement or Black Power movement (e.g., Martin Luther King, Jr. and the Black Panther Party), feminist organizations, anti colonial movements (such as Puerto Rican independence groups like the Young Lords), and a variety of organizations that were part of the broader New Left.

3/11/2017
The surreptitious Reincarnation of COINTELPRO with the COPS Gang-Stalking Program
Case 2:17-cv-01908-TLN-AC   Document 1   Filed 06/09/17   Page 69 of 169

FBI Director J. Edgar Hoover issued directives on COINTELPRO, ordering FBI agents to "expose, disrupt, misdirect, discredit, neutralize or otherwise eliminate" the activities of these movements and especially their leaders. Under Hoover, the agent in charge of COINTELPRO was William C. Sullivan.

Tactics included anonymous phone calls, IRS audits, and the creation of documents that would divide their targets internally.

After the 1963 March on Washington for Jobs and Freedom, Hoover singled out King as a major target for COINTELPRO. Under pressure from Hoover to focus on King, Sullivan wrote: "In the light of King's powerful demagogic speech, we must mark him now, if we have not done so before, as the most dangerous Negro of the future in this nation from the standpoint of communism, the Negro, and national security."

The Final Report of the Select Frank Church Committee blasted the behavior of the intelligence community in its domestic operations (including COINTELPRO) in no uncertain terms:

"The Committee finds that the domestic activities of the intelligence community at times violated specific statutory prohibitions and infringed the constitutional rights of American citizens. The legal questions involved in intelligence programs were often not considered. On other occasions, they were intentionally disregarded in the belief that because the programs served the "national security" the law did not apply. While intelligence officers on occasion failed to disclose to their superiors programs which were illegal or of questionable legality, the Committee finds that the most serious breaches of duty were those of senior officials, who were responsible for controlling intelligence activities and generally failed to assure compliance with the law. Many of the techniques used would be intolerable in a democratic society even if all of the targets had been involved in violent activity, but COINTELPRO went far beyond that - the Bureau conducted a sophisticated vigilante operation aimed squarely at preventing the exercise of First Amendment rights of speech and association, on the theory that preventing the growth of dangerous groups and the propagation of dangerous ideas would protect the national security and deter violence."

According to attorney Brian Glick in his book War at Home, the FBI used four main methods during COINTELPRO:

(1) Infiltration: Agents and informers did not merely spy on political activists. Their main purpose was to discredit and disrupt. Their very presence served to undermine trust and scare off potential supporters. The FBI and police exploited this fear to smear genuine activists as agents;

(2) Psychological warfare: The FBI and police used myriad "dirty tricks" to undermine progressive movements. They planted false media stories and published bogus leaflets and other publications in the name of targeted groups. They forged correspondence, sent anonymous letters, and made anonymous telephone calls. They spread misinformation about meetings and events, set up pseudo movement groups run by government agents, and manipulated or strong armed parents, employers, landlords, school officials and others to cause trouble for activists. They used bad jacketing to create suspicion about targeted activists, sometimes with lethal consequences;

(3) Harassment via the legal system: The FBI and police abused the legal system to harass dissidents and make them appear to be criminals. Officers of the law gave perjured testimony and presented fabricated evidence as a pretext for false arrests and wrongful imprisonment. They discriminatorily enforced tax laws and other government regulations and used conspicuous surveillance, "investigative" interviews, and grand jury subpoenas in an effort to intimidate activists and silence their supporters;

(4) Illegal force: The FBI conspired with local police departments to threaten dissidents; to conduct illegal break ins in order to search dissident homes; and to commit vandalism, assaults, beatings and assassinations. The object was to frighten or eliminate dissidents and disrupt their movements.

The FBI specifically developed tactics intended to heighten tension and hostility between various factions in their targeted groups and individuals, and this resulted in numerous deaths, among which were San Diego Black Panther Party members John Huggins, Bunchy Carter and Sylvester Bell.

While COINTELPRO was officially terminated in April 1971, critics allege that continuing FBI actions indicate that post COINTELPRO reforms did not succeed in ending COINTELPRO tactics.

ENTER THE "COPS" FEDERAL AND STATE SANCTIONED GANG-STALKING PROGRAM

"Community Oriented Policing," ("COPS") is a strategy of policing that focuses on police "building ties and working closely with members of the communities," and originated in 1994 when then Senator Joseph Biden wrote and then President Bill Clinton enacted the Violent Crime Control and Law Enforcement Act ("VCCLEA") establishing the Office of Community Oriented Policing Services ("COPS") within the US Department of Justice.

Community policing is supposedly a policy that requires police to engage in a "proactive approach" to address public safety concerns, and is a cornerstone of the Clinton Administration, gaining its funding from the 1994 Violent Crime Control and Law Enforcement Act.

Common implementations of community policing include: (1) relying on community based crime prevention by utilizing "civilian education," neighborhood watch, and a variety of other techniques, as opposed to relying solely on police patrols; (2) restructuring the patrol from an emergency response based system to emphasizing proactive techniques such as foot patrol; (3) increased officer accountability to civilians they are "supposed to serve;" and (4) decentralizing police authority, allowing more discretion amongst lower ranking officers, and more initiative expected from them.

In other words, federal and state sanctioned and approved GANG-STALKING.

Gang Stalking has been described as fascism, using East Germany style "Stasi Tactics," a systemic form of control, which seeks to control every aspect of a "Targeted Individual's" life. Gang Stalking has many similarities to workplace mobbing, but takes place outside in the community, where the target is followed around and placed under surveillance by groups of organized civilian spies/snitches 24/7, 365 days a year. Targeted Individuals are harassed in this way for months or years before they realize that they are being targeted by an organized program of gang-stalking harassment. This is very similar to what happened to many innocent individuals in the former East Germany or activists and dissidents in the former Soviet Union. Many innocent people in the former East Germany would be targeted for these harassment programs, and then their friends, family, and the community at large would be used to monitor, prosecute, and harass them. In the former USSR it was used by the state to target activists, political dissidents, or anyone that the Secret Police thought was an "enemy of the state," or as "mentally unfit," and many were institutionalized or murdered using this form of systematic control.

In Bill Clinton's COPS Gang-Stalking Program, civilian spies are recruited from every segment of society, and everyone in the "targets" life is made a part of this ongoing, continuous, and systematic form of control and harassment, with such actions that are specifically designed to control the target and to "keep them in line," like a Pavlovian Dog. These actions are also designed to mentally, physically, emotionally, spiritually, financially, socially, and psychologically destroy the target over years, to make them appear to be crazy, and leave them with no form of support, whatsoever.

For the targets of this harassment, COPS Gang Stalking is experienced as a covert psychological, emotional and physical attack that is capable of immobilizing and destroying a target over time. For the state, it is a way to keep their targets in line, control them, or ultimately destroy them.

This modern day systematic form of control is funded at the highest levels of government, just like it has in other societies where these similar types of harassment programs have been implemented.

Targets can be chosen for many reasons: (1) political views; (2) whistle blowing; (3) political dissidence; (4) asserting rights at work; (5) making the wrong enemy; (6) too outspoken; (7) investigating something that the state does not want investigated; (8) signing a petition; (9) writing a letter; (10) being "suspicious" by a civilian spy/snitch; or (11) being a religious/ethnic/racial minority.

The goal of the COPS state sanctioned organized gang-stalking program is to isolate the target from all forms of support, so that the target can be set up in the future for arrest, institutionalized, or forced suicide. Other goals of this harassment are to destroy the targets reputation and credibility, and to make the target look "crazy" or unstable.

The process often involves sensitizing the target to every day stimuli's as a form of control, which is used to control targets when they "get out of line." Targets of this harassment become vulnerable and destitute, and often become homeless, jobless, have a breakdown, are driven to suicide, similar to targets of the banned COINTELPRO. The government eliminates perceived "enemies of the state" in this manner.

When a target moves or changes jobs, the harassment continues.

Every time the target moves, the same defamation, lies, libel, and slander will be spread, and the systematic harassment will continue. Online defamation, libel, and slander on the internet has made this continuation of COPS gang-stalking a great deal easier.

People from all segments of society can be recruited to be the "eyes and ears" of the state, such as laborers, drug dealers, drug users, street people, prostitutes, punks, church groups, youth groups, your best friend, your lawyer, local policeman, doctor, emergency services, a neighbor, family, social workers, politicians, judges, dentists, vet, supermarket cashier, postman, religious leader, care worker, landlord, anyone.

Most of these recruited civilian spies/snitches do not understand or even care that the end consequence of this harassment protocol is to eventually destroy the targeted person, and function as "useful idiots" of the state sanctioned COPS gang-stalking program.

It has been reported that people participate in this COPS gang stalking because it: (1) gives them a sense of power; (2) is a way to make friends; (3) is something social and fun; (4) breaks down race/gender/age/social barriers; (5) is forced or blackmailed upon them by the State or police to take part; (6) is told to them that they are part of "homeland or national security" to help keep an eye on "dangerous" or "emotionally disturbed" individuals where they are "heroic spies for the state;" (7) is used on local thugs or informants who are already being used for other activities where their energies are diverted into these COPS gangstalking community spy programs; (8) is either a choice of spying for the State or police, or else go to jail; (9) involves outright lies and slander about the target to get them to go along with ruining the targets life; (10) includes average citizens recruited by the state the same way citizens were recruited in the former East Germany and other countries.

Some techniques used against targets in this organized COPS Gang-stalking program include: (1) classic conditioning where a target is sensitized to everyday stimuli over a period of months and years to harass them in public to let them know they are constantly being harassed and monitored; (2) 24/7 Surveillance following the target everywhere they go, learning about the target and where they shop, work, play, who their friends and family are, getting close to the target, moving into the community or apartment where they live, across the street, monitoring the targets phone, house, and computer activity; (3) isolating the target via defamation, libel, and slander campaigns, (eg, people in the target's community are told that the target is a thief, into drugs, a prostitute, pedophile, crazy, in trouble for something, needs to be watched, false files will even be produced on the target, shown to neighbors, family, store keepers); (4) constant or intermittent noise and mimicking campaigns disrupting the targets life and sleep with loud power tools, construction, stereos, doors slamming, etc; (5) talking in public about private things in the target's life; (6) mimicking actions of the target and basically letting the target know that they are in the target's life; (7) daily interferences, not too overt to the untrained eye, but psychologically degrading and damaging to the target over time; (8) everyday life breaks and street theater such as flat tires, sleep deprivation, drugging food, putting dirt on targets property; (9) mass strangers doing things in public to annoy targets such as getting called/text messages to be at a specific time and place to perform a specific action; (10) blocking targets path, getting ahead of them in line, cutting or boxing them in on the road, saying or doing things to elicit a response from the target; (11) "baiting" tactics where a surveillance operation can selectively capture evidence of a targeted person responding to harassment, and then that evidence could then be used to justify the initiation of more formal scrutiny by a government agency.

The COPS Gang-Stalking Program, as all other state sanctioned/approved gang-stalking programs, have always been funded by the Government. They are the only ones with enough money, coordination, and power to keep such a system in place. These coordinated efforts then join hands with others for this systemic form of control and harassment.

Such operations have nothing to do with the target's criminality - they are led and perpetrated by federal agents and intelligence/security contractors, often with the support of state and local law enforcement personnel. Unofficial operations of this type are often private investigators and vigilantes – including many former agents and police officers, sometimes on behalf of corporate clients and others with connections to the public and private elements of America's security industry.

The goal of such operations is "disruption" of the life of an individual deemed to be an enemy (or potential enemy) of clients or members of the security state. Arguably, the most accurate term for this form of harassment would be "counterintelligence stalking."

Agents of communist East Germany's Stasi (state police) referred to this process as Zersetzung (German for "decomposition" or "corrosion" – a reference to the severe psychological, social, and financial effects upon the victim). Victims have described the process as "no touch torture" – a phrase which also captures the nature of the crime: cowardly, unethical (and often illegal), but difficult to prove legally, because it generates minimal forensic evidence.

Tactics include online and personal slander, libel, defamation, blacklisting, "mobbing" (intense, organized harassment in public), "black bag jobs" (residential break ins), abusive phone calls, computer hacking, framing, threats, blackmail, vandalism, "street theater" (staged physical and verbal interactions with the minions of the people who orchestrate the stalking), harassment by noises, and other forms of bullying.

Such stalking is sanctioned (and in some cases, orchestrated) by federal agencies; however such stalking is also sometimes used unofficially for personal and corporate vendettas by current and former corrupt employees of law enforcement and intelligence agencies, private investigators, and their clients.

Since counterintelligence stalking goes far beyond surveillance – into the realm of psychological terrorism, as it is essentially a form of extrajudicial punishment. As such, the harassment is illegal – even when done by the government. It clearly violates the US Constitution's Fourth Amendment, which prohibits unwarranted searches, and the Sixth Amendment which guarantees the right to a trial. Such operations also violate similar fundamental rights defined by state constitutions. Stalking is also specifically prohibited by the criminal codes of every state in America.

As was stated above, organized stalking methods were used extensively by communist East Germany's Stasi (state police) as a means of maintaining political control over its citizens. Although this is supposedly illegal in the US, the same covert tactics are quietly used by America's local and federal law enforcement, and intelligence agencies, to suppress political and domestic dissent, silence whistle blowers, and get revenge against persons who have angered someone with connections to the public and private agencies involved.

Although Edward Snowden's revelations about the National Security Agency ("NSA") in 2013 and 2014 generated a great deal of public discussion about mass surveillance, US domestic counterintelligence activities such as the COPS Program receive relatively little attention.

The FBI's COINTELPRO operation is still happening, involving even more advanced surveillance technology - and this program is none other than Joseph Biden and Bill Clinton's COPS Program.

US Department of Justice crime statistics from a 2006 survey indicated that an estimated 445,220 COPS gangstalking victims reported three or more perpetrators (the only ones reported), and this number is growing exponentially on a daily basis.

In addition to being morally reprehensible, the COPS gang stalking program, just like the original version of the FBI's COINTELPRO operations, is very, very illegal. It violates criminal laws in all fifty states against stalking, as well as grossly violates the US Constitution's prohibitions against warrantless searches and extra judicial punishment.

While the vast majority of Americans are never personally targeted by the Joseph Biden/Bill Clinton COPS gangstalking program, they should still be concerned about the existence of such operations.

Even if such activities were constitutionally legitimate (which they are not), they still have an enormous potential for abuse as a personal or political weapon by enemies currently employed or friendly with these governmental institutions.

Ending this cowardly and illegal practice by law enforcement agencies, intelligence agencies, and their parasitic corporate and individual recruits will first require exposing what is happening, to the public.

 521 people like this. Be the first of your friends.   G+1  +10

**Tagged under** #United States (/index.php?option=com_k2&view=itemlist&task=tag&tag=United%20States), #Intelligence (/index.php?option=com_k2&view=itemlist&task=tag&tag=Intelligence), #Democracy (/index.php?option=com_k2&view=itemlist&task=tag&tag=Democracy), #Politics (/index.php?option=com_k2&view=itemlist&task=tag&tag=Politics), #CIA

(/index.php?option=com_k2&view=itemlist&task=tag&tag=CIA), #NSA (/index.php?option=com_k2&view=itemlist&task=tag&tag=NSA),
#Human Rights (/index.php?option=com_k2&view=itemlist&task=tag&tag=Human%20Rights),



**RAHUL D. MANCHANDA, ESQ. (/INDEX.PHP?OPTION=COM_K2&VIEW=ITEMLIST&TASK=USER&ID=510:RAHULDMANCHANDAESQ)**

Ranked amongst Top Attorneys in the United States by Newsweek Magazine in 2012 and 2013.

EXHIBIT 7

# samidoun

## PALESTINIAN PRISONER SOLIDARITY NETWORK

# Cornell University's Johnson Museum of Art to terminate G4S contract in victory for student organizing

Campaigns    Boycott G4S    International Prisoner Solidarity    News    April 3, 2016



Cornell University's Herman F. Johnson Museum of Art is terminating its contract with G4S, the British-Danish security conglomerate that runs private prisons in the United States and provides control rooms, equipment and security services to Israeli prisons holding Palestinian prisoners, reported the Cornell Sun.

............ ........ .......... ........ ....... ....... to terminate G4S contr...        http://samidoun.net/2016/04/cornell-universitys-johnson-museum-of-

Case 2:17-cv-01... .-TLN-AC   Document 1   Filed 06/0.../17   Page 76 of 169

involvement in the private prison industry. The victory follows the divestment of the University of California and Columbia University from G4S, following campaigns led by Black students and prison divestment campaigns against the investment of their universities in the private prison business.

"We would also like to take this moment to announce that we have just received notice from Acting President Kotlikoff that the Johnson Museum will no longer hold a contract with G4S, the oppressive securities company linked to the private prison industry, both domestic and abroad. Incarceration across the globe has wreaked havoc on communities of color. Any step the University takes in distancing itself from that brutal system is a step in the right direction," said Black Students United in a statement.

G4S is a major target of prison divestment movements targeting the private corporations profiting from mass imprisonment in the United States, especially of Black people and Black youth. It is also subject to an international call for boycott, by Palestinian prisoners and Palestinian movements, because of its involvement in the imprisonment of Palestinians, Israeli checkpoints, and the siege of Gaza – G4S provides security equipment for Israel's Beit Hanoun/Erez crossing to Gaza. Samidoun in New York City is working with CUNY Prison Divest and NYC Students for Justice in Palestine to organize a prison divestment speakout on 17 April, Palestinian Prisoners' Day, that will highlight the role of G4S, Corrections Corporation of America and other private corporations in global mass incarceration.

The Black4Palestine statement, signed by over 1,000 Black organizers, activists, artists and intellectuals, highlighted G4S as a target of particular importance for struggle by Black and Palestinian movements for justice and liberation.

G4S recently announced that it was planning to close down its youth incarceration business in the US as well as selling off its Israeli subsidy, labeled as "reputationally damaging." G4S has lost millions of dollars in contracts and investments due to its role in private imprisonment in the United States and in providing support for Israeli occupation and apartheid. However, both the US prison divestment movement and the Palestinian movement have emphasized that it is critical to continue to target G4S which profits daily from ongoing imprisonment, oppression and injustice in the US, Palestine, and internationally.

**Samidoun Palestinian Prisoner Solidarity Network congratulates and salutes Black Students United at Cornell University and the leadership of Black student movements across the United States in confronting and challenging mass incarceration and prison profiteering, and the complicity of US universities in structures of racism and oppression.**

Share this:

[] Facebook   [] Twitter   [] WhatsApp   [] Telegram   [] Google   [] Tumblr   [] Print   [] Email

**The Cornell Daily Sun** │ (http://cornellsun.com/2016/03/22/johnson-museum-severs-ties-with-security-company-with-alleged-ties-to-prison-industry/)

News ▾      Opinion ▾      Sports ▾      Arts & Entertainment ▾

Science    Dining ▾    Multimedia ▾    Sunspots



*Matt Hinsta / Sun File Photo*

Cornell University's Herbert F. Johnson Museum of Art has severed ties with the security company, G4S Secure Solutions USA.

## NEWS                                    March 22, 2016

# Johnson Museum Terminates Contract With Company With Alleged Ties to Prison Industry

By **Stephanie Yan**

*This story has been updated with additional information.*

The Herbert F. Johnson Museum of Art will terminate its contract with G4S Secure Solutions USA — a security service company that Black Students United says has ties to the prison industry — according to administrator Renee Alexander '74.

Provost and Acting President Michael Kotlikoff said the museum's relationship with G4S will be terminated in a letter, said Alexander, the associate dean and

Cornell's Division of Financial Affairs had previously contracted with G4S for consultation on Johnson museum security, according to the DFA website. The company provides risk consultation, investigation and technology support services, according to the security firm's website.

Additionally, G4S has "been linked to the private prison industry, both domestic and abroad," according to a BSU press release.

"Incarceration across the globe has wreaked havoc on communities of color," BSU said in the release on Monday. "Any step the University takes in distancing itself from that brutal system is a step in the right direction."

BSU representatives Samari Gilbert '17 and Carlton Burrell '16 said they hope this successful step in their prison divestment campaign will challenge the University to "more critically examine all of the companies it does business with."

"We appreciate the progressive steps that the administration has taken and hope the University will continue this in other industries," they said.

Gilbert and Burrell also cited the increased diversity of Gannett Health Service's staff as a sign of progress in addressing the challenges that many students of color face at Cornell. The two expressed their hope that further change will continue in ameliorating these conditions.

"We believe their most recent changes are an excellent first step in addressing these issues," they said. "We are optimistic that additional staff of color and support groups will be an asset to the entire Cornell community."

John Carberry, director of Media Relations, added that the University is pleased to have been able to work collaboratively with BSU on their demands.

"The administration has been working closely with BSU and other student groups on a number of issues, and we are very pleased with the progress that has been made," Carberry said.



**Cornell University**

Toggle navigation | Shared Governance

- Home
- Committees
- Log In

# Show Student Assembly R. 72: Resolution Urging Cornell University to Divest from Companies Profiting from Israeli Occupation and Human Rights Violations

**Committee:** Student Assembly

**Period:** 1 Jun 2013 - 31 May 2014

**Position:** 72

**Name:** Resolution Urging Cornell University to Divest from Companies Profiting from Israeli Occupation and Human Rights Violations

**Comments allowed until:** No comment period.

**Description:**

**Content:**

Whereas, Cornell University strives as part of its mission to "enhance the lives of its students, the people of New York, and others around the world;

Whereas, Cornell's Standards of Ethical Conduct call for the university to "conduct, process, and report all financial transactions with integrity;

Whereas, Cornell students have a legacy of advocating for justice, including in campaigns for divestment from apartheid South Africa and unsustainable fossil fuels;

Whereas, we affirm the crucial role of students and scholars in finding and advocating for solutions to humanity's various crises, and all manifestations of oppression and racism, including anti-Semitism, as well as to state actions like occupation;

Case 2:17-cv-012   -TLN-AC   Document 1   Filed 06/0   17   Page 80 of 169

Whereas, the occupied Palestinian territories are controlled militarily by the Israeli government;

Whereas, the occupation entails violations of the fundamental human rights of the Palestinian people, including but not limited to rights enshrined in the Universal Declaration of Human Rights,

Whereas, the Israeli government is engaged in the ongoing building of settlements in the occupied Palestinian territories, which violates the clause of the Fourth Geneva Convention stipulating that the Occupying Power shall not "transfer parts of its own civilian population into the territory it occupies," upheld by the UN Security Council in Resolutions 237, 252, 298, and 446,

Whereas, the separation wall which the Israeli government is building in the West Bank has been declared "contrary to international law" by the International Court of Justice,

Whereas, United Nations General Assembly affirmed in Resolution 3175 that "all measures undertaken by Israel to exploit the human and natural resources of the occupied Arab territories are illegal;

Whereas, the United Nations General Assembly further affirmed in Resolution 3005 "the Principle of the sovereignty of the population of the occupied territories over their national wealth and resources," and furthermore called "upon all States, international organizations and specialized agencies not to recognize or cooperate with, or assist in any manner in, any measures undertaken by the occupying Power to exploit the resources of the occupied territories or to effect any changes in the demographic composition or geographic character or institutional structure of those territories;

Whereas, Cornell University holds portfolio and direct investments in corporations that profit from Israel's military occupation of the West Bank and the Gaza Strip, thereby making Cornell a complicit third party in human rights abuses and violations of international law;

Whereas, the following illustrative and nonexhaustive list of corporations, in which Cornell invests, profits from Israel's military occupation and participates actively in these abuses and violations;

Whereas, Tata Motors produces specialized armored vehicles for the Israeli army, designed for urban combat, which Israel uses to defend its illegal settlements, to prevent Palestinian shepherds from herding their land, and to suppress Palestinian demonstrations;

Whereas, SodaStream maintains its central production plant in Ma'ale Adumim, an illegal Israeli settlement located in the West Bank;

Whereas, IngersollRand creates and produces the technology used at Israeli checkpoints across the occupied Palestinian territories;

Whereas, Raytheon supplies Israel with missiles that are used against crowded residential areas such as refugee camps, and for targeted assassinations;

Whereas, Cornell University contracts with corporations that profit from Israel's military occupation of the West Bank and the Gaza Strip, thereby making Cornell a complicit third party in human rights abuses and violations of international law;

Whereas, the following illustrative and nonexhaustive list of corporations, with which Cornell contracts, profits from Israel's military occupation and participates actively in these abuses and violations;

Whereas, G4S provides security systems for Israeli prisons, detention centers, and interrogation facilities that specialize in holding Palestinian political prisoners, security services for various businesses in illegal Israeli settlements, and technology for Israeli checkpoints in the occupied Palestinian Territories, and provides deportation services to a range of governments, using techniques that fail to meet minimal standards of human rights;

Whereas, Hewlett Packard maintains a development center in Beitar Illit, an illegal Israeli settlement, provides services and technologies for two of the largest illegal Israeli settlements in the West Bank, Modi'in Illit and Ariel, and supplies computer technology for Israeli ministry of defense;

Whereas, Cornell University upholds the principle of "freedom with responsibility," which entails educating ourselves as members of the Cornell community about the location of university investments and the ethical implications of those investments;

Be it resolved, that Cornell University will further examine its assets for investments in companies that a) provide military support for, or weaponry to, the occupation of Palestinian territory or b) facilitate the building or maintenance of the illegal separation wall or the demolition of Palestinian homes, or c) facilitate the building, maintenance or economic development of illegal Israeli settlements on occupied Palestinian territory;

Be it further resolved, that Cornell University will make information about all of its assets public, pertaining especially to its investments;

And be it finally resolved, that Cornell University will end its complicity with the Israeli occupation of the Palestinian territories and divest its holdings from the aforementioned companies and any other companies that profit directly from Israeli military occupation in the West Bank and the Gaza Strip. Moreover, Cornell University will not make further investments in companies that materially support or profit from Israel's occupation of Palestinian territory.

**Sponsors:** Nicholas Vasko

Attachments:

- Resolution Urging Cornell University to Divest from Companies Profiting from Israeli Occupation and Human Rights Violations

Comments:

No comments.

# Events

| Date | Event | Description | Attachments |
|------|-------|-------------|-------------|
| 2014-04-08 | propose | | No attachments. |

# Prior motions superseded by this motion

**Committee Period Position Name Status**

# Later motions that supersede this motion

**Committee Period Position Name Status**

| List users: allowed | List meetings: past, current, future | Back to Student Assembly

© 2008-2017 Cornell University. We use free software. Questions? Contact assembly@cornell.edu.

EXHIBIT 8

Official website of the Department of Homeland Security

Contact Us    Quick Links    Site Map    A-Z Index

Share / Email

# Prime Contractors

The list below provides information on large business Prime Contractors who are interested in subcontracting with small, small and disadvantaged, women-owned small, HUBZone-certified, 8(a), veteran-owned small, and service-disabled veteran-owned small businesses.

To determine if opportunities exist for your company, we recommend you prepare yourself as follows:

1. Research the company by reviewing the column "In Search Of" to determine if there might be a match;

2. Visit each prime contractors' website to learn more about the company;

3. If the company requires businesses to register in their Supplier Registration database, do so (it is very likely that the Prime will ask if you've been to their site and registered in their supplier database);

4. Send an email to the contact listed for each Prime informing them of your interest in being considered for subcontracting opportunities. Briefly explain how you believe you can assist the Prime (be

specific and tie your experience/capabilities to their needs).

5. If you have the opportunity to meet with a Prime, be prepared, and most important, be on time.

6. If they ask you to follow-up with additional information, do so.

Good luck in your efforts to do business with DHS Prime Contractors.

The Department of Homeland Security has established department-wide contracts for Information Technology (IT) services and commodities. These procurements are being managed by the Office of Procurement Operations (OPO) in cooperation with the Chief Information Officer (CIO) and the Component IT and procurement communities. For information on the companies that were awarded contracts and their teaming coordinators please access the ITAC Website (/information-technology-acquisitions) .

Expand All Sections (#)

## Accenture (#)

## Alion Science and Technology Corporation (#)

## AMR Office of Emergency Management (#)

Atkins (#)

BAE Systems Intelligence & Security (#)

Battelle National Biodefense Institute, LLC (#)

BI Incorporated (#)

The Boeing Company (#)

Booz Allen Hamilton (#)

CACI Federal, Inc. (#)

CDM Smith (#)

CH2M (#)

Comprehensive Health Services, Inc. (CHSi) (#)

Covenant Aviation Security, LLC (#)

CSRA (#)

Deloitte Services LP (#)

Dewberry (#)

Ernst & Young LLP (#)

FJC Security Services, Inc. (#)

Fluor Government Group (#)

G4S Government Solutions (#)

Formerly Wackenhut Services, Inc.
Small Business Liaison: Mariah Knefely
Mariah.knefely@g4sgs.com
(mailto:Mariah.knefely@g4sgs.com)

Website: www.wsihq.com (/redirect?url=http%3A%2F
%2Fwww.wsihq.com)

In Search Of:

- Uniforms (Armed and Unarmed)
- Armed Guard Duty Gear
- Security Guard Services Armed and Unarmed)
- Office Supplies
- Office Equipment
- Vehicle Repair and Maintenance
- Vehicle Equipment Installation (Radio, Light Bars, Sirens, etc.)
- Fire Fighter Station Uniforms
- Fire Fighter Protective Gear

# General Dynamics Information Technology (#)

# The Geo Group (#)

# Grant Thornton, LLP (#)

# Grunley Construction Company, Inc. (#)

# Harris IT Services (#)

# The Haskell Company (#)

FREE e-Newsletter

Important News - Hot Topics
Get them Now!



**TECHNOLOGY**

Members Login | Not A Member?

Search

Our Advertisers | Digital Edition | Magazine Subscription | Advertise With Us

**HOME    VIDEO    GANGS    SWAT    WEAPONS    CAREERS & TRAINING    PATROL    TECHNOLOGY    VEHICLES    WOMEN IN LE    DIRECTORY**

Featured Articles    Products    News    Blog    Photo Galleries

**Product News**

# G4S Technology Gains DHS Approval

April 25, 2012  |

G4S Technology's physical and electronic security solutions were again "designated" and "certified" as Qualified Anti-Terrorism Technology (QATT) by the United States Department of Homeland Security (DHS) under the Support Anti-terrorism by Fostering Effective Technologies Act of 2002 (the SAFETY Act), the company has announced.

G4S Technology (formerly Adesta) was one of the first systems integrators to receive this prominent certification and designation for its design, engineering, construction, integration, maintenance, and training services, according to the company.

As a global systems integration company, G4S Technology designs and installs physical and electronic security solutions for critical infrastructure. The SAFETY Act Certification and Designation renewal will continue to provide G4S Technology and its customers significant liability protections.

"G4S Technology is honored to once again receive full SAFETY Act approval from the Department of Homeland Security," said Bob Sommerfeld, president of G4S Technology. "Meeting the requirements of this rigorous certification and designation process is a direct and positive reflection of the quality of service and impressive experience and expertise of G4S Technology and our employees."

The SAFETY Act was created in response to the potentially crushing liability suits that were filed after the terrorist attacks of September 11, 2001. Congress, understanding that the existence of such lawsuits could keep important anti-terror services and technologies out of the hands of the federal government, port authorities, commercial customers, and others, created the system of liability protections offered by the SAFETY Act as an incentive for companies to buy and sell effective anti-terror goods and services, according to G4S.

**Tags:**    Counter-Terrorism Initiatives    Homeland Security    G4S Technology

Request more info about this product / service / company



**Cobalt Software Platform - Mark43**

Mark43's Cobalt software platform unites a set of
law enforcement tools securely...

**LEGALLY DEFENSIBLE TRAINING RECORDS**

## ASK THE EXPERT



**Ari Vidali**
*CEO and Founder of Envisage
Technologies*

**SEE QUESTIONS**

**ASK A QUESTION**

**WEBINARS**

**No upcoming webinars scheduled**

**LINKS**                    More Links

Spillman Technologies    IWCE Show    ITT Night
Vision    ICx Tactical Platforms    Simulator Systems
WatchGuard Video

**Recommended Stories**



**Storage Compartments**



**SHOT Show 2017: Report
from the Aisles**



**How Can Officers Address
Drone Threats?**

<iframe src="https://www.googletagmanager.com/ns.html?id=GTM-WXPGZV" height="0" width="0" style="display:none;visibility:hidden"></iframe>

 **Securing Your World**

CALL G4S TODAY!

# 855-266-6725
(tel:855-266-6725

YOUR TOTAL CALIFORNIA SECURITY SOLUTION

## G4S California

G4S is the world's leading security solutions group. Specializing in security guard services and technology solutions, G4S California is your local security expert. Our background checked and trained security guards are available for armed and unarmed service, short or long term contracts, 24 hours emergency response and more. Our areas of focus includes residential guard gate service, hospital and healthcare facilities, financial institutions, campuses, governement buildings, and most places protection is needed.

G4S offers a wide range of techology security solutions including access control, alarm management, card readers, digital video, identity management and more.

Anything from manned guard service to complex techology services, G4S California will devleop the custom solutions you need!

Call us today for a free consultation!

 OUR CALIFORNIA LOCATIONS

## G4S Orange County, CA (/Orange-county/)

🏠 2300 E. Katella Avenue, Suite 150
Anaheim, CA, 92806

📞 714-939-4900 (tel:7149394900)
✉ lan_info@usa.g4s.com (mailto:lan_info@usa.g4s.com)
🌐 Visit Website (/orange-county)

## G4S Sacramento, CA (/Sacramento/)

🏠 1565 River Park Drive Suite A
Sacramento, CA, 95815

📞 916-641-0200 (tel:9166410200)

## G4S San Diego, CA (/San-diego/)

🏠 5030 Camino De la Siesta Suite 404
San Diego, CA, 92108

📞 619-295-2394 (tel:6192952394)

## G4S San Fernando, CA (/San-fernando/)

🏠 5655 Lindero Canyon Road Suite 504
Westlake Village, CA, 91362

📞 818-889-1113 (tel:8188891113)

## G4S San Francisco, CA (/San-francisco/)

🏠 200 Pine Street 7th Floor
San Francisco, CA, 94104

📞 415-591-0780 (tel:4155910780)

## G4S San Ramon, CA (/San-ramon/)

🏠 One Annabel Lane Suite 208
San Ramon, CA, 94583

📞 925-543-0008 (tel:9255430008)

## CUSTOMER TESTIMONIALS

I would like to take this opportunity to extend my appreciation and congratulations on an excellent job to G4S staff that facilitated maintenance of security operations throughout the day. I was very pleased to see the hard work, diligence, and professionalism all staff displayed.

Government Security Customer

© 2014 G4S - All Rights Reserved

Fax: **(716) 633-1040**

### G4S Secure Solutions (USA)
*Security and safety officers*
33 West Main Street, Suite 309, Elmsford, NY 10523
Phone: **(914) 347-0505**
Fax: (914) 347-1536

### G4S Secure Solutions (USA)
*Security and safety officers*
25 Newbridge Road, Suite 303, Hicksville, NY 11801
Phone: **(516) 349-7070**
Fax: **(516) 349-7075**

### G4S Secure Solutions (USA)
*Security and safety officers*
19 W 44th Street, Suite 305, New York, NY 10036-5903
Phone: **(212) 921-4600**
Fax: **(212) 921-4919**
Web: **http://local.g4s.us/New-York**

### G4S Secure Integration
*Electronic & physical security solutions, communication networks, critical infrastructure, video monitoring & analytics*
Eastern Metro Office, 370 Lexington Ave., Suite 308, New York, NY 10017
Phone: **(212) 414-0073**

### G4S Secure Solutions (USA)
*Security and safety officers*
1425 Mount Read Boulevard, Suite 240, Rochester, NY 14606
Phone: **(585) 546-5506**
Fax: **(585) 546-5385**

→ ### G4S Secure Solutions (USA)
*Security and safety officers*
441 South Salina Street, Suite 201, Syracuse, NY 13202
Phone: **(315) 422-1247**
Fax: **(315) 422-1249**

**Back to top**

Case 2:17-cv-01208-TLN-AC   Document 1   Filed 06/09/17   Page 93 of 169

# G4S

From Wikipedia, the free encyclopedia

**G4S plc** (formerly **Group 4 Securicor**) is a British multinational security services company headquartered in Crawley, England.[3]

The company was set up in 2004 when London-based company Securicor amalgamated with Danish business Group 4 Falck.[4] The company offers a range of services, including the supply of security personnel, monitoring equipment, response units and secure prisoner transportation. G4S also works with governments overseas to deliver security.[4]

It is the world's largest security company measured by revenues and has operations in around 125 countries.[5] With 618,000 employees, it is world's third-largest private employer, the largest European and African private employer, and among the largest on the London Stock Exchange.[6][7] G4S was founded in 2004 by the merger of the UK-based Securicor plc with the Denmark-based Group 4 Falck.

G4S has a primary listing on the London Stock Exchange and is a constituent of the FTSE 250 Index, having been relegated from the FTSE 100 Index in December 2015.

| G4S plc | |
|---|---|
|  | |
| **Type** | Public limited company |
| **Traded as** | LSE: GFS (http://www.londonstockexchange.com/exchange/searchengine/search.html?q=GFS), Nasdaq Copenhagen: G4S (http://www.nasdaqomxnordic.com/shares/shareinformation?Instrument=CSE25634) |
| **Industry** | Security |
| **Founded** | 2004 |
| **Headquarters** | Crawley, England |
| **Area served** | Worldwide |
| **Key people** | John Connolly (Chairman) Ashley Almanza (CEO) |
| **Services** | Manned security services, cash handling services, justice services and outsourced business processes related to security and safety risks |
| **Revenue** | £7,590 million (2016)[1] |
| **Operating income** | £402 million (2016)[1] |
| **Net income** | £220 million (2016)[1] |
| **Number of employees** | 585,000 (2017)[2] |
| **Subsidiaries** | G4S Secure Solutions |
| **Website** | g4s.com (http://g4s.com) |

# Contents

**The Washington Post**

**Investigations**

# DHS 'fusion centers' portrayed as pools of ineptitude and civil liberties intrusions

**By Robert O'Harrow Jr.**   October 2, 2012

An initiative aimed at improving intelligence sharing has done little to make the country more secure, despite as much as $1.4 billion in federal spending, according to a two-year examination by Senate investigators.

The nationwide network of offices known as "fusion centers" was launched after the Sept. 11, 2001, attacks to address concerns that local, state and federal authorities were not sharing information effectively about potential terrorist threats.

But after nine years — and regular praise from officials at the Department of Homeland Security — the 77 fusion centers have become pools of ineptitude, waste and civil liberties intrusions, according to a scathing 141-page report by the Senate Homeland Security and Governmental Affairs permanent subcommittee on investigations.

The creation and operation of the fusion centers were promoted by the administration of President George W. Bush and later the Obama administration as essential weapons in the fight to build a nationwide network that would keep the country safe from terrorism. The idea was to promote increased collaboration and cooperation among all levels of law enforcement across the country.

But the report documents spending on items that did little to help share intelligence, including gadgets such as "shirt button" cameras, $6,000 laptops and big-screen televisions. One fusion center spent $45,000 on a decked-out SUV that a city official used for commuting.

"In reality, the Subcommittee investigation found that the fusion centers often produced irrelevant, useless or

inappropriate intelligence reporting to DHS, and many produced no intelligence reporting whatsoever," the report said.

The bipartisan report, released by subcommittee Chairman Carl Levin (D-Mich.) and ranking minority member Tom Coburn (R-Okla.), portrays the fusion center system as ineffective and criticizes the Department of Homeland Security for poor supervision.

In a response Tuesday, the department condemned the report and defended the fusion centers, saying the Senate investigators relied on out-of-date data. The Senate investigators examined fusion center reports in 2009 and 2010 and looked at activity, training and policies over nine years, according to the report.

The statement also said the Senate investigators misunderstood the role of fusion centers, "which is to provide state and local law enforcement analytic support in furtherance of their day-to-day efforts to protect local communities from violence, including that associated with terrorism."

The DHS statement also said that all of the questioned expenses were allowable under the rules.

Department officials have defended the fusion centers in the face of past criticism from the news media and internal reviews. DHS Secretary Janet Napolitano and other senior officials have praised the centers as centerpieces of U.S. counterterrorism strategy.

Mike Sena, president of the National Fusion Center Association, an advocacy organization, called the report unfair. Sena, who manages the center in the San Francisco Bay area, said fusion centers have processed more than 22,000 "suspicious activity reports" that have triggered 1,000 federal inquiries or investigations. He said they also have shared with the Terrorist Screening Center some 200 "pieces of data" that provided "actionable intelligence."

The Senate report challenged the value of the training and much of the information produced by the centers. It said that DHS analysts assigned to the fusion centers received just five days of basic training for intelligence reporting. Sena said they received an array of other training as well.

Some analysts at the department's Office of Intelligence and Analysis, which received the fusion center reports, were found to be so unproductive that supervisors imposed quotas for reports, knowing those quotas would diminish the quality of the intelligence, according to the Senate report. Many of those analysts at the DHS intelligence office were contractors.

Investigators found instances in which the analysts used intelligence about U.S. citizens that may have been gathered illegally. In one case, a fusion center in California wrote a report on a notorious gang, the Mongols Motorcycle Club,

that had distributed leaflets telling its members to bcome members when they filed suspicious by police. The leaflet said members should be courteous, control their emotions and, if drinking, have a designated driver.

"There is nothing illegal or even remotely objectionable [described] in this report," one supervisor wrote about the draft before killing it. "The advice given to the groups' members is protected by the First Amendment."

Financial questions were pervasive, with the report saying oversight has been so lax that department officials do not know exactly how much has been spent on the centers. The official estimates varied between $289 million and $1.4 billion.

**Today's Headlines newsletter**

The day's most important stories.

**Sign up**

A DHS official, who insisted on not being identified because he was not authorized to talk to the news media, acknowledged that the department does not closely track the money but said it conducts audits of the fusion spending. The official said that just under half of the fusion centers' budgets comes from the department.

In the statement, the department said its Federal Emergency Management Agency, which administers the grants, provides "wide latitude" for states to decide how to spend the money.

"All of the expenditures questioned in the report are allowable under the grant program guidance, whether or not they are connected with a fusion center," the statement said.

The Senate report said local and state officials entrusted with the fusion center grants sometimes spent lavishly. More than $2 million was spent on a center for Philadelphia that never opened. In Ohio, officials used the money to buy rugged laptop computers and then gave them to a local morgue. San Diego officials bought 55 flat-screen televisions to help them collect "open-source intelligence" — better known as cable television news.

Senate investigators repeatedly questioned the quality of the intelligence reports. A third or more of the reports intended for officials in Washington were discarded because they lacked useful information, had been drawn from media accounts or involved potentially illegal surveillance of U.S. citizens, according to the Senate report.

Robert O'Harrow Jr. is a reporter on the investigative unit of The Washington Post. He writes about law enforcement, national security, federal contracting and the financial world.

**The Post Recommends**

# Where was Sasha Obama during her father's farewell address?

When President Obama's family joined him on the stage after his farewell speech, one family member was missing: Sasha. And the Internet immediately noticed.

# Texas teacher who had sex almost daily with 13-year-old student gets 10 years in prison

Alexandria Vera said the teen's family approved of their relationship.

**Opinion**

# Trump gets no respect. That's because he hasn't earned it.

With charity for none and with malice toward all but his supporters, he has set a new standard for gracelessness in victory.

## PAID PROMOTED STORIES

Recommended by

# FBI and NSA outsource their harassment of Targeted Individuals and Watchlisted Individuals to private firms

The Privatization of Government-sponsored Cyber-stalking

By XKeyscore -

03.16.2016 @8:54 AM EST



**(INTELLIHUB) — One of the reasons that the government is consistently "Chicken Littling" us with threats of extremism is money. Security is a multi-billion dollar revenue generator for the National Security Racketeering Network and Private Security Companies run by former ex-federal employees.**

The operations of the private companies run the gamut from street-level tasking to tactical and offensive, weaponized-software deployment against innocent Americans. Now the U.S. has its own groups of militarized and federalized cyber-warriors. The most common groups are the FBI's DITU — Data Intercept Technology Unit (run by an individual with a degree in law and psychology), the NSA of course, The NSA TAO (Tailored Access Operations), and Cyber-Command. Both the NSA and Cyber-Command are based at Fort Meade in Maryland.

Now there are a few private companies, think of Blackwater" on a cyber-level, which are also master's of intrusion, hacking, identity theft, spoofing and 24/7 harassment of anyone who has been illegally and unconstitutionally watch-listed as a domestic threat. However NSA still has the budget, the tech-toys, the software and extra-judicial tactics which trump any of the subsequently mentioned private groups.

One of the companies which acts as a hired gun for the federal government (and thus has the luxury of operating without any oversight, is James Bimen and Associates, based in Fairfax, Virginia. This corporation is right down the street from several acronym agencies, has developed special tools for the FBI and is tasked to hack into computers and phones of watch-listed individuals (WLIs) and Targeted Individuals (TIs).

Another company which develops software being utilized for illegal cyber-intrusions, harassment and data-theft by the FBI & NSA was in part developed and sold by HT Srl (The HackingTeam) and Cicom — both based in Baltimore, Maryland. HackingTeam's head office is located in Milan, Italy, and it is likely that Cicom is a HackingTeam front-company due to their shared location(s) and close association.

Now the HackingTeam has sold its software to oppressive regimes which commit human rights violations like North Sudan — where dissidents are harassed and killed.

This raises an important question. If it is illegal to sell weapons to authoritarian regimes like North Sudan, then why are U.S.-based companies allowed to sell weaponized software to governments which will use the technology to commit human rights violations, and just as importantly — why have certain factions within the

On the street level, private security companies are hiring ex-convicts to harass WLIs and TIs to perpetrate what is referred to as "Gang Stalking" on a street level. But what many people do not know is that the threats, harassment, theft and gaslighting also occur on a cyber-level.

So not only are Targeted Individuals and Watchlisted individuals harassed by finely-tuned Zersetzung operations on the street level, all of their communications and on-line privacy are also violated. This equates to 24/7 harassment.

Why are companies like James Bimen and Associates and HackingTeam allowed to launch vicious and illegal tactics against innocent American citizens? Who provides them with "top cover" to engage in this non-stop torturous activity against individuals who were never charged with any crimes, never had a chance to defend themselves, and never had a day in court?

Wake up people! Our tax dollars are spent funding the very entities which are supposed to be protecting us from external threats, versus deploying what equates to "weaponized software" and technology against innocent and unsuspecting Americans.

Due to lack of technological capability, the Stasi only operated on the street level. But now, here in the U.S.A. we are being subject to treatment which far exceeds what the Stasi perpetrated against the East German population, and we are facing this threat both on the virtual level and on the street.

As a side note, I blogged about James Bimen and Associates at the beginning of this year, and subsequent to that short thread, their website mysteriously disappeared from the internet.

The author of this article, who prefers to use the nom de plume "XKeyscore" in order to maintain his anonymity, is a Doctoral Candidate and multiglot with two Master's Degrees and a Baccalaureate specializing in Middle Eastern Studies. He holds one Master's Degree specializing in Intelligence and Counter-intelligence operations, and a second Master's Degree in Security Studies. XKeyscore has studied under a United States intelligence agency analyst and now-retired, high ranking, American military officers. XKeyscore writes exclusively for Intellihub News & Politics. Read more articles by this author here.

**Comment Policy:** Threats of violence, foul language, bullying, and spam will not be tolerated and may be flagged.

EXHIBIT 9

# RE: requested documents

| | |
|---|---|
| From | **Evonne Opoku** <Evonne.Opoku@disabilityrightsny.org> |
| To | **Tomo Shibata** <revival@hush.com> |
| Sent | Monday, January 12, 2015 at 3:21 PM |
| Replied | Yes |
| Encrypted | No |
| Signed | No |

Good morning Tomo,

Thanks for your email. I am happy to communicate with you via email, and to clarify the conversation we had on January 7th.

Yes, it appears that your 2010 employment discrimination claim is time barred. In order to sue in federal court, you must first file a charge with the EEOC within 300 days of the discriminatory act. Additionally, there is a one year statute of limitations for filing an administrative complaint with the New York State Division of Human Rights, and a three year statute of limitations for filing a lawsuit in state court.

I also believe that there might be timeliness issues with your 2012 employment discrimination claim, since you were to start the position in January 2012. It was not clear from the documents you sent (and from our last conversation), when the discriminatory act took place. You stated that you were "blacklisted" due to your perceived disability, and according to the documents you sent, the University refused to approve your employment with Professor de Bary because of past behavior, lack of candor, and according to the Professor, an unsatisfactory project. Can you clarify if you actually started the position, who terminated you, and for what reason?

I believe you misunderstood our discussion about the University's action. When we were discussing timeliness, you stated that you believe you have until June 2015 to file a lawsuit, because the University "blacklisted" you in their response to your human rights complaint in June 2012. My response was that University's *reference* to their refusal to hire you in their response did not constitute the discriminatory act, because from my understanding, they were describing past events. It appears that the refusal to hire you occurred sometime in January 2012, which is when the statute of limitations begins to run. It is unlikely that we are able to represent you in this matter due to our limited resources for individual representation.

I am still discussing with my supervisor if and how DRNY can assist you with this matter. Have you filed a formal complaint against the Ithaca Police Dept in the past? If so, what was the result?

Thanks again for the information and for contacting DRNY. I will be in touch with you soon.


Evonne


Evonne Opoku

Staff Attorney (Admitted in MD)

DISABILITY RIGHTS NEW YORK

725 Broadway, Suite 450

Albany, NY 12207

518-432-7861 ext. 4918

518-512-3448 (TTY)

800-993-8982 (Toll Free)

518-427-6561 (Fax)

Evonne.Opoku@DisabilityRightsNY.org

http://www.DisabilityRightsNY.org


*This email may contain privileged or confidential information. If you receive it in error, please don't read it, delete it, and advise me of the error. Thank you.*


**From:** Tomo Shibata [mailto:revival@hush.com]
**Sent:** Friday, January 09, 2015 7:03 PM
**To:** Evonne Opoku
**Subject:** RE: requested documents


Dear Evonne,


Thank you for your message. I have not been able to talk with Elizabeth, yet. Yet I did receive her message, called her and left a message. I hope we will not have any further phone tags. Meanwhile, due to the phone tag problem, could we communicate via email? I will be grateful if you could forward this message to Elizabeth and also let me know her email address for future correspondences.

May I first clarify if I understood your legal assessments of my complaints so far? I believe your legal assessments included the following 4 items.

1. The employment discrimination claim in 2010 is time barred at this point.

2. The employment discrimination claim in 2012, which was processed by Tompkins County Human Rights Commission, is time barred at this point.

3. The blacklisting by the university does not constitute an ACT of employment discrimination (sanctioned by the existing law such as ADA), and thus does not constitute a valid legal claim, (not actionable).

4. The Ithaca Police Department's disability-profiling is the only complaint of mine Disability Rights NY can work on (even though the above three items are not actionable by DRNY).

Would you please let me know if each and all above items are correct (i.e., if I understood correctly).

I will be also grateful if you and Elizabeth could elaborate on Item 4, i.e., works DRNY can do on Ithaca police's disability profiling. Specifically and concretely, what can DRNY do to rectify such a discriminatory practice, and how can I work with you on this issue?

There was a young person of color with a psychological disability who had been subjected to surveillance harassment by the police just as I have been. He became so upset that he fetched a gun from a police officer and used the gun to shoot the officer's leg area, glazing the officer's leg. Immediately, the officer's partner shot this person with a psychological disability to death (shot 6 times). This person with the disability had complained to his housemates about the surveillance harassment by the police a few weeks prior to this incident. I talked with one of these housemates, and he was upset about the way the local major media portrayed this incident covering up the discriminatory police harassment.

http://www.ithaca.com/news/is-history-repeating-itself-with-ithaca-s-police-mental-health/article_b6a54faa-0fdf-11e1-ad11-001cc4c002e0.html

https://www.youtube.com/watch?v=RYUi63SnYnc

Best,

Tomo

On 1/6/2015 at 1:32 PM, "Evonne Opoku" <Evonne.Opoku@disabilityrightsny.org> wrote:

Good afternoon Tomo,

I apologize for my delay in getting back to you. Thank you for sending me the attached documents. I will be speaking to my supervisor tomorrow regarding your case, and should be able to get back to you by the end of this week. Please send me anything else you may have that will help us assess your situation.


Kind regards,


Evonne Opoku

Staff Attorney (Admitted in MD)

DISABILITY RIGHTS NEW YORK

725 Broadway, Suite 450

Albany, NY 12207

518-432-7861 ext. 4918

518-512-3448 (TTY)

800-993-8982 (Toll Free)

518-427-6561 (Fax)

Evonne.Opoku@DisabilityRightsNY.org

http://www.DisabilityRightsNY.org


*This email may contain privileged or confidential information. If you receive it in error, please don't read it, delete it, and advise me of the error. Thank you.*


**From:** Tomo Shibata [mailto:revival@hush.com]
**Sent:** Monday, January 05, 2015 4:22 AM
**To:** Evonne Opoku
**Subject:** requested documents


Hello, Evonne.

I apologize for sending the requested documents so late. I have had persistent problems with my computer.

The following New York Times article explains the rationale of the local police in Ithaca area to practice disability profiling by stalk those with psychological disabilities who refuse to be treated by psychiatric professionals:

http://www.nytimes.com/2000/09/06/us/trying-to-prevent-the-next-killer-rampage.html

Thank you,
Tomo Shibata

EXHIBIT 10

# Re: requested documents

| | |
|---|---|
| From | **Giovanna D'Orazio** <gad@doraziopeterson.com> |
| To | **Tomo Shibata** <revival@hush.com> |
| Sent | Thursday, January 15, 2015 at 4:10 PM |
| Replied | Yes |
| Encrypted | No |
| Signed | No |

Dear Ms. Shibata,

Thank you for contacting our office. I have reviewed the documents you provided. Unfortunately, we are not able to assist you with your potential matter against Cornell University. From what I can see it appears that the time limitations for challenging the school's actions under the Americans with Disabilities Act have expired since nothing was filed with the EEOC within 300 days of the adverse employment action. Additionally, we take our employment cases on a contingency fee basis and unfortunately your expected hourly pay and duration of employment are not sufficient for a contingency-fee based case.

If you are interested in pursing your claims further, I suggest either contacting the New York State Bar Association for the names of other attorneys or you are also able to go to the New York State Division of Human Rights without an attorney. They may be able to assist you. However, the Division generally only looks back one year and it is possible that your claims may be time-barred.

I am sorry for the issues you have been having and wish you luck in the future,

Thank you for contacting us,

Giovanna D'Orazio

On Wed, Jan 14, 2015 at 1:32 AM, Tomo Shibata <revival@hush.com> wrote:
> Dear Ms. D'Orazio,
>
> Hello. Please find attached the requested documents. Thank you.
>
> Respectfully,
> Tomo SHIBATA


--
Giovanna A. D'Orazio, Esq.
dp D'Orazio Peterson LLP

125 High Rock Avenue
Saratoga Springs, New York 12866
518.308.8339
gad@doraziopeterson.com
www.doraziopeterson.com

EXHIBIT 11

〈methodology〉

~~copy#~~

③ → the Daily Journal  ('CA' legal newspaper) "100 most influential lawyers in Cal"  6/07/2016 — top 25 ent Q   hard copy y available
(ex- Top 25 plaintiff lawyers)   @ See County Public - Law !   Newspaper Area

② → The National Law Journal   "100 most influential lawyers in America".  tackled unpopular causes.
published in 2006, 2013   precedent making S.s
the latest in 3/25/2013 ←
(versions)

→ The LA Business Journal. "top trial lawyers"

I → keep really landmark case laws to see which attorneys are cited.   feature search & limit ti extension
(on the subject.   L westlaw   (keep checking cases cited in)
2 wk free trial

→ T I connection — Todd Griffen Q.

7/17/2015   plaintiff lawyers ●

⊗ Lawrence Behm — sav.   end. ~~what~~ proz ing.   statement, but not supran cout
                                                                       Eastern & Northern Dist Court,
                                                                       such coordinator will
                                                                       not police his conduct.

Thomas Girardi   LA.   does act. poz ing.

Ry Solomon   LA   mal. wl ptce

_____

Ahilan T. Arulanantham   myrtn

→ Janie Belluci 7.   Snta Maria — btw. LA & San Jose  (805)896-7854
                       SEK offender  1 person law office

Theodore Boutrous  LA   cir ptxr, appelote + Const. Law class action
                        defendant represents corporations only

Cabraser

✗ ~~Brian~~  Brian  LA.   complex. civil action   on Daily Journal's Top 100 over a
   Brad.                  public corruption               decade
                              not civil rights (?.)

                        not admitted to fed supra Court (?)
                        (his firm   represents LA Board of Commissioners
                                                    ( Police )

〈袖側 を 7C2 界 リ2ト〉

- Paul, L. Hoffman

- Eric Holder   (202) 662-6000

X Brian Panish  declined, personal injury only

┌ Penn State
│   child abuse
(organizer)
│   cover up
│ spent a lot of money to
     Sandusky
     Coach.

〈Nat. Law J. 100# リ2ト〉

- Floyd Abrams      NYS.  Ist Amdt.  Cornell grad.

) Cindy Cohn          SF

: Jeffry Fisher      Stanford. Law school , supreme Court Clerk

3 Thomas Girardi.   Girardi keese, LA.  class action king

Roberta "Robbie" Kaplan  :NY.  : argued the unconstitutionality of defense of marriage act

. John Keker      SF.  trial lawyer (not sure civil rights)

) Jay Leftowitz      NY.  pro bono. education.

 Harold McElhinny   SF  Corporate ?.

) Barry Scheck       NY  the Innocence Project.

. Victor Schwarz       ?.  torts.   (±5)

- George Cooney
- Patrick Bridges
- Frank Bacon

Comford . Troy & Newfield.
(Richard) (Lee)

- Joseph Lawrence
- Paul L. Hoffman
- ~~Ted Oferandbies~~
- Robert Lind
- Mark Rosenbaum
- Joan Howarth now in Michigan state U prof.
- Sharon Barton.

☆ Hermez Moreno

Coalition agst Police Abuse
            Michael Zinzun (died)
            LA
            323-733-2107

PAGE 3
Cristina C. Arguedas

PAGE 4
Ahilan T. Arulanantham

PAGE 6
Kirstin M. Ault
Janice M. Bellucci — *sex offender laws (805) 896-9854*

PAGE 8
Bruce Bennett
Michael W. Bien

PAGE 10
Barbara Borden
Theodore J. Boutrous Jr. — *entertainment*
Christopher D. Brearton

PAGE 12
Brad D. Brian — *the firm represents the LA board of police commissioners   defamation employer 800-541-7358  (415) 956-1000   represents media*
Elizabeth J. Cabraser
Joseph A. Calabrese

PAGE 14
Sean M. Caplice — *represents corporations, used attorney (DOJ)   at Hoffman!  law prof at Irvine  (constitutional truth)*
George S. Cardona

PAGE 15
Erwin Chemerinsky — *declined*

PAGE 16
Apalla U. Chopra — *represents employers*

PAGE 17
Morgan Chu — *$19   233-3169   intellectual property   will consider co-counsel*
Judy C. Clarke — *criminal defense  619.309.8484*
Cindy A. Cohn — *Electronic Frontier Foundation  cindy@eff.org  (415) 436-9333 x108  info@eff.org*

PAGE 18
Joseph W. Cotchett — *630.697.6000  complex case (declined)  (takes) Cal state govt  welcome as well  online win govt 09/16   corporate finance corporate venture corporate*
Bruce S. Dallas
Craig E. Dauchy

PAGE 19
Gordon K. Davidson

PAGE 20
Jorge A. del Calvo — *corporate finance*
Alan F. Denenberg — *the disenfranchised*

PAGE 21
Kelly M. Dermody — *Cabraser office 415-956-1000  notify for intake digital security  used hospitals  employment law  class action*

PAGE 22
Scott C. Dettmer
James R. Dutro
Ruth E. Fisher — *Told me thought she had*

PAGE 24
Keith A. Flaum
Eric Garner — *thought I saw me on phone (Sanders Sommers)  sent online form not received  employers, personal injury  class action, civil rights  police misconduct.  213-625-3900  high profile cases, not over it deep (cale.)*

PAGE 25
Eric M. George

PAGE 26
Mark J. Geragos — *bug  civil/constitutional  received a from  @lawpromo.com*
Elsa Gifford

PAGE 27
Thomas V. Girardi — *cyber security  prior tort  (213) 687-5730 (ans 33)  products liability  toxic torts,  belongs to Rosen Bien*

PAGE 28
Patricia L. Glaser
Daniel Grunfeld
Gay Crosthwait Grunfeld

PAGE 29
Robert V. Gunderson Jr.
Lynne C. Hermle
Karen P. Hewitt

PAGE 30
William H. Hinman
Craig Holden
Mark Holscher

PAGE 31
Wesley L. Hsu

PAGE 32
John C. Hueston
Annette L. Hurst
Cary K. Hyden — *866-442-2529  Cal Bar Assn. referral*

PAGE 34
Brian S. Kabateck — *consumer attorney, personal injury. sex abuse,*
John W. Keker

PAGE 35
Jennifer L. Keller

PAGE 36
Paul R. Kiesel — *represents consumer politics, personal injury. consumer, environ.*
Charles S. Kim
Kenton J. King

PAGE 37
Randall R. Lee — *intake (age 55)  contract litigation  investigation  pro bono for prisoners abuse  ant. corruption (213) 443-5361  connected to HV law Sch.*
Mark A. Lemley

PAGE 38
Felicia A. Marcus
Brian J. McCarthy
Marcellus A. McRae

PAGE 40
Louis R. Miller
Robert F. Millman — *rfmillman@littler.com  discrimination, harassment,  employment (310) 772-7206  US supreme court  circuit ord.  9/27*
Robert A. Mittelstaedt

PAGE 41
Sean Moran
Anton N. Natsis — *talked w/ Jody Thorp. (declined;)*
Stephen C. Neal

PAGE 42
Thomas J. Nolan — *has been too busy for a while (not to) (not taking new cases)  dpetrocell@omm.com  (310) 246-6850 (LA)  handles complex large scale litigation*
Ronald L. Olson
Brian Panish

PAGE 43
Sarah P. Payne

PAGE 44
Elliot R. Peters
Daniel M. Petrocelli — *employment. trial of wide areas  terminated  good at July truth.  DJ Grosson*
Glenn D. Pomerantz — *Rice case -inst. may issue  doesn't handle my topic  wide range (LA)  (declined)  (213) 683-9132  white collar criminal  Glenn. Pomerantz@mto.co  defense.*

PAGE 45
Michael J. Proctor
John B. Quinn
Joseph R. Re

PAGE 46
Alison S. Ressler
Rick Richmond
Michael S. Ringler

PAGE 47
Mark P. Robinson Jr. — *(213) 385-2977  outside of their areas  Public Counsel (nation's largest pro bono law firm)  constitutional civil rights issue prof.  economic justice, criminal defendants rights  wrote the curricula of Black Panther  consumer fraud  immigration*

PAGE 48
Mark Rosenbaum
Jane Ross
Allen Ruby

PAGE 49
Kelli L. Sager
Scott L. Sanders

PAGE 50
David L. Schrader
Martin D. Singer
Larry W. Sonsini

PAGE 51
Danyl Steinhause
Adam F. Streisand
Robert A. Van Nest

PAGE 52
Thomas K. Vandiver — *no response (call 3)  399-7806  call 9am  matmons@aol  (call 3)*
Jeffrey R. Vetter

PAGE 53
Ted Wang
Laura A. Wasser — *(213) 384-6964 (ans 55, enrolled)  Law Offices of Frank A Weiser, LA  police inspection of hotel guests  warrantless*

PAGE 54
James R. Wheaton
Bart H. Williams
Michael A. Woronoff

PAGE 55
Debra Wong Yang — *(213) 229-7472  dwongyang@gibsondunn.org  cyber privacy, former US attorney  may become collusive*
Kenneth Zifren



PAGE 6
Daniel B. Asimow
Steven M. Bauer
Bruce Bennett

PAGE 7
Gregory L. Bentley

PAGE 8
~ Michael W. Bien
Barbara L. Borden
✗ Theodore J. Boutrous Jr.

PAGE 9
n John G. Branca

PAGE 10
Christopher D. Brearton
Brad D. Brian
n Bruce A. Broillet
PAGE 12
∩ Juanita R. Brooks
Elizabeth J. Cabraser
Joseph A. Calabrese

PAGE 14
n David S. Casey Jr.
n Tom Chen
n John O. Chesley

PAGE 15
Apalla U. Chopra

PAGE 16
Morgan Chu
∩ Daniel Clivner
Joseph W. Cotchett Jr.

PAGE 17
Gordon K. Davidson

PAGE 18
Jorge A. del Calvo
Alan F. Denenberg
n Diane M. Doolittle

PAGE 19
Robert E. Dugdale

PAGE 20
∩ Jeffrey V. Dunn
n Sara E. Finigan
n Jeffrey L. Fisher

PAGE 21
n Michael S. Gendler

PAGE 22
Lisa M. Gilford
Eric M. George
Thomas V. Girardi

PAGE 23
Patricia L. Glaser

PAGE 24
Gay Crosthwait Grunfeld
Daniel Grunfeld
Richard L. Hasen

PAGE 25
Lynne C. Hermle

PAGE 26
∩ David M. Hernand
Karen P. Hewitt
Mark C. Holscher

PAGE 27
John C. Hueston
PAGE 28
Brian S. Kabateck

PAGE 29
John W. Keker
Jennifer L. Keller
Kenton J. King

PAGE 30
n Leif B. King
n Jackie Lacey
Mark A. Lemley

PAGE 32
n Richard Marmaro
Katharine A. Martin
n Niall P. McCarthy

PAGE 33
✗ James McManis

PAGE 34
n Darrell D. Miller
n Daniel R. Mitz
n John Nadolenco

PAGE 36
Ronald L. Olson
Olu K. Orange
Brian J. Panish

PAGE 38
Kirk A. Pasich
n Clifford H. Pearson
Daniel M. Petrocelli

PAGE 39
n Mark T. Quigley

PAGE 40
John B. Quinn
Alison S. Ressler
n Michael G. Rhodes

PAGE 42
n Eric A.S. Richards
Rick L. Richmond
Mark P. Robinson Jr.

PAGE 44
Mark D. Rosenbaum
n Michael Rubin declined by the firm
Allen J. Ruby

PAGE 45
Kelli L. Sager
Scott L. Sanders
n Jeffrey D. Saper

PAGE 46
n Joseph R. Saveri
n Andrew B. Serwin
n Aalok Sharma

PAGE 47
n Nina L. Shaw
n Stephanie A. Sheridan
n David Siegel

PAGE 48
∩ Roman M. Silberfeld
n Bruce L. Simon
n Nancy C. Smith

PAGE 50
n Lawrence W. Sonsini
Darryl L. Steinhause
Margaret P. Stevens

PAGE 51
n Mark C. Stevens

PAGE 52
n Richard L. Stone
n Steven M. Strauss
n Britt K. Strottman

PAGE 53
n Jeffrey T. Thomas
n Mary Ann Todd
n Robert S. Townsend

PAGE 54
Robert A. Van Nest Jr.
Laura A. Wasser
Bart H. Williams

PAGE 55
∩ David K. Willingham
Debra Wong Yang
n Michael A. Woronoff

Christina Arguedes
n Robert F. Lewis

(213) 229-7804   office (?)

— Niall P. McCarthy on 10/6/16
cpmlegal.com  submitted
class action case summary  1 - 2 days reply

✗ James McManis
( emailed case summary on
10/6/16   declined

— Clifford H. Pearson
sent online request 10/6/16

— Mark T. Quigley (emailed) 10/10/16
srussell@cgbw.law

— Nat. & J. Top 100 (in 2013)
— Theodore Olson  NBC admitted to Cal.
✗ Gibson Dunn

〔コネクロ #〕 CA. contin.

related starters of puration like abuse

( Re Michael Flynn    oakland    Hstng star 2012-2015 (licensed ~2008)    Avvo 8.1
    declined    (510)893-    police abuse, employment discrimintn.
    collusive of city police    322b
    fax 728-7879

X Pamela Price    p.(510)877-0024    blk & former foster juvenile delinquent, sex harassmt.
    not available till    f    452-5625    votepyp@pypesq.com (email)
    Dec.'16    hope    ✓emailed on 9/7/16

→ Lisa Ells - supreme court    p (415)433-6830    Rosen, Bien, Galvan & Grunfeld,    complex litigation
    expert    - 7104    submitted online form;    supreme court practice
    Jennifer Stark - mentally    f.    3-2 business days to respond.    mental disability
        ill plaintiffs    on 9/1/16 / receptionist. Christine.
    michael Nuez - disability rights    (accordg to...)

    Rosen - Cornell alumni., supreme court expert.    AC@pasternak law.com
    Bornstein    mentally ill inmate abuse    It is the date when I was
    Stowe - Manzota    informed of the barred
        employmt!

                            Amanda. Collins    "good luck finding
                                                an attorney".

( Arthur H. Bryant @ Public Justice    kathny    2-3 wks respond.
    abryant@publicJustice.net (510)622-8150
    /Case intake @ "    8155(f)
    emailed m 9/8/16 (received)    f. (202)232-7203 (Dc)

( Julianne Schwarz @ Cal Civil Rights Law Grp.    mostly employmt (not police)  866-953-9572    will return a call back
    100% contingency fee.    415-785-7352 (f)    took 3-5 pm...
Sanjay    Schmitt    (415)563-8583    police & employmt.    d-l'med because of the police.
( Jeremy Pasternak    employmt discrimintn. disability,    (415)693-0300    3:14pm all received. 9/8/16 intake by,    irrelevant
        - only: at torture or police misconduct    intake apt. Thur    UJC Hastg Law School
Jayne Walker / Gwilliam    employmt discr., police misconduct    (510) 832-5711 p    (called) collusive    r clation 4 year statute of transfer litigation
    1918 f    early sept.    wrong legal info.
Center for Justice and Accountability (415) 544-0444    torture started   North Tenn    Cornell grant be sued in CA ×
    extension bill supporter
    (now ago) humanity.
( Hadsell Stormer & Renick  866-457-2590  ~ LA    Holderen bill supporter    police illegal surveillance
    fill out the entire form 626-381-9261 (submitted online intake form)    employee's rights    total of
    Lisa keller    waits in her bed.    on 9/7/16    Richard
        declined    Can only be sued in NY    Thompson
                                                gave
                                                declined to be an
Probono > super & in Northern CA.    (415) 989-1616    attorney but
- Gloria Chun    415-782-8970    Justice & Diversity center & bar: Assoc of SF (crisp star)    not
    has to be referred before she takes the case
:) Robert Borton (415) 864-8848    Legal Aid society. Employmt Law Center
    Christopher Ho  2006-2016 super#

received petitioning agent
- Rahul Manchanda (212)968-8600    not admitted to sup court.

Am. Psych. Assoc. → list names → correll a police.

X Cutter Law.                    888 - 726 - 4982
  - John Parker                  personal injury, civil rights, class action
  - Brooks Cutter                Debra  304 - 9890

                                              fax.
X Anthony Perez          (916)441-0500 / 491-0555
                         aperez@perezlawoffices.com.
                         declined + employment matter only

- Ben Rosenfeld                      (415)285-8091

X Tony Serra (emailed 8/29/16)   jts@pier5law.com   (415)986-5591
                                 declined, not his field.

X Carrie Ann Colton  in Novato   (415) 231-5701
  influenced by Cornell/police           40% contingency
                                 retainer $10 k.  installments OK

X Mark E. Merin   (emailed 8/29/16)(p) 916) 443-6911   1010 F St. suite 300
   insou                          (f)  447-8336       Civil rights, class action, employment litigation
   Cornell graduate               office@markmerin.com

< Michael Haddad                 (p)(510)452-5500   ex-
   oakland.                       (f)  "  -5510     president. National Police Accountability Project.
                                  (2x.)             super #
                                          we don't handle this kind of     <methodology>
< Morris Baller  class action    emailed mballer@gbdhlegal.com  cases  † super lawyer. list
          employment discrimination  & other abuse   oakland (510)763-9800  declined   | other winning TIS #
                                                                              (attys.)    DO ATTYS. SU LA
super # 424 ok >                     lead # Doug Mckustck ext. 603          as # for referral from the
   [ email staff @ - → address to him.              (434)  (fax)                  unknown db. Targeting.
              (emailed 8/29/16)                      978 - 1789
                                                     (legal)
, John Whitehead , Rutherford  Institute   staff @ rutherford. org         + ask Anna Merr Anderson
                          (in VA)   (434)978-3888 EST                       John Whitehead ext. 604
                                                   ext. 682.
< Center for Constitutional Rights  (in NYC)  (212)614-6464  too backed up. due or email.
                                    NG person will    will be on    212 - 614 - 6499
                                    wait list.        waiting list.  info@ccr-ny.org
Harris & Hoffman LLP, venise, CA  Paul L Hoffman, Schonbrun,
          (LA area)               De Simone, seplow,  trial at 9th circuit. → SF & LA  appellate portland & seattle.
           (310)346-0731          contingency basis   Papa v. USA
IEFF                              police spying   # B. Leavy ,  employment, civil rights, police misconduct
                                  co.intel.pro    not aborted  personal injury. class actions  (esp. mentally ill)
                                  admitted to US supreme court.   to supreme court
checked
- Constitutional Law. super #  { Nor Cal - (??)
                               { Sac. - all defend the police
- Civil law- super # Nor Cal (??) - super # only 64 #s.
      { Rights.
  Disability     "     "     (??)

Civil Rights super [?] [?]

X Kelly Armstrong          (415) 692-0462  emit const[?] declined

. Margo Hasselman.          employt only [?] am 23.

Amitai Schwartz          appellate expert, torigate a jot univ. 500t)
am. [?] (not responsive)    admid [?] Supreme Court.
                         (510) 597-1775 . left message + submitted online intake form.
                           ex. 100

                         spalexander @ constantine cannon. com
Sarah Alexander          (415) 766 - 3514   whistle blower protection civil rights in general.
                                            evd: theory. the graduate intake ans [?], (not responsive)
                                            resen been           " I wish you the best of luck "

Dale Allen               police representative

Ethan A. Balogh          resmd / Yale graduate, very talented both criminal + civil)
                          ◦ eab@colemanbalogh.com declined

Philip Bourdette          [only
                          ◦ personal injury, Presno area
                           (not contacted)

Julia Campins             Lafayette .CA   employed only (tenure)
                                          (and aware of torture law.

, Andrea Carlise           defends public entities, "dispute resolution"
                           + hospitals (not contacted)

Duffy Carolan             media law, represents media in defamation case
                           (not asked)

Rayma Church              in Fresno. personal injury. not admitted to supreme court
                           (mostly) (not asked)

Thomas Cregger            in Sac. represent public entities (not police) employmt + hous.
                           (not asked)

George Cummings .         Anti-trust, commercial disputes, product liability actions
                           (not asked)

Deborah England           employmt only SF (415) 434-9800 (temp [?]) : [?]   → refused to have conversation recorded
                           talke at 3:00pm 9/12/16 over phone                 ◦ declined the juridical opposition
                                                                             will contact again if can't find any alternative

Barney Feingold           blind people's rights , Berkely
                          negotiation expert    ff @ fflegal. com (email?)

Carl Freunsenden          in Sac   represents police

Lauren Finberg.           SF law school prof. employmt only   (asked if I have ?)
                          (not crim + ask)    (discrimination) Fany evidence + if I know anyone who face the same
                                                                -- treatmt from the univ
                          Hanna Cole intake from legal now [?] (recorded ) 9/9/16  5:20pm
                          , public policy incessant                              ans [?]

[Civil Rights, War CAL. support only] page

Kathleen Finnerty        ADA defense

Gregory M. Fox        represents police & govt

Kurt Franklin        represents civil rights defense.

Lawrence M. Glasner        Redding, selected only in 2016 (no T estab.)
                             North of chico, no website.

Geri Green.        (415) 982-2600        civil rights, cram defense,
                   200-16 employ        sued Berkeley, on the nation's day's suicide
                   call after 10/20/16 (ont) (counting)

John Hauson.        bankruptcy

John Heller        (415) 956-2828    while done over phone 9/9  declined "good luck"
                   (415)

John Hollenbeck        Family law, medications

Jay Jambeck        education law, disability  800-768-2168
                   employment, not police.
                   insp. sue govt, not supreme court.

James Kan        rep sec in 2014 only, employment discrim class action
                 young.

Bruce Kilday        police defense #

Peter Koenig        govt liability, medical malpractice, employment, personal injury.
                    (police brutality)        Serena    clerk    conversation recorded
                    Walkar, Hamilton & Koenig.
                    not police or med malpractice, but employment & personal injury    possible.
                    (415) 590-7694
                                    emailed Gunderson affidavit's BFF on 10/10/16   Sam stated declined

Joshua Konecky        complex litigation (415) 421-7100       sounds sympathetic(?)
declined                handles   class action   (intake done?)   schneider, (wallace), cottrel,
                        employment discrimination (disability)              Konecky, Wattens.

Elizabeth Lawrence        2016 selected only
                                                                                    (employment
                                                                            " we deal w/taxes, so
eslie Levy        doesn't deal w/ (complex case?) (declined) - employment only. possibly collusion.    only while employ;

ichard Matin        (530) 891-6111 (Kns #9.)  no employment, mostly personal injury   notes related 1 person office
                    in chico  sued city of Sac

D. Newdorf        represents the police

S. Norman        prisoner rep.

c  a...         employment, mental legal aid.

[civil rights, Nor Cal super# on _____ ] pg-4

x Lori Rifkin → merged of Hadsell, Stormer & Renick

x Owen Rooney    police defendant

§ Mark Schickman    liability avoidance   only employment
                    [employment]

x T. Schmal.          very capable  not sure if civil rights oriented.   tjs @ schmal law. net
                      portal tort liability, bodily injury   ~~brought~~  Susan T emis/jennine on 9/21/16
                                                                         831-227-2245 x 801

x Pan Siegel (declined)   cop. unw.
                          employment discrimination, police misconduct.   emailed intake form to
                          sued SF fire dept. (510) 839 - 1200  Barbara on 9/21/16 (reception confirmed)

Karen Snell.          2 person law firm = SF (415) 225-7592    ovwoked on 9/23/16
(ans 2g)              complex civil litigation  police abuse, 1st Amdt (admitted to fed sup court)  ksnell@ snell-law.com
                                                                  talked over the phone  9/16
                                                                  (about 5:40pm)
{ James Sturdevant    class action, investigations, employment, disability discrimination, (probably collusive)
                      in San Rafael                          consumer law              insisted on time bars
                      (415) 477-2410       #. asked when I was notified of permanent,   recommended hiring
                                                              employment blacklisting.   in Sac by
Robert Tyler         medical malpractice (defendant only) criminal, civil rights,  when the allegations searching
                     professional liability defence specialist                     were filed

Michael Verna        complex personal injury   defense for corporate + gov't clients

Walter Walker        only personal injury   not related.

) Guy B. Wallace ——→ schneider wallace  (415) 421-7100 x 309  already contacted Mr. Konecky.
                     class action, impact litigation on behalf of the disabled, employment
                     09-14 super#  wheelchair user.

{ Adam Wolf          constitutional civil rights, complex litigation       "I wish you all the
                     (415) 766-3545 ~~can't be but may have already talked~~ ) best of luck."
                                                                            our firm is too busy to take
James Wood           - HIV rep. only, declined                              another case. 9/23/16 3:40 pm

Michael Woods        Fresno, defendant rep.

Stephanie Yu         municipal defense.

civil Rights   South Cal   super # only ↓ 53#5   pg2.

< James DeSimone          intake email 310 /626, 1487    papa v. USA.
                          (form)

< Robert Farohi.          not admitted to US supr. Court, personal injury
                                                    (mostly).

a Scott Myer              admitted to (fed. or Eastern District
                          sup. Court, not police misconduct , child abuse (310) 277-3000

< Brown Green             personal injury.

: Daren Lipinsky          not admitted to Cen. or East. District of CAL

J. Cowan                  Cornell graduate. not sure if admitted to feds, no police matter.

Best law firms (US News + world report)

Employt ]
( Blitman & King     1-800-667.5521

$420/h.

employt, disability discrimation.
syracuse.
Evelyn. did intake. over the phone   would take my complaint yet I couldn't talk
                                         directly to H

472

|J-21N| ₦

Michael Macomber ⎫  888-529-4543   2 atty to together   Albany  employmt fed.,  super$  wtblg value
David Fallon   ⎭                    "                    . fed. applelile court when disability  $150/h   (#175/h)

Stephan Bergstein   (518) 640-2594  Josh   northwest & NYC   Axon
                    (845)469-1277   chester NY (2th from Bigham.)  flat mail the form printed from the website
                                                               police  misconduct.  lectures employmt law & 7's

Giovanna D'orazzio ⎫   (888) 706-9765  on lottery  gad@dorazzpetersan.com  set precedent & appellate courts.
Scott Peterson   ⎬ work  (518) 308-8339-2  Saratoga springs>  disability employmt discrimination ) ans $$9
                 ⎭ together     "            "                (large firm employers who has hidden the real reason for termination
                                          Employmt    (litigated agst)
                                         (not disability?)   Sam Cro bande from Albany Law School
Michael Scotti    (315) 425-2974   ADA employm. only defense?  (left msg in answ machine.  asked 2 call back)

Kimberly Glennon   (585)250-0126   disability specialist in employmt discrim. may not serve outsd of Rochester  (ans #3 called 1/12/15)
                                   Rochester                                                          & mention the cond can be syracuse

Heidi Feinberg    (585)563-9744   Rochester  may not be disability  Family law. etc. left a message 1/19/15
                  closes by 3:30pm

Sarah Burger    (518) 244-8918   Saratoga Springs   Employmt LGBT  not disability or police  root cavad & will call back

Michael Burger   (585) 563-7514   serve NYS wide, Rochester.  civil rights constitutional law  employmt. Appellate.  $305/h
                                   TR 1-3 pm open for appt.                      contingency fee possible  refund
                                   (callback.)                                                              pro-rated
Harry Zappeton   (888)529-4543   employmt yet not so disability, business oriental & won't take new clients now
iffer Corcoran & the same firm   Albany.  $150/h  sliding fee scale (call back + pay)

John Gaal    (315) 218-8288   disability discrimination universits only employmt defense.  us supreme court alerted.
                              possible conflict of interest  Cornell.  represents only the employer
                              syracuse

Call back

(4)

NYND | Albany
- Binghamton
- Plattsburgh
- Utica

Center for Constitutional Rights. (212) 614 - 6464  NYC. rarely takes an individual case
info@ccr-ny.org  [to ~ legal aid]

Janice Gregory
    Johnson City     educational law - small business, not fraud specialist (?)  evidenced by author &@ office
    ~~fraud specialist~~  797-9839

DeFrancisco
    Jeff.
    Cortland     personal injury &  (315) 352-4063  (~~Ann #3~~) don't answer.
    (Excellent)

Harris et al.
    Rochester     consumer law.  (585) 899-1414  ~~(#?)~~
    or     contracts  14230
    ~~Syracuse~~     discrimination.  Chestworth & (talkely)
    (too far)

~~Scarzafava~~ dies
    Brenton
    Oadey     Oneonda     personal injury  432-9341  out of specialty for RAS.
    you serves all NYs.  only  Can't do intentional tort
    sympathetic

Gary Schanz
    Binghamton     super & family law  8/18 2:30 pm apt. ®.
    no specialty  (315) 474-1285  will call me back on #20

John Ciraldo
    Syracuse
    (315) 696-3991  will call back (Jr.)

John Wiezerski
    "  JSPieple@law.syr.edu
    (315) 443-4582

Gary Preples
    "  no  (25993)

Kristy Lynn Fischmann
    "  ~~fraud spec.~~ medical malpractice  ~~(315) 637-3663~~

John Patrick Lagan
    254-4229

Michael Stroeen
    Ithaca

(NYS AG @ Binghamton  consumer fraud  721-8971  won't refer #

I-24

‹state civil rights›

X Friedlander    272-5590    103 W. Seneca   suing Fraternity   call back on 10/22
   no desire to represent

X cu v.s. Ginsberg         bridge suicide    & kenneth F. McCallion   696-366-0580 / 914-698-2816
                          (settled)                                                      893-9449
· stephen L Morgan vs. Corvell    defamation 2009   CurtEnd @             Support
                                                                         Susan Heiman

                                                                                              outline
· James Fransis Barna ——→ 315.440-6450    civil rights. Employat law. Education Law
   will take the case, but will charge   422, 1152 Ext 204.    @ will call back.     $300/hr        susan@mccallion
X CCHR    supervision.                                recommend   $10K retainer fee   law.com
                                                                  I can't be a paralegal   @ no reply
③ Sussman & Watkins        (845)294-3991    will represent Ithaca {hotline in   to reduce the fee   disability def
                                                           {super#  no contingency fee
Disability Rights NY        (518)432-7861  (Albany)                    accepted   left a mssge w/ new counc
   pro bono                 Ex.9918 (Evonne.opoku@disabilityrightsny.org)   512-4959 Elizabeth  not impartial   child 2 John
                                                                            fill in intake form John

Jeffrey Hurd       (518)812-1386    expert  albany   Employat discrimination, medical malpractica   cambridge justice (ans #5)
ACLU.              (212) 607-3300   Nyc  no individual cases
Stiskin & Assou.   (914)261-9828    disability specialist. Hv graduate  near NYC  ron@stiskinlaw.com  [police is
                                                                                                   not w/in his specialti
Catharine M.       (888) 352-3751                                                 [has
Phillip Steck      (518)449-3901   Albany, NYS Assembly member, civil rights & Employat lecture to bar speek   Hv gabate
                   618-4082         {too many cases to handle -can't take a new case now 1/13/06   (ans #5)
Kevin Luibrand     (518) 783-1100   Albany suburb.  Civil Rights, police misconduct, education employat. abk   (not disability)
sonny Dolin        (585)292-0540   Rochester (2.5 h to Binghamton, 1.5 h to Syracuse) disability, employat super#
                                                                                    (2.5hours)   [intake @ #5) (#4:20pm
adam Thomas            "           # (?)   1-day at disability discrimination.                 Joyce left a mssge on 1/1
michael Linye          "           "       Employat discrimination, Corvell update. (Ed Lang)  will call back 4 in 24-48
Fred Cook              "           "       "                              retaliation.          hrs
TC)
Stoll, Glickman & Bellina    718-852-3710    Police misconduct. gov't tort liability  free consultation
                              349-694-5909    Civil rights. Brooklyn   Can't sue in upstate

Maduegbuna Cooper.           212-232.0155    civil rights. employat {disability discrimination  ans #5
                                                                  {mental                distance problem

Jason Rozger                 (212)509-1616 Ext 13   info@ nyemployeelaw.com  super#  employat discrimination, disability
                                                                           ans #5                national

Andrew Miltenberg           (212)736-4500    {false sexual harassment allegations @ univ., super #, yet business oriented
                                              (specialize in)   will call back

Michael Jaffe               (212)227-1212    super #, police brutality?) won't serve Ithaca

entry for Court Rights                        won't take individual cases



                            Prabal
                            Buttler
   914 434 2966

EXHIBIT 12

# SUSSMAN & WATKINS

## *- Attorneys at Law -*

| | | |
|---|---|---|
| MICHAEL H. SUSSMAN | 1 RAILROAD AVE. - SUITE 3 | PARALEGALS |
| CHRISTOPHER D. WATKINS | P.O. BOX 1005 | JONATHAN R. GOLDMAN |
| MARY JO WHATELEY | GOSHEN, NEW YORK 10924 | AARON FERRI |
| MICHAEL A. DEEM | | |
| AMY M. ATTIAS | | LEGAL ASSISTANTS |
| | (845) 294-3991 | SONNIA MORSTATT |
| | Fax: (845) 294-1623 | GERRY PRESCOTT |
| | sussman1@frontiernet.net | DONALD BUCKNER |

January 12, 2014

Tomo Shibata
700 Warren Road
Apt 20-1B
Ithaca, NY 14850

**RE: Intake Form Response**

Dear Ms. Shibata:

Upon review of the Intake Form you have submitted to our office, we are informing you that we are not able to represent you in the matter for which you are requesting assistance. We are not commenting on the case and this decision does not necessarily reflect the merit of your claim.

Please seek legal assistance elsewhere if you still feel you have a legal claim. You can contact your local county Bar Association for assistance in finding an attorney.

Sincerely,

Michael H. Sussman

MHS/glp

If checked, please respond to one of our offices

| | | | |
|---|---|---|---|
| ☐ 145 Main St. - 2nd Floor | ☐ 11 Fowler St. | ☐ 159 Canal St. | ☐ 142 Main St. |
| Ossining, NY 10562 | Port Jervis, NY 12771 | Ellenville, NY 12428 | Liberty, NY 12754 |
| (914) 236-3610 (ph) | (845) 294-3991 | (845) 294-3991 | (845) 294-3991 |
| (914) 236-2308 (fax) | | | |

# RE: question about the statute of limitation

| | |
|---|---|
| From | **Tomo Shibata** <revival@hush.com> |
| To | **Ashlee Cherry** <ac@pasternaklaw.com>, **amanda** <amanda@pasternaklaw.com>, **lb** <lb@pasternaklaw.com> |
| Sent | Sunday, September 11, 2016 at 12:40 PM |
| Encrypted | No |
| Signed | No |

Dear Ms. Cherry,

Thank you for your prompt reply. During the phone interview held on 9/8/16, I remember that the intake person stated that her name is Ashlee. Now reading this email message, I notice that your name is Ashlee. Right after the phone interview, I called back the number "Ashlee" called from and talked with another staffer, a gentleman, whose email address is included in the CC section (Mr. Bukhari). I stated that I have a question to ask concerning the legal information I received from the intake staffer during the interview with her, which took place within one hour. I believe I stated that she stated that her name is Ashlee and that she is a current student at the University of California Hasting Law School. Mr. Bukhari stated that the intake staffer's name is indeed Amanda, which is different from the name I heard during the intake phone interview. Mr. Bukhari then gave me Ms. Amanda Collins' email address to which I may send my question. I shall address my question to the intake staffer with whom I did indeed have the intake interview. Are you indeed the person who called me at (916)620-0921 to have an intake interview around 3:00 p.m. on 9/8/16?

Amanda,

Hello. Would you mind sending an email confirmation that you are not the person whom I had an intake phone interview around 3:00 p.m. on 9/6/16?

Thank you,
Tomo Shibata

On 9/9/2016 at 12:14 PM, "Ashlee Cherry" <ac@pasternaklaw.com> wrote:

> I apologize; I believe this email was sent to me in error, and was meant for my colleague Amanda
> Collins. We have the same initials, and so email mix-ups happen from time to time. Her email
> address is amanda@pasternaklaw.com. I have forwarded your message to her, but just wanted to let
> you know.

> Sorry for the confusion.

> Sincerely,

> Ashlee

> **From:** Tomo Shibata [mailto:revival@hush.com]
> **Sent:** Thursday, September 08, 2016 4:13 PM
> **To:** Ashlee Cherry <ac@pasternaklaw.com>

**Cc:** Layth Bukhari <lb@pasternaklaw.com>
**Subject:** question about the statute of limitation

Dear Ms. Collins,

Hello. We just had an intake phone interview this afternoon on Sept 8th, 2016. You mentioned that the time the university stated that I would be permanently banned from employment is when the clock starts with respect to the statute of limitation, as opposed to my understanding that the statute of limitation does not exist since I am banned from employment *permanently*. Could you please let me know any statute, case law or any other authoritative citation regarding your interpretation of the statute of limitation, if you know it off hand? If not, could I receive the information from an attorney?

Thank you,
Tomo Shibata

# RE: Request for Legal Representation

| From | **Tomo Shibata** <revival@hush.com> |
|------|-------------------------------------|
| To | **Danny Garza** <danny@markmerin.com> |
| Sent | Tuesday, September 6, 2016 at 4:00 PM |
| Encrypted | No |
| Signed | No |

Thank you.

On 9/6/2016 at 8:36 AM, "Danny Garza" <danny@markmerin.com> wrote:

> Ms. Shibata,
>
> To my knowledge, the only information put in front of Mr. Merin was the information you sent us and I have no indication that any other information was considered.
>
> Sincerely,
>
> Danny Garza
>
>
> **From:** Tomo Shibata [mailto:revival@hush.com]
> **Sent:** Friday, September 02, 2016 3:25 PM
> **To:** Danny Garza
> **Subject:** RE: Request for Legal Representation
>
>
> p.s. Could I please ask if you, anyone else in Mr. Merin's office or Mr. Merin himself received any information concerning my case over the phone or other methods of communication other than what is described in my email below for Mr. Marin to make the denial decision on my complaint? I ask this question just in case, mainly because sometimes my organized stalkers make phone calls and send email messages impersonating me for sabotaging purposes. Please let me know if the email message of mine below dated 8/29/16 is the only source of information concerning my complaint, on which Mr. Marin made the determination. Than you. Tomo Shibata
>
> On 9/2/2016 at 2:21 PM, "Danny Garza" <danny@markmerin.com> wrote:
>
> Dear Ms. Shibata:
>
>       Thank you for calling our office regarding the wording of our last correspondence. I apologize for the mistake and the reference to sexual assault. While replying to another intake request, I must have mixed up our response to you with a different email address.
>
>       Although, I did mix up the response, the same general message was meant for you as well, and unfortunately, Mr. Merin has determined that he is not in a position to represent you at this time. I can assure you that he did review your file personally and came to the decision to decline to represent. Mr. Merin is the only one who determines which clients to approve and decline. I only organize the request for his review and contact those requesting representation with Mr. Merin's decision. I am not an attorney and I have no say in the decision, nor do I know the reasons behind the decisions.
>
>       As stated in the original correspondence, Mr. Merin's decision is not meant to reflect on the merits of your claims and is not meant to discourage you for further action or seeking other counsel. If you decide to seek other counsel, you should do so immediately to determine the appropriate statute of limitations and the extent of your rights and obligations.

As promised in our phone conversation, I will be leaving a message for Mr. Merin regarding your request to speak to him personally. The phone number I have for you is 916-620-0921. I sincerely apologize for the mix up and confusion it may have caused.


Sincerely,


Danny Garza

Legal Assistant


---

**From:** Danny Garza
**Sent:** Thursday, September 01, 2016 2:55 PM
**To:** 'Tomo Shibata'
**Subject:** Request for Legal Representation


Dear Tomo Shibata:

This letter confirms receipt of your email dated August 29, 2016 in which you outlined your legal issues regarding sexual assault.


In response, I determined that I am not in a position to assist you with this matter. My decision did not involve consultation with any experts, is not meant to reflect on the merits of any potential claim you may have, and is not intended to discourage you from further action.


In that regard, certain statutes of limitations apply with respect to any legal action you may wish to pursue. Since I possess only a limited amount of information concerning the nature of your problem, I am not able to advise which, if any, statutes may apply. Should you decide to proceed with this matter, you should immediately consult with another attorney to determine the appropriate statute of limitations, and the extent of your rights and/or obligations to this matter.


We appreciate your having contacted us; however, we regret we cannot presently assist you with this matter. In the future, please keep us in mind should you require an attorney to assist you with another matter.

Very truly yours,

LAW OFFICE OF MARK E. MERIN


Mark E. Merin

**From:** Tomo Shibata [mailto:revival@hush.com]
**Sent:** Monday, August 29, 2016 1:04 AM
**To:** Inbox
**Subject:** request for legal representation

Dear Mr. Merin,

Hello. I am one of the victims of organized stalking and harassment perpetrated by the local police, law enforcement contractors (plausibly partially paid by a university against which I have constitutional civil rights violation complaint as described below) and other clandestine parties operating separately from the aforementioned parties. I am concurrently a victim of ongoing organized torture defined as the following:

"Organized torture" means a knowing and willful course of conduct directed at a specific person that inflicts extreme or cruel pain or suffering by non-impulsively, calculatedly and clandestinely inflicting grave bodily injury. Such injury is mostly invisible and/or often seems prima facie naturally occurred, and inflicted in such sophisticated and diverse methods as to render the victim's torture complaint resemble delusional or paranoid. A criminal organization often centrally coordinates such torture for such purposes as discrediting the victim, who filed a civil or criminal complaint against a member or an associate of the criminal organization; discrediting a crime witness; discrediting a whistleblower; punishing the victim for the act s/he committed; coercing the victim; gaining sadistic pleasure; and/or for any reason based on discrimination of any kind. In lieu of abducting the victim, which results in the sudden disappearance of the victim and naturally raises law enforcement's suspicion, organized stalking is used to keep the victim under the control of the criminal organizations.

The vast majority of attorneys decide not to represent a victim of this particular human rights violation, fearing that they would be ostracized by their peers.

I will be grateful if you could represent me in my prospective lawsuit against Cornell University, who once bared me from its campus by giving me a false reason, rescinded my academic appointments I have had and then declared that the university would principally indefinitely refuse to employ me. The university took such actions after the university police had received crime allegations against me as well as my complaints of organized stalking and torture, which started shortly after I had filed police reports against those who are possibly the mafia associates' family members. The police then stated that these organized stalking and torture complains I had filed were delusional. Conversely, I have never been informed of the nature or cause of the crime allegations filed against me or been confronted with the witnesses. Shortly afterward, the organized stalking harassment by the university police, the local police and eventually law enforcement contractors had started, of which I have collected colossal video-recording evidence. Some other "community policing agents" such as ambulances, security companies, local hospitals, school buses, and fire-fighters, joined organized stalking harassment operations, which has been continuing even after I moved from New York to California (currently living in Sacramento). Such clandestine and sophisticated organized stalking harassment includes such acts as home intrusions while I am away from home, the clandestine installation of video and audio recording devises during these home intrusions, the installation of a GPS and an audio/video recording devise in my car, the police and other emergency vehicles showing up often with sirens and flashing lights in front of me constantly while I am out on the street on a daily basis, email and phone interceptions (certainly including this email), among others. By intercepting emails and phones and thus identifying which attorney I contact to request legal representation, law enforcement (and its contractors) manipulates an attorney whom I seek representation into not assist me (though sending subliminal messages to the attorney as well as convincing those with whom the attorney interacts to prompt the attorney not to help me), among others.

Please note that there exists complete immunity surrounding an act of filing a false police report against a person who is perceived to be mentally ill and refuses psychiatric treatment. It is because the police's "mentally ill offenders' squad" customarily places such a "delusional" person under active "informal" probation and harassment, without going through a criminal court proceeding at all. Therefore, such a "delusional" person is deprived of any and all constitutional rights to defense. The majority of "targeted individuals," the victims of organized stalking and torture, complain about being subjected to false crime complaints of which these victims are never even informed. Such organized perjury is coordinated by a criminal organization in order to sabotage the target's employment and to prompt the police to stalk the target.

Secondly, my proposed litigation can include a mass tort/class action seeking both monetary damage and an equitable relief from the American Psychiatric Association. This class action will move the court to compel the

APA to emend the DSM-5 to acknowledge the existence of organized stalking and organized torture as well as demand a monetary compensation for systematically instructing psychiatrists to misdiagnose organized stalking and organized torture victims and thereby negligently endangering these victims. Otherwise, organized stalking and organized torture victims will continue to be misdiagnosed as delusional/paranoid schizophrenic who refuse psychiatric treatments.

I would like to pay the representation fee on a contingency basis (such as 30%) without any retainer fee if possible. Otherwise, I should be able to pay a modest retainer fee if necessary.

For further reference, please find attached a legislative bill proposal titled "the Organized Torture Act" to the California state legislature, which includes an analytical report on organized torture and a proposed bill text. Please do not feel obliged to read this lengthy document as it is for an information purpose only.

Please let me know if you consider yourself having a conflict of interest in this proposed case given that you are a graduate of Cornell University.

I look forward to hearing from you.

Sincerely,
Tomo Shibata

# RE: request for legal representation

| | |
|---|---|
| From | **Mike Baller** <mballer@gbdhlegal.com> |
| To | **Tomo Shibata** <revival@hush.com> |
| Sent | Thursday, September 8, 2016 at 6:30 PM |
| Encrypted | No |
| Signed | No |

I cannot represent or otherwise help you.


Sent from my Verizon Wireless 4G LTE smartphone


-------- Original message --------
From: Tomo Shibata <revival@hush.com>
Date: 09/08/2016 6:01 PM (GMT-08:00)
To: Mike Baller <mballer@gbdhlegal.com>
Subject: request for legal representation

Dear Mr. Ballar,

Hello. I am a victim of organized stalking and harassment perpetrated by the local police, law enforcement contractors (plausibly partially paid by a university against which I have constitutional civil rights violation complaint as described below) and other clandestine parties operating separately from the aforementioned parties. I am concurrently a victim of ongoing organized torture defined as the following:

"Organized torture" means a knowing and willful course of conduct directed at a specific person that inflicts extreme or cruel pain or suffering by non-impulsively, calculatedly and clandestinely inflicting grave bodily injury. Such injury is mostly invisible and/or often seems prima facie naturally occurred, and inflicted in such sophisticated and diverse methods as to render the victim's torture complaint resemble delusional or paranoid. A criminal organization often centrally coordinates such torture for such purposes as discrediting the victim, who filed a civil or criminal complaint against a member or an associate of the criminal organization; discrediting a crime witness; discrediting a whistleblower; punishing the victim for the act s/he committed; coercing the victim; gaining sadistic pleasure; and/or for any reason based on discrimination of any kind. In lieu of abducting the victim, which results in the sudden disappearance of the victim and naturally raises law enforcement's suspicion, organized stalking is used to keep the victim under the control of the criminal organizations.

I will be grateful if you could represent me in my prospective lawsuit against Cornell University, who once bared me from its campus by giving me a false reason, rescinded my academic appointments I have had and then declared that the university would principally indefinitely refuse to employ me. The university took such actions after the university police had received crime allegations against me as well as my complaints of organized stalking and torture, which started shortly after I had filed police reports against those who are possibly the criminal group associates' family members. The police then stated that these organized stalking and torture complains I had filed were delusional.

Conversely, I have never been informed of the nature or cause of the crime allegations filed against me or been confronted with the witnesses. Eventually, a person in Ithaca, whom I offered free housing help, told me that he heard from the local drug dealers that they gave free illegal drug to Cornell students, and, in return, these students filed false police reports against me (I did not know when I helped him that this person had drug dealer acquaintances).

Shortly afterward, the organized stalking harassment by the university police, the local police and eventually law enforcement contractors had started, of which I have collected colossal video-recording evidence. Some other "community policing agents" such as ambulances, security companies, local hospitals, school buses, and fire-fighters, joined organized stalking harassment

operations, which has been continuing even after I moved from New York to California.

Such clandestine and sophisticated organized stalking harassment includes such acts as home intrusions while I am away from home, the clandestine installation of video and audio recording devises during these home intrusions, the installation of a GPS and an audio/video recording devise in my car, the police and other emergency vehicles showing up often with sirens and flashing lights in front of me constantly while I am out on the street on a daily basis, email and phone interceptions (certainly including this email), among others. By intercepting emails and phones and thus identifying which attorney I contact to request legal representation, law enforcement (and its contractors) manipulates an attorney whom I seek representation into not assist me (though sending subliminal messages to the attorney as well as convincing those with whom the attorney interacts to prompt the attorney not to help me), among others.

Please note that there exists complete immunity surrounding an act of filing a false police report against a person who is perceived to be mentally ill and refuses psychiatric treatment. It is because the police's "mentally ill offenders' squad" customarily places such a "delusional" person under active "informal" probation and harassment, without going through a criminal court proceeding at all. Therefore, such a "delusional" person is deprived of any and all constitutional rights to defense. The majority of "targeted individuals," the victims of organized stalking and torture, complain about being subjected to false crime complaints of which these victims are never even informed. Such organized perjury is coordinated by a criminal organization in order to sabotage the target's employment and to prompt the police to stalk the target.

Secondly, my proposed litigation can include a mass tort/class action seeking both monetary damage and an equitable relief from the American Psychiatric Association. This class action will move the court to compel the APA to emend the DSM-5 to acknowledge the existence of organized stalking and organized torture as well as demand a monetary compensation for systematically instructing psychiatrists to misdiagnose organized stalking and organized torture victims and thereby negligently endangering these victims. Otherwise, organized stalking and organized torture victims will continue to be misdiagnosed as delusional/paranoid schizophrenic who refuse psychiatric treatments.

I would like to pay the representation fee on a contingency basis (such as 30%) without any retainer fee if possible. Otherwise, I should be able to pay a modest retainer fee if necessary.

I look forward to hearing from you.

Sincerely,
Tomo Shibata
2306 Capitol Ave. Apt. 2
Sacramento, CA 91856
Mobile: (916)620-0921

# RE: Findlaw FirmSite Message From www.hadsellstormer.com

| | |
|---|---|
| From | **HSR Intake** <intake@hadsellstormer.com> |
| To | **revival** <revival@hush.com> |
| Sent | Thursday, September 8, 2016 at 1:58 PM |
| Encrypted | No |
| Signed | No |

This office will not be able to take your case. You may want to consult with other attorneys. We do not respond to any subsequent communications directed to us. The fact that we cannot represent you does not reflect upon the merits of your case. You should be reminded that all cases have statutes of limitations that limit the amount of time within which a lawsuit may be brought.

# Request for Legal Services Re: request for legal representation

| | |
|---|---|
| From | **Intake Dept.** <hope@pypesq.com> |
| To | **revival** <revival@hush.com> |
| Sent | Wednesday, September 7, 2016 at 4:34 PM |
| Replied | Yes |
| Encrypted | No |
| Signed | No |

Thank you for contacting me. I am on sabbatical until December 31, 2016. Our office will be closed during this time. We will review your information and try to send you a referral list of other attorneys who may be able to assist you. In the meantime, you should IMMEDIATELY contact another attorney to obtain legal representation. You should be aware that there are strict time limits within which you must act in order to protect your rights in this matter. These time limits are complex and vary for different types of legal actions. YOU SHOULD ACT IMMEDIATELY IF YOU WISH TO PURSUE THIS MATTER. Thank you for considering my Firm. I regret that we could not take your case, and hope that your issue will either be resolved in your favor or you will be able to find another attorney to represent you.

--
Pamela Y. Price
Attorney at Law
Law Offices of Pamela Y. Price
Airport Corporate Centre
7677 Oakport Street, Ste. 1120
Oakland, CA 94621
hope@pypesq.com
www.pypesq.com

Phone: (510) 452-0292
Fax: (510) 452-5625

*"Injustice anywhere is a threat to justice everywhere." -- Martin Luther King, Jr.*

*Have you seen our brand new website? Check out our new site at pypesq.com and Pamela's blog at pamelaspage.com!*

This communication and the information contained herein is confidential and privileged by among other doctrines, the attorney-client, attorney work product and privacy privileges. If you are not the intended recipient of the communication, please take the following steps: immediately 1) notify Attorney Pamela Y. Price by email and phone that you have inadvertently received the communication; and 2) delete the communication from your email folder, hard drive, server and/or any other means by which the communication is stored on your behalf. Thank you.

# Non Representation Notification

| | |
|---|---|
| From | **PC Intakes** <intakes@civilrightsca.com> |
| To | **revival** <revival@hush.com> |
| Sent | Friday, September 9, 2016 at 1:23 PM |
| Encrypted | No |
| Signed | No |

Unfortunately, we are not able to offer you representation at this time.

Although we cannot represent you in this matter, there may be other attorneys who would take your case. You may be able to locate an attorney using Findlaw or by checking with your local bar association. You can also call the California State Bar Referral at 888-643-9774.

We wish you the best.

--

## CALIFORNIA CIVIL RIGHTS LAW GROUP

407 San Anselmo Avenue, Suite 201, San Anselmo, CA 94960

SF: (415) 453-4740

OAK: (510) 978-4880

SJ: (408) 471-6914

Fax: (415) 785-7352

www.CivilRightsCA.com

DISCLAIMER: This e-mail message is intended only for the personal use of the recipient(s) named above. This message may be an attorney-client communication and as such privileged and confidential. If you are not an intended recipient, you may not review, copy or distribute this message. If you have received this communication in error, please notify us immediately by e-mail and delete the original message.

# Legal Inquiry

| | |
|---|---|
| From | **Hannah Cole** <hcole@altshulerberzon.com> |
| To | **revival** <revival@hush.com> |
| Sent | Friday, September 9, 2016 at 5:53 PM |
| Replied | Yes |
| Encrypted | No |
| Signed | No |

Thank you for your legal inquiry.  Unfortunately, our firm is unable to represent you. We receive many requests for representation, and are unable to accept most of these requests. Our decision not to represent you does not reflect an assessment of the merits of your case, and you should consult other attorneys who may wish to represent you in this matter.

Sincerely,

Hannah Cole

*Hannah Cole*

*Litigation Assistant*

*Altshuler Berzon LLP*

*177 Post Street, Suite 300*

*San Francisco, CA 94108*

*(415) 421-7151 (telephone)*

*(415) 362-8064 (facsimile)*

*hcole@altshulerberzon.com*

# PUBLIC JUSTICE
## IMPACT. CHANGE.

September 21, 2016

Tomo Shibata
2306 Capitol Ave. Apt. 2
Sacramento, CA 91856

Dear Ms. Shibata:

Thank you for contacting Public Justice. Regrettably, we are unable to offer you legal assistance.

The fact that Public Justice has decided not to accept your case should not be interpreted as an expression of our opinion on the merits of your claims. Given our limited resources, Public Justice can only accept a certain number of cases. We receive substantially more requests for representation than we can accept. You may have very good claims, and I encourage you to continue pursuing them through whatever channels are available to you.

If you intend to pursue this matter in court, we urge you to attempt to obtain an attorney to represent you quickly, as there are often legal time limits on the filing of claims. Because these time limits vary from state to state, we are not in a position to offer you advice on the limits that apply to your situation. However, if you do not file your case within those time limits, you will lose your ability to sue.

We wish you success in resolving this matter.

Sincerely,

*Jennifer Bennett*

Jennifer Bennett
Budd-Kazan Attorney

JB:km
506475

National Headquarters
1620 L Street NW, Suite 630, Washington DC. 20036
(202) 797-8600 phone • (202) 232-7203 fax

West Coast Office
555 12th Street, Suite 1230, Oakland CA. 94607
(510) 622-8150 phone • (510) 622-8155 fax



**ATTORNEYS AT LAW**

❖ Dan Siegel

❖ Alan S. Yee

❖ Jane Brunner

❖ Jose Lúis
   Fuentes

❖ Dean Royer

❖ Peter Haberfeld

❖ Michael Siegel

❖ Kevin Brunner

❖ Vylma L. Ortiz

**OF COUNSEL**

❖ Anne
   Butterfield
   Weills

September 21, 2016

Tomo Shibata
2306 Capitol Avenue
Sacramento, CA 95816

Dear Ms. Shibata:

Thank you for contacting Siegel & Yee regarding your issue. Siegel & Yee has decided not to represent you with respect to this matter. I wish you the best in however you decide to pursue this matter.

Very truly yours,

B. Frank
Assistant



July 21, 2016

**<u>VIA U.S. MAIL</u>**

Tomo Shibata
2306 Capitol Avenue
# 2
Sacramento, CA, 95816

*Re: Your Potential Case*

Dear Tomo Shibata:

Thank you for contacting our firm regarding your potential case. Based upon the information provided, we have decided to decline your invitation to undertake your representation in this matter. Please be advised that our law firm will not be taking any action on your behalf against any potential defendant. If you wish to proceed with any claim or suit, you must contact and retain another attorney or law firm.

This decision to decline your representation on this possible legal claim is not intended as a reflection upon the merits of your case, but rather is a business decision. We encourage you to contact other counsel and to obtain a second legal opinion with respect to your possible claim.

If you decide to proceed with this possible claim, you must act promptly to obtain other counsel as claims and cases must be filed within a statutorily defined time limitations period. We have not determined what limitations period may apply in your case and we stress the need for prompt action on your part if you wish to proceed to ensure that your potential claim is not barred by any applicable statute of limitations.

To repeat, our law firm will not be representing you in this matter and you must retain another attorney or law firm if you wish to proceed with your potential claim.

Yours very truly,

C. Brooks Cutter

CBC/mb

Tomo Shibata
2306 Capitol Ave. Apt. 2
Sacramento, CA 95816
Telephone: (916)620-0921
Fax: (916)668-7065
Email: revival@hush.com
*Plaintiff*

# UNITED STATES DISTRICT COURT

# EASTERN DISTRICT OF CALIFORNIA

|  |  |
|---|---|
| Tomo Shibata,<br><br>    Plaintiff,<br><br>  v.<br><br>G4S Secure Solutions (USA) Inc. et al.,<br><br>    Defendants. | No.<br><br>**PLAINTIFF'S MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFF'S INITIAL *EX PARTE* MOTION TO EXTEND THE TIME TO FILE PLAINTIFF'S COMPLAINT PERSUANT TO F.R.C.P. §6(b)(1)(A) AND L.R. 144(c)** |

I.   **Reasonably Accommodating the Permanent Neurological Disability of Parental Child Incestuous Abuse Survivor Plaintiff Tomo Shibata as Per the Judicial Conference Policy**

Clinical Psychology Professor Judith Herman, who has treated 40 child incestuous abuse survivors states that those who were sexually abused as children by their parents are abused as adults in a wide variety of ways, both sexually and non-sexually. JUDITH HERMAN, FATHER-DAUGHTER INCEST (Harvard University Press 1981), 31, 224, 226. Traumatic damage to the growing brain and psyche of the victimized children caused by child incestuous abuse (by

parents) results in various permanent invisible neurological disabilities, such as the survivors' cognitive inability to detect and avoid dangerous situations in interpersonal relations. JUDITH HERMAN, TRAUMA AND RECOVERY (Basic Books 1992), 111. DIANA RUSSELL, THE SECRET TRAUMA: INCEST IN THE LIVES OF WOMEN AND GIRLS (Basic Books 1986), 168. According to Sociologist Diana Russell's survey, women who were sexually abused by their fathers during childhood are subjected to sexual and physical violence at least twice more than women who were not abused in such manner during childhood. RUSSELL, THE SECRET TRAUMA, 161.

Those who victimize the (adult) survivors of child abuse perceive the survivors' invisible neurological disabilities as defenselessness and "weakness" and consequently intentionally choose those with such disabilities for exploitation and abuse. It is further plausible that these predators assume that such cognitive/neurological disabilities cause those with such disabilities to dysfunction and fail in the pre-litigation and the litigation processes. The child sexual abuse survivors are highly susceptible to a wide range of exploitation and abuse, such as sexual, physical and financial abuse, plausibly because the perpetrators consciously and/or unconsciously assume impunity in exploiting those with such permanent neurological disabilities, including parental child incestuous abuse survivors.

Due to the *permanent* nature of the child incestuous abuse survivor's disabilities, such disabilities invariably exist when the right of action accrues as required for the tolling of action as per Section 357 of the California Code of Civil Procedure. If the court does not reasonably and procedurally accommodate the child abuse survivors' such disabilities, the prevalent phenomenon of "re-victimization," where these survivors are subjected to a wide range of abuse and exploitation, perpetually for the rest of the survivors' life, will continue. Therefore, without such reasonable accommodation by the Court, the child incestuous abuse survivors as a class of

people will be systematically deprived of the rights to due process and the equal protection of law under the 5th Amendment of the U.S. Constitution. Kenneth Karst, The Fifth Amendment's Guarantee of Equal Protection, 55 N.C.L. Rev. 540 (1977). Therefore it is in the significant public interest that the court reasonably accommodates the permanent invisible neurological disabilities of the child sexual abuse survivors as per the Judicial Conference Policy, in order to prevent the profoundly unjust social phenomenon of re-victimization.

The U.S. District Court for the Northern District of New York granted Plaintiff Tomo Shibata's Motion to Extend the Time for Service, which was filed after the statutory deadline for serving the summons and the complaint. Shibata et al. v. Swingle, et al., No. 3:16-CV-1349 (N.D.N.Y. filed Nov. 14, 2016). The deadline for the service was January 13, 2017 as per General Order 25 of the U.S. District Court for the Northern District Court of New York, and February 12, 2017, as per Rule 4 (m) of the Federal Rule of Civil Procedure. Upon Plaintiff's motion, the said court extended the deadline till May 22, 2017, thereby extending the time by over 120 days with respect to the General Order and over 90 days with respect to F.R.C.P. Exhibit 1. Plaintiff Tomo Shibata expressly stated in Plaintiff's Status-Report Affidavit and Memorandum of Law in Support of Plaintiffs' Motion to Extend the Time for Service in the said case that the intent of this motion is to establish a precedent on the court's reasonable accommodation of the disabilities of the survivors of child incestuous abuse in order to end the profoundly unjust prevalence of the perpetual re-victimization of such survivors.

## II. Pursuant to the California Civil Code Section 354.8(a)(1)(A), the 10-Year Statute of Limitations Applies to Any Civil Claim of Plaintiff Tomo Shibata as an Ongoing Organized Torture Victim

The Torture Victim Protection Act of 1991 (28 USC Section 1350 Note) recognizes the physiologically, neurologically and psychologically incapacitating effects of torture and thus allows ten years of statutes of limitation for torture claims. Moreover, equally recognizing the incapacitating and traumatizing effects of torture, Section 354.8(a)(1)(A) of the California Civil Code intends to enable a torture victim to exercise her constitutional right to the equal protection of law, concerning not only her torture claim itself but also all other claims (committed even by the third party) accrued while being tortured and within 10 years after the torture ends. A.B. 15 (Cal. 2016). Telephone Interview with Catherine DelRosario, Senior Legislative Aide of Assembly Member Chris R. Holden, Cal. State Assembly (Oct. 14, 2016). Section 354.8(b) of the Civil Code allows the retroactive enforcement of this statutory provision to all the claims that accrued before the enactment of this statute on January 1, 2016 as long as such civil actions are commenced after the enactment date as per Section 354.8(e) of the Civil Code. Therefore, the 10-year statute of limitations set forth in Section 354.8(a)(1)(A) of the California Civil Code shall be applied to the statute of limitations of any and all civil claims of the California resident Plaintiff as an ongoing victim of organized torture.

However, the discovery and trial processes are principally required to prove that Plaintiff has been a victim of organized torture given the largely invisible and covert nature of organized torture as stated in Plaintiff's Affidavit in Support of Plaintiff's Initial *ExParte* Motion to Extend the Time to File Plaintiff's Complaint Pursuant to F.R.C.P. §6(b)(1)(A) AND L.R. 144(c). Therefore, at this pre-discovery stage of the proceeding, Plaintiff has only minimum resources to prove her torture victim status.

Hypothetically, if the Court eventually denies the application of the 10-year statute of limitations prescribed by Cal. Civ. §354.8(a)(1)(A) to Plaintiff's claims set forth in the

forthcoming Complaint of Plaintiff, Plaintiff respectfully moves the Court to extend the time for filing the Complaint on the aforementioned ground of permanent disability caused by parental child incestuous abuse victimization. Yet, Plaintiff will also request to substantially extend the preexisting statute of limitations period (such as tripling the preexisting limitations period) at least for the proven child incestuous abuse survivors, in order to end the prevalent and frequent re-victimization of these survivors in the forthcoming Complaint.

### III.  The Cause of Action Pertaining to Plaintiff's Motion to Extend Time to File Plaintiff's Complaint

Asian Studies Professor Bret de Bary at Cornell University drafted written employment contract in the forms of 1) the statement of Plaintiff's work description and skill level; and, later, 2) the final appointment letter signed and dated 11/30/2011 to hire Plaintiff as a researcher at the Asian Studies Department, Cornell University, between 1/20/2012 and 5/30/2012. Exhibit 2. Professor de Bary stated to Plaintiff on 2/1/2012 that, due to the complaints filed against Plaintiff at Defendant CUPD, Defendant Cornell did not allow Professor de Bary to employ Plaintiff, thereby arguably constituting Defendant Cornell's total breach of the written employment contract by anticipatory repudiation as per Restatement (Second) of Contracts § 253(1).

Please note that Plaintiff had a telephone intake to file an employment discrimination complaint based on psychological disability against Cornell University at the Tompkins County Human Rights Commission in Ithaca, NY, on 4/25/2012. Exhibit 3. On 5/13/12, Plaintiff had an initial interview with Human Rights Commission Director Shawn Martel Moore, and Director Martel Moore drafted the Opening Memorandum on the same day. Exhibit 4 (please note that there is an error in the Opening Memorandum: the basis of Plaintiff's complaint is not

arrest/conviction but disability). On 6/8/2012, Plaintiff signed a verified complaint drafted by the Human Rights Commission. Exhibit 5. Director Martel Moore's letter served to Cornell University's Office of University Counsel, along with the said verified complaint, is also dated 6/8/2012. Exhibit 6.

On 10/17/13, new Human Rights Commission Director Karen Baer dismissed Plaintiff's complaint without prejudice due to the lack of jurisdiction. Exhibit 7. The equitable tolling doctrine applies "when an injured person has several legal remedies and, reasonably and in good faith, pursues one." Elking v. Derby (1974) 12 Cal. 3d 410, 414 The California Supreme Court further notes: "The primary purpose of the statute of limitations is normally satisfied when the defendant receives timely notification of the first of two proceedings." Elking v. Derby 12 Cal. 3d at p.417, fn.3. Further, Section 4 of the California Code of Civil Procedure declares the liberal construction of the provisions and all proceedings under the Code. Therefore, the date Plaintiff started to actively pursue her judicial remedies by first filing the oral pleading at the Human Rights Commission during the initial interview, which was then recorded as the Opening Memorandum by the Commission, is plausibly the date the statute of limitations should toll.

However, if the Court decides that the statute of limitations due to Plaintiff's complaint pending at the Human Rights Commission tolled when Plaintiff executed the verified complaint drafted by Human Rights Commission Director Martel Moore on 6/8/2012, then 6/10/2017 is the deadline for the cause of action based on the total breach of employment contract in violation of public policy (the deprivation of Plaintiff's right to employment at Cornell without the due process of law, proscribed by the 14th Amendment of the U.S. Constitution, in particular). If the Court decides that 6/8/2012 is the date the statute of limitations tolled, then Plaintiff hereby respectfully moves the U.S. District Court for the Eastern District of California to extend the

filing deadline till September 8, 2017 (90 day extension).

Nonetheless, Plaintiff argues, at least tentatively, that the cause of action as to the total breach of written employment contract is a mere alternative to the principal, primary cause of action against Defendant CUPD, Defendant Cornell, Defendant G4S and other relevant Defendants' (such as local criminal law enforcement agencies including those in Sacramento), under the 14th Amendment of the U.S. Constitution, namely, the said Defendants' concerted *continuous* deprivation of Plaintiff's liberty, including Plaintiff's right to privacy (continuing to this date, in California), without the due process of law. Plaintiff's forthcoming Complaint will explain numerous grounds for the tolling and the non-commencement of the statute of limitations for the primary cause of action against the said Defendants. Plaintiff will further set forth causes of action against the said Defendants other than the said 14th Amendment violation, that are not mere alternatives to the said primary cause of action.

Dated: Sacramento, California

June 9th, 2017

By: _____

Tomo Shibata, Plaintiff

MEMORUNDAM OF LAW TO EXTEND TIME

EXHIBIT 1

**Other Orders**

3:16-cv-01349-BKS-DEP Shibata
et al v. Swingle et al

PRO SE

## U.S. District Court

## Northern District of New York - Main Office (Syracuse) [LIVE - Version 6.1.1]

### Notice of Electronic Filing

The following transaction was entered on 3/21/2017 at 12:14 PM EDT and filed on 3/21/2017

**Case Name:**        Shibata et al v. Swingle et al

**Case Number:**    3:16-cv-01349-BKS-DEP

**Filer:**

**Document Number:** 13(No document attached)

**Docket Text:**
**TEXT ORDER re [11] MOTION for Extension of Time to File by Tomo Shibata, Yayoi Shibata. The court is in receipt of plaintiffs' response to the court's order to show cause dated March 06, 2017. Dkt. No. 11. Plaintiffs are directed to effectuate service of the summons and complaint on the defendants in accordance with the Federal Rules of Civil Procedure no later than May 22, 2017. Authorized by Magistrate Judge David E. Peebles on 3/21/17. (Copy served via regular mail)(cam, )**

**3:16-cv-01349-BKS-DEP Notice has been electronically mailed to:**

Tomo Shibata      revival@hush.com

Yayoi Shibata     revival@hush.com

**3:16-cv-01349-BKS-DEP Notice has been delivered by other means to:**

EXHIBIT 2

Work Agreement for Tom Shibata
Brett de Bary
Asian Studies Department, Cornell University

Definition of job and skill levels:

1. The appointment is offered to a skilled researcher who can assist me with surveying various primary and secondary materials in Japanese broadly related to my research interests. These areas include Japanese writings in critical theory (especially including gender theory, film theory, intellectual history, literary and media theory, translation theory) which directly or indirectly pertain to my current research projects dealing with the cultural history of *Saakuru mura* (and the work of Morisaki Kazue) and the writings of Tawada Yoko.

2. Specific Tasks: Bi-weekly 45 minute meeting (this may vary depending on other demands on my schedule). The researcher should bring to the meeting a summary (written or oral) of essays or books assigned for that bi-weekly period. The amount of work to be accomplished should be whatever can be read in nine hours per two week period. The meeting time would count as one hour, for a total of 20 hours per month.   $15/hr.

3. If I need more detail on the materials read, I will request translation of specific (limited) portions of the material. Translation time would count towards the 20 hours per month (i.e. replacing the time spent reading).

4. This agreement is on a trial basis for the first month; if successful it runs through May 31, 2012. However, the employment cannot be used by Brett de Bary as a basis for sponsoring a visa, etc.

November 30, 2011

Dear Tomo,

As Sheila Haddad and I have written to you, I am looking forward to working with you as a part-time researcher beginning in the Spring Term, 2012. Your appointment beings on January 20, 20012 and continues until the end of the term, on May 30, 2012.

Brett de Bary
Professor
Asian Studies Department
Cornell University



**Tomo Shibata< tomoshibata1@gmail.com>**

## Thank you, Tomo!

**Brett de Bary**< bmd2@cornell.edu>                    Fri, Dec 16, 2011 at 9:53 AM
To: Tomo Shibata <tomoshibata1@gmail.com>

Dear Tomo, I was able to send my comments to our team's organizer, Professor Hirata, last night. I already heard from her this morning. She could understand everything in the コメント and she said having the comments would really be very useful to the workshop on the 17th. I reread the comments myself, and they read really well! (I am fussy, as you learned.) I couldn't have done it without you! Thank you so much for dropping everything in this emergency, and offering me your help.

I hope you will keep warm and dry over the winter break. Even if you have to stay in Ithaca, Ithaca is very beautiful in the deep winter. Just be sure you bundle up and put a warm sweater under your coat if you need it.

Best, Brett

EXHIBIT 3

TOMPKINS COUNTY
HUMAN RIGHTS COMMISSION
120 West State Street
Ithaca, New York 14850
P: (607) 277 - 4080
F: (607) 277 - 4106

## CASE ACTIVITY

**Complainant: -** Tomo Shibata

TCHR Staff: Shawn Martel-Moore

Joan Bodnar

| Date | Activity Code | Record of Case Activity |
|---|---|---|
| 4/25/12 | IT | Intake |
| 5/3/12 | MT | Initial Interview |
| 5/3/12 | MM | Opening Memo |
| | CF | Complaint Filed |
| | MI | Complainant's Acknowledgement / Receipt of Complaint |
| | MI | Respondent's Notification / Service of Process |
| | LT | TCHRC letter to Respondent, re: Answer |
| | | |
| 3/5/13 | TCF | Respondent, re : request for extension until 4/8/13. Granted. |
| 3/12/13 | TCF | Complainant, re: status update |
| 4/4/13 | TCF | Respondent, re: Request for extension until 4/22 in order to collect documents. Granted. |
| 4/5/13 | MT | Met with Complainant, re : case status. |
| | | |
| | | |
| | | |
| | | |
| | | |

**Activity Codes:**

| | | | |
|---|---|---|---|
| SR – Status Report | IV – Interviewed with | LR – Legal Research Re. | DR – Drafted |
| TCF – Telephone call from | ER – Edited & Revised | TC – Telephone call to | MM – Memo |
| IS – Investigation Summary | FR – Final Report | RQ – Record Request | MT – Met with |
| TCC – Telephone Conference Call | CF – Complaint Filed | AC – Amended Complaint | IT – Intake |
| IP – Investigation Plan | NP – Notification to Parties | CC – Conciliation Conference | LT – Letter to |
| WS – Witness Statements | WT – Witness Transcript | CR – Complainant's Rebuttal | EX – Exhibits |
| RA – Respondent's Answer | RR – Record Release | MR – Medical Release | MI - Miscellaneous |

TCHRC: F-19 (11/99)

**TOMPKINS COUNTY HUMAN RIGHTS COMMISSION
TELEPHONE INTAKE**

First I would like to describe to you what type of cases we cover:

**(1) Subject matter jurisdiction, which includes the following:**

| Credit | Education | Employment | Housing | Public Accommodation |
|--------|-----------|------------|---------|---------------------|
| ☐ | ☐ | [X] | ☐ | ☐ |

**(2) Protected Class Status, which includes the following:**

| Sexual Orientation | Age | Disab. | Gender | N.Origin | Race/ Color | Religion | Arrest/ Conviction |
|--------|-----|--------|--------|----------|-------------|----------|--------------------|
| ☐ | ☐ | [X] | ☐ | ☐ | ☐ | ☐ | ☐ |

| Family | Sexual Harassment | Gender Identity & Expression |
|--------|-------------------|------------------------------|
| ☐ | ☐ | ☐ |

I will need to ask you a series of questions to complete the telephone intake process. If you have any detailed questions, the time to ask would be during the initial interview.

First, are you able to speak with me now? Yes or No

Now, I will need for you to tell me, which subject matter area and protected class status you fall within. Would you like for me to read both categories again?

Note: If they do not fall within one of the above categories, and they wish to proceed, please make appointments anyway.

---

May I please have your

Name:       **Tomo Shibata**

Address:    **P.O. Box 531**

            **Ithaca, NY 14851**

Home #:     **319-0473**

Business #:

1

It would be helpful if you could prepare a written or typed narrative for the initial meeting. Are you able to do this? Yes or No. (If they indicate no, inform them that we will prepare the narrative.)

I would like to schedule an appointment with you in about two weeks. Are mornings or afternoons best for you?

**APPOINTMENT:  Thursday, May 3, 2012 @ 1:00 p.m.**

Can you inform me of the date of the alleged discriminatory act? "DATE ONLY"
**Ongoing for a couple of months**

Where did this happen? "LOCATION ONLY"
**Cornell University**

Do you have a union representative, or does the employer have a grievance process? "YES OR NO"

**-UNION REPRESENTATIVE**
**-GRIEVANCE PROCEDURE**
**-EMPLOYEE HANDBOOK**

Can you take five minutes and give me one example of the alleged discriminatory act? Complainant called Cornell University to inquire about a job and she was told that she is not going to be hired by Cornell University any time soon. Complainant believes is due to her disability.

Intake completed by:              Date:

**Carmen Arroyo**              **April 25, 2012**

2

EXHIBIT 4

# TOMPKINS COUNTY HUMAN RIGHTS COMMISSION
## OPENING MEMORANDUM
(Use Additional Paper As Needed)

FROM:  Shawn Martél Moore
TO:    File
CC:
DATE: May 3, 2012
COMPLAINANT: Tomo Shibata
RESPONDENT: Cornell University, Asian Studies Department

**Subject Matter Jurisdiction: Employment**
**Basis: Arrest/Conviction**

FACTS: On November 20, 2011, Complainant received a job offer from Professor deBarry from the Cornell University Asian Studies Program. In January 2012, Professor deBarry attempted to process Complainant's employment thru human resource department and human resources notified her that she could not be hired. February 1, 2012, 4:00 pm Professor deBarry notified Complainant that she could not hire her due to numerous police reports on file at Cornell University Police Department, and PNG persona non grata. Complainant believed that it expired in 2010. Complainant discussed with Allen Bishop, Human Resources, on or about February 2012, the PNG and complaints. Complainant states she was notified that due to complaints filed at the police department and judging from the complaints that she would not be the appropriate type of person that they would want to work at the university. Complainant is seeking copies of police reports, the expiration date of PNG, she also wanted to know if her picture is circulating with janitorial service b/c she believes she is being watched. Currently, Complainant is allowed on campus and she has audited several classes.

Remedy: Complainant wishes to file a complaint
DEADLINES (ex. statutory): 1/31/13

EXHIBIT 5

## TOMPKINS COUNTY HUMAN RIGHTS COMMISSION

| |
|---|
| (Tompkins County Human Rights Commission On the Complaint of )<br><br>**TOMO SHIBATA,**<br><br>Complainant,<br><br>-v-<br><br>**CORNELL UNIVERSITY,**<br><br>Respondent, |

**VERIFIED COMPLAINT**
**Pursuant to**
**Tompkins County Chapter 92,**
**Anti-Discrimination Local Law No. 6-1991**
**As Amended 2004 (Tompkins County**
**Charter§C-23.01(e))**

**TCHRC No:  ED2012005**

I, Tomo Shibata, residing at 316 Highland Road, Apartment C105, Ithaca, New York 14850, charge the above-named respondent whose address is Office of University Counsel, 300 CCC Building, Ithaca, New York, 14853, with an unlawful discriminatory practice relating to employment in violation of Tompkins County, Chapter 92, Anti-Discrimination Local Law No. 6-1991, as amended by Local Law No. 1-2004 (Tompkins County Charter §C 23.01(e)) on the basis of my perceived disability.

Date most recent or continuing discrimination took place: February 1, 2012.

The Particulars are:

1. I have a perceived disability, because of this, I have been subject to unlawful discriminatory actions.

2. Complainant received an offer of employment on November 20, 2011 from Professor deBarry from Cornell University Asian Studies Program.

3. On or about February 1, 2012, Complainant alleged that Professor deBarry notified Complainant that she could not hire her due to numerous police reports on file at Cornell University Police Department and PNG persona non grata.  Complainant understood that the PNG expired in 2010. Subsequently, Complainant contacted the Human Resources and stated Allen Bishop notified her that "judging from the complaints that she would not be the appropriate type of person that they would want to work at the university."

4. Complainant believes she is being denied access to employment by the records and comments made by the Cornell University Police Department and the Human Resource Department.  Accordingly, she alleges that she was discriminated against on the basis of a perceived disability.

1

Complainant:     Tomo Shii.
Respondent:      Cornell University
TCHRC No.:       ED2012005

     Based on the foregoing, I charge the above-named Respondent with an unlawful discriminatory practice by denying me equal terms, conditions, and privileges of employment due to disability in violation of  Tompkins County, Chapter 92, Anti-Discrimination Local Law No. 6-1991, as amended 2004 (Tompkins County Charter §C 23.01 (c)).

Complainant:     Tomo Shi.
Respondent:      Cornell University
TCHRC No.:       ED2012005

State of New York     ) ss:
County of Tompkins    )

"I have not commenced any other civil or criminal action, nor do I have an action pending before any administrative agency under any other law of this state based upon this same unlawful discriminatory practice."

_____
Tomo Shibata

Tomo Shibata, being duly sworn, deposes and says: that she is the complainant herein; that she has read (or has had read to her) the foregoing complaint and knows the content thereof; that the same is true of her own knowledge except as to the matters therein stated on information and belief; and as to those matters, she believes the same to be true.

_____
Tomo Shibata

Subscribed and sworn to before me this
    7    day of June 2012

_____
Notary Public

SHAWN MARTEL MOORE, ESQ.
Notary Public, State of New York
No. ...
Qualified in Tompkins County
Commission Expires Mar. ...
June 17, 2015

3

EXHIBIT 6

TOMPKINS COUNTY
HUMAN RIGHTS COMMISSION
120 WEST MARTIN LUTHER KING, JR. STREET
ITHACA, NEW YORK 14850
B: 607.277.4080 | F: 607.277.4106
SHAWN MARTEL MOORE, ESQ.

INCLUSION THROUGH DIVERSITY

June 8, 2012

Cornell University
Office of University Counsel
300 CCC Building
Ithaca, New York 14853

**Re:** **Tomo Shibata v. Cornell University**
CASE NO.: ED2012005

Enclosed is a copy of the verified complaint filed with the Tompkins County Human Rights Commission. The complaint alleges an unlawful discriminatory practice in violation of Tompkins County Chapter 92, Anti-Discrimination Local Law No. 6-1991, as Amended 2004, Tompkins County Charter §C 23. The Commission will be conducting the investigation.

This office will conduct a thorough investigation, with a resulting determination as to whether there is probable cause to believe that an act of unlawful discrimination has occurred.

Please submit a response **in duplicate** to each and every allegation in the complaint, complete the enclosed Respondent Information Sheet, and return the response and Information Sheet to the Commission, at the address above, **within fifteen (15) calendar days from the date of this letter.** The Commission will not extend the time for this response, unless good cause is shown in a written application, submitted at least five (5) calendar days prior to the time the response is due. **Failure to respond could result in an adverse finding against you, which would be shard with, among others, the Secretary of the State and the applicable State licensing agencies that govern your business.**

Anyone who willfully resists, prevents, impedes or interferes with an investigation under the Human Rights Law shall be guilty of a misdemeanor punishable by imprisonment, by fine, or by both.

If you have any questions about the process generally, or how to submit your response, please call me at (607) 277-4080.

Sincerely,

Shawn Martél Moore, Esq.

Enclosure:
Verified Complaint
Respondent Contact Information Form

EXHIBIT 7

**TOMPKINS COUNTY Office of Human Rights**

INCLUSION THROUGH DIVERSITY

120 MARTIN LUTHER KING, JR. / W. STATE STREET
ITHACA, NEW YORK 14850
Tel: 607.277.4080   Fax: 607.277.4106

17 October 2013

Tomo Shibata
P.O. Box 531
Ithaca, New York 14850

Case Name: Shibata, Tomo v. Cornell University
Case No.: ED2012005

Dear Ms. Shibata:

This letter is to inform you that the Tompkins County Office of Human Rights has completed a review of the above referenced case.

After a thorough review of the case file and an analysis of the powers delegated by the Tompkins County Legislature to this office for the processing of local discrimination complaints, it has been determined that our agency lacks sufficient jurisdiction to investigate your complaint. Therefore, the claims arising under this complaint are DISMISSED without prejudice. In other words, although our office has closed your case, you may still retain the right to pursue your claim in another forum or court of appropriate jurisdiction.

If you wish to continue seeking a remedy, you may do so by contacting a private attorney; and for this purpose, I have provided for you a lawyer referral service number that you may find helpful.

It is a priority of this office to establish the necessary enforcement mechanisms so that complaints of discrimination are addressed properly and in a fair and timely manner. In the future, if you feel that you have been subjected to a discriminatory act, please do not hesitate to contact us for assistance.

Sincerely,

Karen W. Baer, J.D.
Director of Human Rights

KWB/ca
Enc.

cc:   Nelson E. Roth, Esq.
      Cornell Office of University Counsel, Ithaca